```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                       CASE NO. 14-CR-80067-DPG
 3

 4    UNITED STATES OF AMERICA,            Miami, Florida

 5               Plaintiff,                April 16, 2015

 6    vs.                                  9:34 a.m. to 11:27 a.m.

 7    ELI RIESEL,

 8               Defendant.                Pages 1 to 52
     _____

 9

10                    EXCERPT OF PROCEEDINGS
                         CLOSING ARGUMENTS
11           BEFORE THE HONORABLE DARRIN P. GAYLES
                  UNITED STATES DISTRICT JUDGE

12

13
     APPEARANCES:

14

15    FOR THE GOVERNMENT:      JOSEPH CAPONE, ESQ.
                               ASSISTANT UNITED STATES ATTORNEY
16                             FEDERAL HOUSING FINANCE AGENCY
                               400 7th Street SW
17                             Washington, DC 20024

18
      FOR THE DEFENDANT:       BENEDICT P. KUEHNE, ESQ.
19                             MICHAEL DAVIS, ESQ.
                               LAW OFFICE OF BENEDICT P. KUEHNE, P.A.
20                             100 S.E. Second Street
                               Miami, Florida **

21

22    STENOGRAPHICALLY REPORTED BY:

23                             PATRICIA DIAZ, FCRR, RPR, FPR
                               Official Court Reporter
24                             United States District Court
                               400 North Miami Avenue
25                             11th Floor
                               Miami, Florida 33128
```

1                              (305) 523-5178

2     GOVERNMENT'S CLOSING STATEMENT

3     BY MR. CAPONE                                        3

4     DEFENSE CLOSING STATEMENT

5     BY MR. KUEHNE                                       18
      BY MR. DAVIS                                        38
6

7     GOVERNMENT'S CLOSING STATEMENT

8     REBUTTAL BY MR. CAPONE                              49

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to the order of the Court.)

 2              THE COURT:  Is the Government ready to proceed?

 3              MR. CAPONE:  Yes, Your Honor.

 4              CLOSING STATEMENT

 5              MR. CAPONE:  Your only interest is to seek the truth

 6    from the evidence in the case.  It's true that Mr. Riesel paid

 7    huge incentives to people to buy his condominiums.  It's true

 8    that he paid people to buy his condos.  It's true that the

 9    banks didn't know.  It's true that key facts about Mr. Riesel's

10    incentives were concealed from the banks.  It's true that

11    Mr. Riesel held a mortgage broker's license.

12              In Mr. Kuehne's opening statement to you he told you

13    all about Mr. Riesel's background.  He mentioned his religious

14    training.  He mentioned his family.  He mentioned his work

15    history.  One thing he didn't mention was that his client was a

16    licensed mortgage broker, and it is true that probably the only

17    person in this courtroom right now who held a mortgage broker's

18    license is the defendant.

19              It's true that Mr. Riesel paid cash to close for his

20    buyers, and it's true that he is not allowed to do that.  This

21    is the HUD-1 form for Nora Mayasen.  Ms. Mayasen was supposed

22    to bring $81,000 to her closing of her own money.  Where did

23    that money come from?  Mr. Riesel.  This is a very telling

24    e-mail so it's worth reading out loud.  "Send this ASAP.  We

25    need to take the cash to close for Teran and Leon today.  We
```

1   also have more closings this week.  Let's go.  Nora Mayasen,

2   cash to close, 81,919."  What does Mr. Riesel say in response?

3         "Okay."  He didn't say, let me run this by the lawyer.

4   He didn't say, I can't do this, this is improper.  He didn't

5   say, go talk to Rashmi Airan-Pace.  He said, "Okay."

6         Coralia Rocha, $75,000.  Hanoy Leon, 78,000.  Mileydis

7   Teran, $62,000.  All of this money was paid by Mr. Riesel for

8   their cash to close.  Osmer Orta, Eduardo Menendez both cash to

9   close.  Here is the wires that came in to pay for their cash to

10  close.

11        Ms. Morales, $69,000 cash to close.  You already

12  advanced.  Mr. Riesel paid the cash to close for these buyers.

13  This is a spreadsheet that Mr. Riesel sent to Ernesto Rodriguez

14  May 27th of '08.  Look at the amount of money these buyers are

15  getting.  Jason Porterfield bought a condominium unit for

16  $339,000.  How much did Mr. Riesel pay him to buy that unit?

17  Over $97,000.  Do you think the banks needed to know about

18  that?

19        Porterfield, another unit for 339,000.  Mr. Riesel paid

20  him over $101,000 to buy that condo unit and he still made a

21  profit.

22        Nelson Montano bought a unit for 325,000.  He got back

23  $81,000 and on and on and on.  Look at all the Porterfield

24  units.  Mr. Porterfield bought five units and got back around

25  100 grand on each unit that he bought and Mr. Riesel made a

1    profit on each one.

2         In his opening statement, Mr. Kuehne told you that

3    Mr. Riesel did not initiate or orchestrate this scheme.  The

4    evidence shows that he was the maestro of the scheme.  This was

5    his money he was giving away, his money, not somebody else's

6    money.  If he doesn't give it to the buyer, he gets to keep it.

7    But, of course, the whole purpose for the scheme was if you

8    don't give the buyer the money, you can't sell the unit.  The

9    person who makes the decisions about who gets the money was

10   Mr. Riesel, nobody else.

11        Ms. Ende Tobel told you that on occasions her realty

12   company, E3, fronted the cash to close.  That means she put it

13   up and got reimbursed for it, and here is one of those

14   instances.  This is Guy Salveta who bought a unit in

15   Kensington.  Here in this e-mail Ms. Tobel lays out all the

16   details of the deal, the purchase price of the condo, the

17   design credit, which is another word for the money that

18   Mr. Riesel was giving to the Salvetas, commissions and so forth

19   and the rental guaranty.

20        Here is Mr. Salveta's HUD-1 form.  If you look down

21   here at the bottom, Mr. Salveta was supposed to put up about

22   $20,000 of his own money.  That didn't happen.  Here is what

23   happened.  Ms. Ende's brother, Alex Ende, got the money from

24   the E3 bank account, put it into his personal bank account, and

25   then wired it over to Fernandez, Airan-Pace, and called it a

 1    personal loan.

 2         But look what happens when the money comes back.  Who

 3    pays the money back that E3 fronted for Mr. Salveta's cash to

 4    close?  Kensington Trust, IW, incoming wire, Kensington Trust,

 5    and look at these two numbers.  This is no coincidence.  The

 6    money that came back in from Mr. Riesel was exactly $2,500 more

 7    than the money E3 fronted.  That's not a coincidence.  That's a

 8    deal.  That's a behind-the-scenes deal.  On this case, you

 9    front the money, I will pay you back and I will flip you 2,500

10    bucks for your trouble.  That's sneaky.

11         Mr. Kuehne told you in his opening statement that there

12    would be -- the evidence would show that there was nothing

13    hidden, nothing secret.  This is hidden.  This is secret.

14         This is an e-mail from Ms. Ende to Mr. Riesel but

15    remember where this e-mail came from.  It came from Yeshaya

16    Gross.  Yeshaya Gross was given this e-mail from Mr. Riesel

17    with the instructions to wire this money to Jason Porterfield.

18    Yeshaya Gross got this e-mail from Mr. Riesel with the

19    instructions wire this money to Jason Porterfield, and he did.

20         Now, I spent a lot of time going through all of these

21    notes one after the other after the other, ad nauseam, note

22    after note from Mr. Riesel to Mr. Gross, and all of them are

23    basically the same.  Look at this.  Kensington Trust to AMG to

24    JAER.  KT, AMG, JAER, over and over and over again.  Why did

25    Mr. Riesel do this?

1          If these were legitimate business transactions, if this

2     was all on the up and up approved by lawyers, approved by the

3     banks, why not keep a set of books?  Why not have a formal

4     procedure for transferring money from Kensington Trust to this

5     separate organization, Arbors Management Guaranty, because

6     that's not what it was.  This is sneaky.

7          If you look at the originals of these documents -- you

8     will have them in evidence -- they are scraps of paper, scraps

9     of papers with scrawled notes on them.  Do you think Mr. Riesel

10    ever thought he'd see them again?  When he walked into Yeshaya

11    Gross' office day after day and handed him scraps of paper with

12    notes written on it, do you think he intended for those notes

13    to be kept?

14         What he intended was that those notes would find their

15    way to the trash can and on this day, this evidence would not

16    be in front of you.  Look at this, arrows.  How many times

17    would Mr. Riesel have to do this before Mr. Gross got it?  Why

18    each time a little scribbled note with an arrow or sometimes

19    cryptic Blackberry messages?

20         In this note he calculates the profit they made on one

21    of these transactions, Abbey, Eli, Yoel.  You heard Yoel

22    Damas's name mentioned a couple of times.  He is a non-factor

23    in this.  This company was run by Mr. Riesel and Mr. Berkowitz.

24    They were the ones who made the decisions, nobody else.

25         Look at the breakdown of the details, unit by unit.

1  Are these the notes of a man who has no idea what people around

2  him are doing?  Is this the note of a man doesn't know what's

3  happening at the closings with his money?

4       This is the note of a man who is paying very, very

5  close attention to what is going on here.  Porterfield, JAER,

6  Reserves, KT to AMG to JAER.  Blackberry e-mails from

7  Mr. Riesel to Mr. Gross, $188,000 from KT to AMG to JAER.

8  These are not legitimate business transactions.  This is

9  concealment.  Wire 56,452, KT to AMG to JAER.  $120,000, KT to

10 AMG to JAER.

11      What was AMG?  AMG was one guy, Yeshaya Gross, sitting

12 in the same office where Mr. Berkowitz and Mr. Riesel worked,

13 just down the hall.  One guy in an office next to his office.

14 That's not an independent company.  That's the same company,

15 and in terms of moving money, Yeshaya Gross didn't have any

16 authority to do this on his own.  He did this because

17 Mr. Riesel told him to do it.

18      We presented you with Agent Petrillo's charts because

19 we wanted you to have an image, a graphic picture of how this

20 money moved from account to account to account.  On

21 February 26, 2008, $130,000.  That's the kick-off money.

22 That's the first payment to JAER to get the ball rolling so

23 they can start fronting cash to close for all those buyers.

24      The money comes into JAER's account and money starts

25 going out from JAER's account.  There is only two wires

```
 1   directly from Kensington, 130,000 and then you see one here for
 2   71,000.  After that, KT, AMG, JAER, over and over and over
 3   again.
 4           This is the second chart Agent Petrillo prepared and
 5   you will see, and you will recall this from the evidence, that
 6   the first few closings were done a little differently.  Right?
 7   The first few closings the money went to Paige Tarver.  After
 8   that, KT, AMG, JAER.  Why was Mr. Riesel paying all this money
 9   to people to buy these condos?  Because they wouldn't have
10   bought them otherwise.
11           Think about this for a minute.  You can buy a $340,000
12   condominium with no money down, no payments for two years.  You
13   don't have to come out of pocket a penny and you can own a
14   condominium in the western part of Palm Beach County free for
15   two years.  Do you think the banks needed to know that, that
16   the buyers weren't putting up a penny of their own money, that
17   Mr. Riesel was putting up that money, that the buyers weren't
18   going to have to come out of pocket a penny for 24 months of
19   mortgage payments and HOA fees, that Mr. Riesel was going to
20   pay that?  Imagine the pressure to sell.
21           Mr. Riesel says to the attorney for the -- rather the
22   Carmelken representative for whom he made this agreement to buy
23   the condos.  "Since then we have been very aggressively first
24   marketing and then selling.  Aggressively marketing, paying
25   people to buy condos."  That's aggressive marketing, all right,
```

1    but they are not meeting that quota.  They are still not

2    meeting that quota.  If the banks stop approving the HUDs, what

3    happens?

4         This whole deal collapses.  If they don't get anywhere

5    near 35 condos a month, the whole deal collapses, and that

6    profit you saw on that chart, 5 grand, 10 grand, 20 grand isn't

7    coming in anymore.  Mr. Riesel says first you only have seven

8    closings to date.  If you were anywhere close to 35 closings,

9    we wouldn't be wasting time.  We're not anywhere close.

10        This deal was renegotiated every single quarter because

11   they were trying to sell condos that they couldn't sell.  The

12   incentives sold the condos.  The incentives sold the condos.

13   Without those incentive packages, those condos wouldn't sell.

14        Now I think it's worth taking a minute to talk about

15   the few instances where the so-called BID, beneficial interest

16   disbursement, was actually on a HUD.  First of all, that

17   doesn't mean anything to a bank.  Beneficial interest

18   disbursement, that does not say that money is going to Julio

19   Campos.  It doesn't say who it's going to at all, and it's not

20   on the buyer's side.  Anyone reading a HUD says, okay, the

21   seller is giving $11,000 in closing costs contributions.  It's

22   right there on the HUD.  It shows up on both sides of the HUD.

23   But what is that?  What does that mean?  It doesn't say what it

24   meant.

25        Three times they did it this way, and the logistics of

 1    it are that money doesn't go to Mr. Riesel at closing.  It goes

 2    straight to Paige Tarver.  Paige Tarver does a bunch of

 3    rigamarole with it, puts it through another company, RISOM,

 4    Realty Investment Services of Miami, and maybe in another

 5    company, and then it ends up in the buyer's pocket, but there

 6    is no doubt it is true that that money went to a buyer.  Maybe

 7    it took three companies or four bank accounts to get there, but

 8    it went to a buyer.

 9         But think about this for a minute.  If that money is

10    not on the HUD, that means this number down here increases.

11    Right?  The 22,995 increases by $79,000 or so.  That means that

12    money goes to Mr. Riesel.  That number on the bottom is money

13    that goes to Mr. Riesel from the closing, from the sale of

14    these properties.  He made a decision early on, divert that

15    money through these other companies to the buyer.  I won't take

16    it on the front end, divert it.

17         But then Wells Fargo got suspicious.  Right?  Wells

18    Fargo on the second Henry Regan property said, what is this?

19    What is this?  You saw the note from Candace Casas at Wells

20    Fargo.  "Please explain this 58,500 money that's going to

21    Henry" -- well, on the right side of the HUD.

22         In response, Ms. Airan-Pace's office sends the trust

23    agreement, the declaration of trust, that meaningless document

24    that doesn't say anything, and Wells Fargo said, we are not

25    buying that, forget it.  We are not funding that deal.

1        So what happens now?  What do they do?  The money

2   doesn't get diverted off immediately anymore.  It just goes to

3   Mr. Riesel.  That's what happened on all the subsequent

4   closings.  This is still a fraud.  There is no doubt about

5   that.  All we are talking about is how we are going to move the

6   money around when the bank says no.  If the bank stops

7   accepting the HUDs, what happens to the agreement with

8   Carmelken?

9        Nobody, nobody had the authority to say what happened

10  to that money except for Mr. Riesel.  Nobody.  Ms. Airan-Pace,

11  Ms. Tobel, Mr. Rodriguez, nobody in this whole scheme could

12  decide what happens to that money except Mr. Riesel.  And you

13  know he was paying attention to that.

14        This is an interesting e-mail for what's between the

15  line.  Jay Martin and Gary Hughes are finders.  They are out in

16  California.  They are bring buyers in.  They have a

17  relationship with Mr. Riesel because they are a finders group.

18  Rodriguez and Aller were finders.  Ms. Tobel was a finder.  Jay

19  Martin and Gary Hughes in California were finders.  They

20  brought buyers in.

21        "Gary told me about the good news as far as the HUD

22  issues go and removing that information entirely.  Wells is

23  still fighting us on Regan and now they are saying that the

24  risk department won't just accept removing it without an

25  explanation.  These guys are idiots over there.  Once you give

```
 1    them material to run with, their goal is to kill the file."
 2            That's the mentality of the co-schemers, the conspiracy
 3    that you have seen in this case.  The banks are idiots.  We are
 4    taking money, giving it to buyers, and not telling them and the
 5    banks are the idiots.  Anyway for future files, not having that
 6    disbursement interest on the HUD for the lender to see at any
 7    point will eliminate this issue entirely.
 8            How did Jay know that Gary -- Jay says Gary told him,
 9    Gary Hughes.  Gary told Jay we are taking BID off the HUD.  How
10    did Gary find out?
11            Gary and Mr. Riesel had a relationship.  Gary was the
12    finder.
13            MR. KUEHNE:  Objection, Your Honor.
14            THE COURT:  Legal basis?
15            MR. KUEHNE:  No evidence in the record.
16            THE COURT:  Overruled.  Ladies and gentlemen, you can
17    rely on your own recollection of what the evidence was during
18    the trial.
19            MR. CAPONE:  Gary told me, from now on no more BID on
20    the HUD.  The BID is a fraud, it's still a fraud, but from now
21    on we don't want the bank even questioning it.
22            What happened when Freddie Mac started snooping around?
23    First they went and talked to Ms. Airan-Pace.  They asked for
24    her files.  They started asking questions about this trust
25    agreement, declaration of trust business.  She talks to
```

1    Mr. Riesel.  Mr. Riesel knows that Freddie Mac is snooping

2    around, asking a lot of questions.  They come to interview him

3    and they start talking about the incentive stuff.

4          Mr. Riesel tells Robert Hagberg, ever since you guys

5    have been asking around we have stopped the incentives.  Once

6    you all started asking around, we have cancelled the incentive

7    programs and that's just not true.  That's not true.

8          What they did do was they created this fake document,

9    Defense Exhibit 2.  It's the very first exhibit the defense

10   offered in evidence in this case.  The defense offered this

11   exhibit to you for you to rely on to convince you that this was

12   all on the up and up.  Look, there is a declaration of trust.

13   This is legit.  This covers the money.  This is why we have the

14   legal authority to give money back to the buyers.

15         What did you learn about this document?  Mr. Riesel

16   didn't sign this document on January 18th of '08.  This

17   document had nothing to do with that property closing.  Sahara

18   Mageesh (phonetic) wasn't even working for Fernandez,

19   Airan-Pace until May.  I showed you her payroll records.  This

20   is a counterfeit made up, fake document to fool Freddie Mac or

21   anyone else who may start looking at these transactions.  It's

22   worthless.  Take that back.  Its value is it proves its intent.

23   Its value is it shows concealment.  It shows intent to hide, to

24   cover what they were doing.

25         October 1, 2008, about 80 Kensington properties had

1    closed by October of '08.  No coincidence that they are

2    printing up 82 copies of the signature page for this

3    declaration of trust.  This e-mail was sent to Mr. Riesel.

4    "Complete trust documents will then be sent to your office,"

5    you being Mr. Riesel, "for storage of the blue ink originals."

6        Why were they doing this?  To cover the fact that they

7    were giving huge amounts of money to people to buy the condos

8    and had no documentation of any sort of legitimate purpose.

9        You heard a lot of finger pointing.  The lawyers said

10   this was okay.  Ms. Airan-Pace said this was okay.  I relied on

11   the advice of my lawyer.  You have heard that throughout the

12   trial.  You will hear that again in closing argument.

13       Let me ask you to think about something.  What if a

14   lawyer was not involved?  Imagine for a second that a lawyer

15   was not involved in this scheme.  Mr. Montano goes to his

16   closing.  He has a stack of documents to sign.  He sits down at

17   the table.  They start handing him documents.  Here is your

18   loan application, sign that.  Sign the mortgage notes, I mean,

19   a stack of documents that Mr. Montano has to sign before he can

20   take ownership of the condo.

21       MR. KUEHNE:  Objection, Your Honor.  Facts not in

22   evidence.

23       THE COURT:  Overruled.

24       MR. CAPONE:  All of these documents that Mr. Montano

25   would have to sign in order to take ownership of his Kensington

1    condominium.

2           Then, the lawyer who is conducting the escrow,

3    conducting the settlement, says, "Okay, Mr. Montano, now I need

4    your cashier's check for $78,431.15."  What would Mr. Montano

5    say?  "I don't have a check.  I'm not supposed to have a

6    check," and the lawyer conducting the escrow would say, "Yeah,

7    you are, it's right here on the bottom of HUD-1.  Do you see

8    that?  We sent you this stuff in advance.  You are supposed to

9    come here with a cashier's check."

10          And Mr. Montano would say, "Mr. Riesel is paying this.

11   The seller is paying this, I don't have to pay any of this."

12   What would the lawyer do who is not in on it?  "That's it,

13   closing cancelled, get out of my office, call Wells Fargo,

14   sorry, this loan is not going to fund."  Maybe, maybe the

15   escrow agent lawyer would pick up the phone and call Freddie

16   Mac.  Maybe they would pick up the phone and call the seller or

17   their title insurance company, but the closing would not happen

18   if the lawyer wasn't in on it.

19          Mr. Riesel relied on Ms. Airan-Pace but not for the

20   reasons that Mr. Kuehne says.  He relied on Ms. Airan-Pace to

21   be in on it, to not blow the whistle, to not ruin the scheme,

22   to go along, conduct the closings as arranged, and send the

23   money back to the buyers.

24          Judge Gayles tells you that I get the last word.

25   That's because I have the burden of proof on this case.  I am

1    going to sit down now.  I am going to listen to what Mr. Kuehne

2    and Mr. Davis have to say, and I will have more comments when I

3    get back up here.

4         While you are listening to them argue, though, I would

5    like you to think about some of these issues.  Whose money,

6    whose money was being given away here?  Who had the final

7    decision about what happened to that money and why, why if this

8    is all in the up and up and this is all legitimate, did you see

9    all of this concealment, all of this hiding, all of this

10   coverup?

11        Thank you.

12        THE COURT:  Do you need time to set up or are you

13   ready?

14        MR. KUEHNE:  Just a brief moment to set up, Your Honor,

15   a couple of minutes.

16        THE COURT:  All right.  Ladies and gentlemen, why don't

17   we take about five minutes.  Wait in the jury room.  Please

18   don't discuss the case.

19        COURT SECURITY OFFICER:  All rise.

20        THE COURT:  Okay.  Five minutes.

21        (Jury Out at 10:05 a.m.)

22        (Brief recess.)

23        (Call to the order of the Court)

24        COURT SECURITY OFFICER:  All rise.

25        (Jury In at 10:13 a.m.)

```
 1              THE COURT:  All right.  Everyone, please be seated.

 2         CLOSING STATEMENT

 3              MR. KUEHNE:  Thank you, Your Honor.

 4              Eli Riesel, a businessman with a legitimate sales

 5    program selling legitimate condominiums in Palm Beach County,

 6    offering sales programs that are offered in the marketplace,

 7    not unique to Kensington, not unique to South Florida, common

 8    in the Florida real estate marketplace, who knows this is a

 9    matter, this is a business, this is a sales program, this is an

10    endeavor that is complicated, that is legally infused with

11    issues, that involves ambiguity and uncertainty, and what does

12    he do?

13              As any businessman working for a company with a track

14    record, a history of successful condominium conversions and

15    sales, reaches out to a lawyer.  Not just a lawyer, a lawyer

16    with experience, with significant involvement, with an

17    expertise in the very kind of complicated market-specific

18    business that he has and searches out and finds a lawyer and

19    informs the lawyer of the business.  He seeks advice and

20    counsel from the lawyer about getting into the business and

21    every step of the way is guided by a lawyer who then purports

22    to be and is known as not just a professional, but a recognized

23    expert in this area of Florida real estate law.

24              That individual, Eli Riesel, has committed no crime.

25    That individual, Eli Riesel, has done nothing wrong.  That
```

1    individual, Eli Riesel, has not acted with any willful intent

2    to steal money, no willful intent to act with a bad purpose.

3    To the contrary, that is a businessman who is attempting in

4    good faith to do what is allowed in a difficult, ambiguous

5    market.

6         And that's the question before you, did Eli Riesel act

7    with a bad purpose?  Did he act with an intent to steal money

8    or, in fact, did he act to follow what he understood to be

9    legitimate, legal, valid approach to a business?  And the

10   answer is a resounding, he did what he understood, what others

11   understood to be allowable, legitimate with guidance every step

12   of the way.

13        Now, any disputes about the business practice, any

14   after-the-fact analysis does not enter into this case.  Any

15   concern about what business protocols after the decline in the

16   mortgage and housing and residential market happened is not the

17   issue before you because, as you have heard from the evidence

18   in this case, the practices, protocols and programs utilized by

19   Kensington, utilized in this marketplace, were found throughout

20   Florida.  And the Freddie Mac witness told you exactly that,

21   nothing unusual, nothing extreme, nothing out of the ordinary.

22        So what does this case involve?  A series of lots of

23   documents but it starts with professionals and ends with

24   professionals, none of whom had been seen as unskilled,

25   unsophisticated in 2007, 2008, moving into 2009, people who

1    purported to know what the marketplace, what the business

2    practices and what the law allowed, and even what the lending

3    institutions required, a number of whom had researched

4    sophisticated areas of law and you know that I am talking about

5    Rashmi Airan-Pace in that regard, and you will remember much

6    about her testimony.

7         But a businessman and a business that Kensington Group

8    with a sterling track record and involved in what can be done

9    to legitimately authorize the use of buyer incentives,

10   something that allowed them to compete with all the other

11   marketplace of ideas out there and an uncertainty as to what

12   the law allows.

13        So what happened?  What did Eli Riesel and the

14   Berkowitz Group do?  And the evidence will show that the

15   regulators provided no advice to developers.  Ask questions,

16   get no answers, but lawyers with knowledge of the transactions,

17   with knowledge of real estate, with knowledge of disclosures

18   and how to structure a process, how to utilize the existing

19   provisions to allow the business to move ahead, a lawyer who

20   not sought out by the Berkowitz Group, not sought out by Eli

21   Riesel or Abbey Berkowitz but who comes to them -- and this is

22   the first in a time frame significant determination for you --

23   comes to them as not just an expert, not just a professional

24   but somebody who knowing the nature of the business,

25   condominium sales in the South Florida market, the Florida

1    marketplace, comes to the Berkowitz Group with a legal

2    proposal.

3            In fact, you know how studied this is because before

4    the meeting takes place -- she is referred by a friend of hers,

5    a criminal defense lawyer, Paige Tarver.  She prepares a

6    confidentiality agreement because she wants to be able to talk

7    to this prospective new client without fear that her legal

8    proposal, her legal structure would end up not being

9    implemented by her.

10           And we know coming to this meeting she has not just

11   documentation on what her proposal involves but she is prepared

12   to discuss it and does discuss it.  In fact, discusses it in a

13   way that involves some sophisticated legal analysis.  And we

14   know that, you have heard it because Paige Tarver, who didn't

15   practice real estate but remember at one time she thought, her

16   company thought maybe we will do some title insurance work and

17   it turned out not to be her area.  She was there and it wasn't

18   Paige Tarver providing the information.  It was Rashmi

19   Airan-Pace starting the process.  And actually, let's look at

20   that.

21           But before we do, before we look that, let me remind

22   you, as you think about this case -- Judge Gayles is giving you

23   the instructions and you are going to get a copy of the

24   instructions in writing to be able to review but I want to

25   remind you, Judge Gayles has told you that part of the case

1    involves good-faith reliance on advice of counsel, and you

2    heard this already, so let me remind you.  Good faith is a

3    complete defense to the charge in the indictment because the

4    Government must prove beyond a reasonable doubt that Eli Riesel

5    acted with the intent to defraud.  And evidence that Eli Riesel

6    in good faith followed the advice of counsel is inconsistent

7    with unlawful intent.

8            The Court gives you three aspects of advice of counsel

9    to focus on.  That's the framework for Eli Riesel obtaining,

10   following, being guided by the advice of counsel.

11           One, did Eli Riesel, before acting, make a full and

12   complete good-faith report of the material facts to an attorney

13   he or she considered competent, and there is no doubt, although

14   Rashmi Airan-Pace would suggest differently, that this was a

15   lawyer, Columbia Law School graduate, prestigious school, told

16   you -- and I think you got the impression -- told you that she

17   was good.

18           Two, received that attorney's advice as to the specific

19   course of conduct that was followed and, three, reasonably

20   relied on the advice in good faith.  And not only Eli Riesel

21   relied on that advice in good faith but you heard person after

22   person after person, including Paige Tarver, a lawyer, rely on

23   what Rashmi Airan-Pace said.

24           And there is a component to this as well that is the

25   good-faith defense which embellishes the reliance on advice of

 1    counsel, but good faith, acting in good faith is a complete

 2    defense.  Reliance on advice of counsel is complete defense,

 3    and, Judge Gayles has told you, mistakes in judgment, an error

 4    in management or carelessness is not fraudulent intent.

 5         So identifying the intent aspect, identifying the

 6    legitimacy of the Kensington transactions -- let's start first,

 7    the Government paints a picture of a company under pressure

 8    that the Government would have you believe meant pressure

 9    equals illegal conduct.  Not only does common sense tell you

10    that's not the case, the evidence here tells you that is no

11    part of the case because how did this originate?

12         Before -- before the bulk sale, a complicated

13    structure, not just a normal sale, before the bulk sale took

14    place, before Carmelken, the owner but not the seller of these

15    units, the owner has a bulk sale which transfers the right to

16    sell to the Berkowitz Group, what happens?  Rashmi Airan-Pace

17    reviews the bulk sale agreement.  She has already provided

18    Kensington, the Berkowitz Group of her legal methodology for

19    allowing and promoting and legitimately pursuing these sales

20    and acting on that advice with no obligation, no pressure.

21         The Berkowitz Group enters into the agreement to buy,

22    not outright, but to take that bulk sale and have the right to

23    then sell individual units for which they do not have title.

24    Title, you have heard, is with Carmelken.  They are only going

25    to be able to, according to the agreement, pass title along at

1    the time of closing.  So Kensington Group, Abbey Berkowitz, the

2    company Eli Riesel works with, doesn't even own them but Rashmi

3    Airan-Pace provides advice.

4         Then what else do you learn?  The Berkowitz Group has

5    investors -- Adken is the company but the JAER principals are

6    investors.  They are real in the real estate area.  They have

7    an involvement with buyers on the buyer's side, but they invest

8    in this property $600,000, and they are going to be receiving

9    their funds as the condominiums close.  That becomes the focus

10   in which Eli Riesel, a good man, no evidence that he has

11   committed any fraud or wrongdoing whatsoever, starts the

12   process with his company with Rashmi Airan-Pace before

13   Kensington even is an obligation of the Berkowitz Group.

14        And here is what you have learned from the evidence.

15   The trust scenario, as it's called, the trust structure, is

16   Rashmi Airan-Pace's concept.  It's not just Rashmi Airan-Pace's

17   concept, it is a concept that she brings to the table, she

18   brings to the initial meeting.  Defendant's Exhibit 16 you saw

19   is the Rashmi Airan-Pace explanation of the structure for the

20   purchase of condominium units October 2007.  Comes to the

21   meeting fully prepared to talk about a synopsis of the

22   structure that I propose, and every one of these factors in the

23   structure are her guidance.

24        The development of a document, assignment of beneficial

25   interest necessary for the kind of structure that allows these

 1    sales to take place in the marketplace with the necessary

 2    disclosures to the lenders, something that Rashmi Airan-Pace's

 3    advice made clear that third-party participation in the

 4    structure, in the sales is precisely what is going to allow the

 5    Berkowitz Group to comply with legal disclosure requirements

 6    because of third-party participation, third parties that have a

 7    risk, a stake in the transaction.

 8          Then preparation of the declaration of trust that you

 9    have heard is a declaration of trust that was implemented and

10    at a time when -- later when Rashmi Airan-Pace got careless,

11    didn't follow up.  Rashmi said, oh, in e-mail, gave

12    instructions, those trusts that we had intended to put together

13    that were part of these sale transactions, the paperwork never

14    got completed.  We've got to complete it.  Rashmi Airan-Pace,

15    careless, negligent.  She is the lawyer who is doing real

16    lawyering in connection with all of this.

17          And when you talk about material facts disclosed, you

18    have Eli Riesel sending Rashmi Airan-Pace the lease program.

19    Remember those leases, the master residential lease, the

20    program that essentially allowed for another company, AMG, a

21    company the Government says to you is not an independent

22    company, it was a smoke screen that did nothing.

23          You heard Yeshaya Gross, a company started in 2006 that

24    did real things with real money that it earned.  It provided

25    not just a service.  It provided management.  So effective was

1    Yeshaya Gross, this one-man shop that the Government says with
2    disdain hires one of the largest management companies in
3    America, A&P Management, to handle the work for a fee that AMG
4    is contracted to, has a contractual obligation with every
5    single unit.  That's the independence of a third-party with a
6    real stake in the transactions.
7         So that there is no ambiguity, every step of the way --
8    and you remember this evidence -- but every step of the way
9    Rashmi Airan-Pace is involved.  Not a single aspect of this
10   highly lawyered structure transaction takes place without
11   Rashmi Airan-Pace providing legal direction.
12        You wouldn't know that from listening to her.  Right
13   out of her mouth at the beginning of her examination what did
14   Rashmi Airan-Pace tell you that you know to be her brand of
15   lying?  Oh, no, Eli Riesel had this idea.  All I did was -- I
16   think she even said I kind of looked at the paperwork to make
17   sure it didn't have typos on it or something absurd like that.
18        Why, you will ask, was that Rashmi Airan-Pace's claim
19   to you, false claim, false statement here in this courtroom
20   that colors everything she did?  Because we know from
21   independent evidence that's not even close to the case.  She
22   prepared a structure that later on was questioned.  Later on
23   she gets indicted.  Later on she says she is scared.  So what
24   does she do when she is scared?  She told you.  When she is
25   scared, she makes things up.  When she is scared, she

1    fabricates.  When she is scared, she creates false documents.

2    To do what?  To blame somebody else.  Why?  So her way of

3    avoiding the reality of the fact that she provided good advice

4    but she didn't want to go to jail for 30 years was let me blame

5    Eli Riesel for something that I authorized, that I advised was

6    legal and legitimate every step of the way.

7         So, January 28, 2008, e-mail.  January 28, 2008,

8    beneficial interest disbursement is being disclosed to Rashmi

9    Airan-Pace for Porterfield.  Porterfield is an investor, buys

10   property for investment.

11        Next month, February, 2008, Rashmi Airan-Pace, getting

12   the information about beneficial interest disbursement, a

13   concept that she created because it had a function.  It served

14   a purpose.  It wasn't, the evidence shows, a made-up issue.  It

15   was a legally binding payment to an independent third-party

16   that provided services that had a function.  Whether it's AMG

17   or Paige Tarver, trustee, or JAER, the marketing company that

18   had the connection to making the Kensington product available

19   to the world through their marketing efforts.

20        February 2008, another Porterfield, beneficial interest

21   disbursement, computed and sent to Rashmi Airan-Pace.  In

22   March, beneficial interest disbursement, March of 2008.

23   Remember the claim, oh, beneficial interest disbursements were

24   not even considered after Rashmi Airan-Pace made the

25   determination because of the independent flow of money, not

1    money going directly from the company for which Eli Riesel

2    worked, Kensington to a buyer, going through third parties who

3    have a role and a stake in the transaction.  Her advice is,

4    that disclosure is not even necessary because it's a post-

5    closing third-party transaction, not a seller to buyer payment.

6          But she continues.  March 25, 2008, beneficial interest

7    disclosed to her.  And at the same time, you've heard the

8    testimony and you have seen it here, Paige Tarver says Rashmi

9    told me when she made the determination that these HUDs, these

10   HUDs are proper and have all the disclosures because the BID

11   does not have to be disclosed because the banks are already

12   aware of this, of the trust, of the obligation.  She

13   affirmatively says and in writing as well, "I have informed the

14   banks of this."

15         And what do we know from her file?  The only

16   relationship with the banks is either on the buyer's side,

17   buyers who have their own disclosure obligations, and Rashmi

18   Airan-Pace.  Never is there a relationship between Eli Riesel

19   and the Kensington, the Berkowitz Group, Kensington Trust with

20   the banks.

21         And even going into May, beneficial interest

22   disbursement disclosures, all things that Rashmi Airan-Pace was

23   supposed to, for paperwork purposes, handle all the flow of

24   that paperwork and she got behind.

25         July 2008, still, beneficial interest disbursement

 1   being given to Rashmi Airan-Pace, with the understanding that

 2   this is consistent with the entire structure that Rashmi

 3   Airan-Pace has provided, has set out, a structure that she

 4   explained at the beginning and she pursues every step of the

 5   way.

 6        And Rashmi says, "I am preparing the trust documents, I

 7   am doing it."

 8        And notice this, continuing along the lines of

 9   following her advice, look back in, all the way in October

10   of 2008.  We are now almost a year since she provided legal

11   advice to the Berkowitz Group that this bulk sale can go

12   through without significant monetary risk to you.  She is

13   saying, "Please make sure to include this addendum in all the

14   contracts we have for Kensington.  Can we get the buyers to

15   sign prior to closing and then send it to the lenders?"  Rashmi

16   Airan-Pace sending it to Donya Litowitz, who is at --

17        MR. CAPONE:  Your Honor, I object.  I don't have a

18   record of this document being in evidence.

19        THE COURT:  What exhibit number is this?

20        MR. KUEHNE:  Your Honor, I didn't print it out with an

21   exhibit number, but I will find it.

22        MR. DAVIS:  That's 22.

23        MR. KUEHNE:  I believe it's Exhibit 22.

24        THE COURT:  Government's or Defense?

25        MR. KUEHNE:  Defense.

1          MR. CAPONE:  The Government Exhibit 22 I have is not

2   that document.  Defense Exhibit 22 is not that document.

3          MR. DAVIS:  Defense 25.

4          MR. CAPONE:  I don't have a Defense 25.  I move to

5   strike that document and instruct the jury to disregard that

6   argument.

7          THE COURT:  Mr. Kuehne, I don't see that Exhibit 22 in

8   my thing.

9          MR. KUEHNE:  Your Honor, I had it on my list and to

10  that extent, if it's not in evidence, I apologize and I will

11  move on.

12         THE COURT:  Okay.  All right.

13         MR. KUEHNE:  Your Honor, I have -- my next exhibit is

14  Exhibit 25 that I have in evidence, but --

15         MR. CAPONE:  Your Honor, may the jury be instructed to

16  disregard that document?

17         THE COURT:  All right.  Ladies and gentlemen, you may

18  only rely on the evidence that was actually introduced during

19  the trial.  I do show that 25, an e-mail from Ms. Litowitz, was

20  admitted on April 14th.

21         MR. KUEHNE:  To Ms. Litowitz, Your Honor.

22         THE COURT:  Or to -- I may have written it down wrong.

23         MR. KUEHNE:  In March of 2008, March of 2008, Rashmi

24  Airan-Pace refers to the streamline process, her streamline

25  process.  And what does she say?  "There should be a

1    correction" -- this is Rashmi Airan-Pace sending to Donya

2    Litowitz, who you heard works with the Berkowitz Group.  "There

3    should be a correction to this process.  The trust documents

4    are prepared at the time I get the title request from the

5    lender and before the title commitment is even ordered.  The

6    trust document then gets sent to the underwriter for review and

7    then to the lender, etcetera.  That's why I have to have the

8    breakdown of the beneficial interest from each person

9    involved."  Names the people, "At the beginning of the process

10   now, and those numbers cannot change once the trust is prepared

11   and sent out."

12         Again, she is not just overseeing.  She is making sure

13   that the process that she developed, the confidential

14   process -- that, by the way, she is so sufficiently proud of

15   that in April of 2008, she has interviewed for a headline

16   feature in the South Florida Business Journal about what a

17   great project and legal development this was with Kensington to

18   allow it to compete in the busy marketplace, so proud of it.

19         And the evidence reflects that she communicates about

20   the mechanism with other lawyers, other people openly

21   throughout.  Not a hint of any uncertainty that this is the way

22   to go or that her client is not following her direction.

23         And the Government suggests to you that -- well, let's

24   find a lawyer who is in on it.  That's the only way this can

25   succeed.  Is there any suggestion that Rashmi Airan-Pace was

1    anything but the best professional to do this legally?

2          A company that utilized, and you heard, the Greenspoon

3    Marders, the Greenberg Traurigs, lawyers that know, that have a

4    specialty in the area.  That's the kind of reaching out for the

5    professionals who can provide the guidance.  And at the core of

6    this case is -- what was Eli Riesel doing in the course of

7    this?  Was he hiding?  Was he keeping things secret?

8          In fact, you heard over and over again -- remember

9    Yeshaya Gross, important for lots of reasons, but Yeshaya Gross

10   who told you of the legitimacy of this project from day one and

11   the role of the lawyer each step of the way.  He says Eli

12   Riesel documented, documented in writing the transfer of funds

13   to the independent third party, AMG and he then, Yeshaya Gross,

14   who told you these funds were mine when they came into the

15   account, I had an obligation with each individual unit, I had a

16   contractually obligated responsibility.  And he transferred AMG

17   funds based on information in writing, recordkeeping by Eli

18   Riesel and Yeshaya Gross, not secret, not hidden, Kensington

19   Trust records, the way a business is kept.  And what did

20   Yeshaya Gross tell you, "I kept all of this documentation on a

21   QuickBooks, a computer program, so it's there."  Normal.

22         Government says, "Well, don't businesses keep books and

23   records?"  You heard the testimony, books and records to be

24   able to demonstrate the propriety per the lawyer's structure

25   each step of the way.

1          And when Eli Riesel was asked about this in -- by the

2    Freddie Mac investigators in 2008, do you remember that?  He

3    says a couple of things that tell you how Eli Riesel is not

4    keeping anything hidden.  Eli Riesel is not acting in secret.

5    Eli Riesel tells Freddie Mac, and Mr. Hagberg told you, not

6    only cooperative but he said explained how this process worked

7    with the guidance of, and he remembered the name, Rashmi

8    Airan-Pace.  He even recalled Paige Tarver, another lawyer, a

9    lawyer who was involved in the trust aspect.

10          How much more credible can that be, and you heard Paige

11   Tarver tell you, "Yeah, I took my job seriously as the trustee.

12   And when Rashmi didn't get the paperwork done, I confronted her

13   about it.  And you know what, she asked me to come over to the

14   office so that I could review files to get that paperwork

15   straightened out."

16          Why was Rashmi behind, who knows?  But Paige Tarver

17   explained how that process flowed with Rashmi doing what she

18   was supposed to do, legally allowed to do.

19          And Eli explains the incentives.  He explains the

20   nature of what is going on in the competitive marketplace.  He

21   even asks a question of the regulator, who doesn't answer him,

22   about, you know, we have this issue with incentives, an issue

23   that the Government regulator said, hey, this is an ambiguous

24   area, this is an uncertain area, this is an area that's not

25   clear.  And the regulator's response was disclosure.

1          What was Eli Riesel's discussion with Rashmi Airan-Pace

2    when all of those others involved, with all the documentation

3    trail, what are the required disclosures and how are those

4    disclosures made?

5          Some businessman needs to know how to comply with the

6    law and seeks out a lawyer.  A businessman needs to know how to

7    comply with the tax code, seeks out a skilled accountant to

8    comply to learn what it is to do to follow the law, something

9    Eli Riesel did every step of the way from the beginning in 2007

10   until the end in 2009.

11         And Eli says, "Hey, when you raised a question about

12   this, we are going to stop doing these incentives until we can

13   figure out what to do."  And what does he do?  He consults with

14   the lawyer again.  He poses this question, "What if we do a

15   BOGO, buy one, get one free to investors?  How do we do that,

16   do that incentive?"

17         And when the regulator says in that context, "Oh, you

18   have to make disclosures," what's his response?  His response

19   is, "But we can't do it.  That would affect the value.  It

20   doesn't mean if you buy one, get one free the units are worth

21   only half each.  That's not the marketplace of those units."

22   And that's what his concern was, disclosures in a way that

23   legitimately reflect the business transaction, not disclosures

24   to hide any business transaction.

25         And he tells you that.  He tells the Government that,

```
 1   and the Government doesn't give him any other advice, any
 2   statement that he is doing things wrong or that his reliance on
 3   the lawyer is not allowed.  And throughout all of that you know
 4   that there is no seller to buyer payments being made in these
 5   transactions.  That's why the trust scenario, the sales
 6   legality scenario that Rashmi Airan-Pace put together was that
 7   independence by a party who had a stake, a contractual role, a
 8   legal obligation in that transaction.
 9           COURTROOM DEPUTY:  Five minutes.
10           MR. KUEHNE:  Remember the issue about HUDs and what was
11   disclosed on a HUD and what wasn't, and you heard lots of
12   testimony about Rashmi Airan-Pace making that determination,
13   what needed to be disclosed on the HUDs to comply?  And one
14   thing was very revealing, and I will point this out.  This is
15   part of Government Exhibit 4, Porterfield.  I have highlighted
16   a little bit, but it's a Porterfield HUD-1.
17           But Rashmi Airan-Pace made that very clear.  This one
18   has a beneficial interest disbursement disclosure.  She said,
19   "Yeah, I signed these HUDs.  That was my role, I signed.  I had
20   a power of attorney but I signed the HUDs.  We don't" -- she
21   didn't produce the power of attorney.  She said she had a power
22   of attorney but the point is she signed these HUDs.  She, as a
23   lawyer, asserted the accuracy of the seller's side of the HUD
24   based on her assertion that the seller's side of the HUD is
25   correct on all of those.  Whether it has the BID or doesn't
```

1    have the BID, she is signing for Eli Riesel and she is proud of

2    that program.

3          And remember when she says, "Oh, well, I got specific

4    instructions from Eli Riesel," and she was asked, "Well, do you

5    have an e-mail, do you have a handwritten note?"  Eli Riesel

6    who is a record keeper, "No, I don't have anything."

7          And we saw time after time examples from her own

8    closing files.  Remember these worksheets?  This is the Regan

9    one.  She claims Eli approved.  No documentation of that.  No

10   note.  No contemporaneous phone call.  But let's look at this.

11         Jason Porterfield, another one.  Rashmi, Eli, Jordana.

12   No other notation, just the name.  Another one, Regan, the same

13   thing, no notes, no contemporaneous approval.  This was all

14   work that she did in her office because that's what the lawyer

15   did because the lawyer had the contact and disclosure and flow

16   with the lender, not Eli Riesel.

17         So when you -- by the way, when you think about the

18   evidence, it comes through people as well as documents but,

19   remember that Judge Gayles has given you an instruction about

20   the extra caution you make when somebody has a plea agreement

21   and the extra attention you need to critically examine the

22   validity of somebody's complete testimony with a felony

23   conviction.

24         And remember, when you think about the witnesses, Paige

25   Tarver, Yeshaya Gross came here, no suggestion of wrongdoing.

```
 1    They told you the way it was, that this was a legitimate lawyer
 2    directed every step of the way series of transactions.  And
 3    compare that to Rashmi Airan-Pace.  Little needs to be said
 4    about her willingness to lie when she is scared, her plea
 5    agreement, her felony conviction.
 6             Jordana Tobel, who even with that made clear that, hey,
 7    Rashmi Airan-Pace was involved in the cash to close issue and
 8    all that cash to close was not fronted by Eli Riesel or the
 9    Berkowitz Group.  That all came from funds from E3 or JAER,
10    individuals and businesses that had independence and a stake in
11    the underlying transaction.
12             Joaquin Cossio, Ernesto Rodriguez, convicted felons,
13    individuals who need to have their testimony evaluated with
14    that extra attention and care, and I think it's fair to say --
15    and Mr. Davis is going to follow me to continue with aspects of
16    the evidence, but let me close my aspect by reminding you that
17    not only is it clear that Eli did things in writing, that Eli
18    followed the instructions, that Eli did matters the way the
19    lawyer requested him to do, not in secret, not hidden with the
20    profit of these transactions not going to Eli Riesel but going
21    to pay the investors unit by unit by unit, not money in his
22    pocket.
23             And when you even think to the Government's questions,
24    whose money was given away, the evidence is very clear.  It was
25    a contractual obligation.  This money in the beneficial
```

1   interest disbursement, this money that is characterized as

2   incentives, not the seller's money, money that is held

3   legitimately by a third party with a stake in the transaction.

4          And who had the final decision about what happened?

5   You heard the testimony.  All of the flow of funds went through

6   Rashmi Airan-Pace who issued the checks, who directed the

7   funds.  Rashmi Airan-Pace, the lawyer, sees the transaction

8   from beginning to end.  And why all the concealment?  On Eli

9   Riesel's part, no concealment whatsoever.  On Rashmi

10  Airan-Pace's part, she tells you document after document, these

11  disclosures are being made.  The banks are aware of this

12  transaction and you hear from the regulator incentives were

13  common in the industry, not just in South Florida but

14  throughout all of Florida.

15          CLOSING STATEMENT

16          MR. DAVIS:  Just so you know, I won't be up for an

17  hour.  We actually split for an hour so you don't have to

18  listen to an hour of him and then an hour of me.  Aren't you

19  glad about it?

20          I want to jump in and I just want to talk about the

21  cash-to-close issue.  The Government has given you the

22  impression, because they want to paint a picture that the

23  process that Rashmi Page, Attorney Page -- Pace outlined was

24  not followed.  But you saw the records.  You saw the exhibits,

25  and you know from the Government's agent itself that the

1    process she outlined in her memo was always followed.

2         There was a sale transaction that went from Kensington

3    to a third party and then to the buyer.  That was the outline

4    that she proposed, the October e-mail that she sent to

5    Mr. Riesel and others involved, the e-mail she sent in March

6    that all said the same thing, that this was the structure to be

7    followed.

8         Now, if you recall when the Government's summary

9    witness got on the stand, he gave you the impression that the

10   funds were being used to pay the cash to close, but when we

11   broke that down and we looked at the evidence, it turned out

12   that there was more, that there was things that were missing.

13   And the judge is going to explain to you, he is going to give

14   you an instruction about reasonable doubt and I want to show

15   that to you.

16        The Government's burden of proof is heavy.  I am going

17   to take you here.  A reasonable doubt is a real doubt based on

18   your reason and common sense after you've carefully and

19   impartially considered all the evidence in the case.

20        Members of the jury, there is plenty of reasonable

21   doubt.  Take for example the chart, Government Exhibit 64 and

22   63, after going through that entire transaction, I think he

23   counted that there are at least 37 transactions that he

24   analyzed.  Only one of them, only one of them did not follow

25   the procedure.  The vast majority, 36 of them got it right.

1          A mistake is not proof of fraud.  People make mistakes.

2     You heard the judge explain to you, a mistake, carelessness is

3     not proof beyond a reasonable doubt of an intent to defraud.

4     The evidence has shown, the evidence that you have seen has

5     consistently shown that there was a pattern and that they

6     followed Attorney Pace's advice.

7          I want to address the Government's argument that there

8     was a transfer to JAER from Kensington and that those funds

9     were actually used to pay the cash to close.  And I want to

10    take you back to Rodriguez's testimony himself when the

11    Government introduced the evidence of what happened.

12         If you will recall, e-mail sent on July 18th, the

13    request is for $110,000.  That's the BID disbursement.  The

14    request is not for cash to close.  The second request, this

15    e-mail is not requesting that the cash to close be forwarded.

16    This e-mail is dated July 18th.

17         Then the Government showed you the cash-to-close check.

18    See, the e-mail request is July 18th for Coralia Rocha.  And

19    look, the cashier's check was cut the day before, July 17th.

20    Rodriguez was not asking for the money to go get the cash to

21    close.  The cash-to-close check was already there.  The

22    Government has it wrong.  They are absolutely wrong about this

23    idea about cash to close.

24         Let's look at the rest of this e-mail, Hanoy Leon,

25    again, July 18th, when was the cashier's check cut?  This

```
 1   wasn't a cashier's check.  This is actually a request for wire
 2   transfer, July 15th.  Again, the e-mail is July 18th.  This was
 3   not a request for funds to be given to JAER so they could pay
 4   the cash to close.  The Government can say that that happened
 5   over and over and over again, but you have the evidence.  Your
 6   job is to look at the evidence.  As the judge explained to you,
 7   what the lawyers say is not evidence.  What's here is evidence.
 8           We will do another one.  Mideilys Teran.  That check
 9   isn't even an exhibit.
10           Exhibit 35, again, this is an e-mail from Rodriguez to
11   Mr. Riesel.  This is a request for the BID disbursement.  These
12   e-mails are the same e-mails that you saw from Jordana Ende
13   Tobel.  After the sale was accomplished, they would ask for the
14   BID disbursement to determine how it would be sent.
15           The e-mail is dated July 14th.  The settlement date is
16   July 7th.  That's a week after.  You also saw this exhibit,
17   over and over again, the physical evidence, the physical
18   evidence, the evidence that you can look at, the evidence that
19   you can analyze, the evidence that you can review shows it's
20   not how the Government says it happened.
21           E-mail, July 25th.  Do you remember the Government
22   showing you this, $140,000 wire in.  This request is made on
23   July 25th.  Osmer Orta, cashier's check July 5th and for
24   Eduardo Menendez, cashier's check July 24th.
25           The Government argued to you that this proved that this
```

```
 1    money was given to fund the cashier's checks.  But don't
 2    forget, the Government also included the bank record in the
 3    same exhibit, Exhibit 37 C.  Do you see that?  The wire came in
 4    August 5th.  This money did not come in to fund the cash to
 5    close.  The cash-to-close cashier's checks were obtained before
 6    they ever got the wires.
 7         These wires were consistent with the process that
 8    Rashmi Airan-Pace outlined.  There is a sale.  There is a
 9    transfer to a trust, transfer ultimately then to the buyer.
10    Never from the seller to the buyer because that's illegal.
11    That was not within her advice.
12         This is why we have juries.  We have juries because we
13    make the argument and you hear the evidence.  You determine
14    what actually happened, and as you review all of the exhibits,
15    you will always have a doubt about the Government's case about
16    the cash-to-close issue.
17         Now, the Government mentioned this one, Ileana Morales,
18    and let's just address that.  Even assuming -- for the sake of
19    argument -- even assuming, this is just one out of many and one
20    mistake is not proof beyond a reasonable doubt of an intent to
21    defraud.  Moreover, you never saw a loan file for Ileana
22    Morales 320-202.  You don't know what was in her mortgage loan
23    application.  This mortgage application file was never
24    introduced in evidence.  It simply does not exist.  There is no
25    evidence in this e-mail or any evidence that they brought to
```

1    you to even -- to suggest and to prove beyond a reasonable

2    doubt that that is what happened here.

3          I now want to turn your attention to the mortgage

4    files.  You will recall at the beginning of this trial you

5    heard from three individuals from the banks.  You recall that?

6    They testified to you the process that they go through in

7    underwriting.  I just want to highlight a few things that you

8    heard.

9          If you will recall, you heard from Timothy Lockwood

10   from Wells Fargo.  And if you recall, we showed him Government

11   Exhibit 6, Guy Salveta.  And we went through his final loan

12   application that was signed.  You remember this.  He explained

13   to you that it is the buyer's obligation to disclose things.

14   The process starts at the buyer where there is a phone call.

15   The phone call is between the buyer and the bank and the bank

16   asked all of the relevant questions, including incentives.

17         And what did he explain to you?  That was where you

18   would find out the incentives.  They would then ask for the

19   contract.  They'd review the contract and they would go through

20   the process.

21         As you recall, I showed them this exhibit, Guy Salveta,

22   where the source of the down payment is actually empty, silent.

23   Do you remember what he said?

24         He didn't say that this was improper.  What he said

25   was, as long as the person has the capacity, has the money in

 1   their account, that's what matters.  The source of the down

 2   payment, as he explained it, their witness, the source of the

 3   down payment goes to the question of capacity.  This, good to

 4   know.

 5        This may matter but what matters is capacity and in all

 6   of this case, and throughout the Government's entire case and

 7   throughout this entire trial you have heard evidence --

 8   actually, you have heard no evidence that any of the incomes

 9   that were listed in here were incorrect.  In fact, the only

10   buyer that you did hear from, Mr. Cossio explained that he had

11   the money.  Right?  He said that he had 132 employees, that his

12   business did 65 million.  And then I showed him one of the

13   applications of his employee, Ms. Lopez, Idalis Lopez, and I

14   asked, "Was she making $13,000 a month from you?"  And he

15   explained, and he replied, "Yes."  I mean, he admitted that it

16   wasn't her base salary and he explained, that's her commission

17   but she was making that amount of money.

18        So when you look at all of the exhibits, when you look

19   at all of the evidence, you will see that in every loan

20   application these people have the money to pay the cash to

21   close.  And as the banks themselves said, Wells Fargo, Timothy

22   Lockwood, also Ms. Regan from Chase, that they look to the

23   person's capacity and that's what matters most of all, the

24   capacity to pay the down payment.

25        And I will remind you, if you will recall for Ms. Regan

1    Nelson Caviglia, we showed Government Exhibit 3, source of the

2    down payment, down payment -- you remember that when I showed

3    that to her what her response was.  Well, they have the money.

4    It's very genuine.  She wasn't making it up.  She's being

5    genuine.  What matters to the banks is whether they have the

6    money.

7          This idea about failure to disclose the cash to close,

8    as the judge has explained to you, the failure to disclose,

9    even assuming there was a failure to disclose, it must be

10   material.  Two out of the three bank representatives explained

11   to you the source of the down payment is not material.

12   Actually, if it's not on the application, it doesn't matter, so

13   long as they have the capacity, and here, again, $84,000 in

14   liquid assets and there has been absolutely no evidence that

15   this was false.

16         And you will also recall when the bank representatives

17   testified, they all explained that buyer incentives and seller

18   inducements, as some of them call them, are lawful.  Nobody,

19   absolutely nobody got on the stand and said it's illegal.  No

20   one said that.  It's lawful, and if you recall, the last

21   witness from, I believe it was Fannie Mae or Freddie Mac, I get

22   the two confused, he explained that in Florida it was common.

23   It was a common practice.  That is the context that you have to

24   view the Government's case.  This is something that's common,

25   and Mr. Riesel is navigating his way through the law, through

1    complicated disclosures to figure out what is allowed and what

2    is not allowed.  And is that is why they hired a Columbia Law

3    School grad.  I did not go to Columbia.  They would not have

4    hired me.

5            Rashmi Pace, Columbia.  They hired her.  They went for

6    the best.  That's what you do.  When you want to try to do

7    things the right way, you try to get the best lawyer, the

8    lawyer that's going to tell you like it is.  This woman came to

9    that meeting ready to go.  She had her plan.  She had her ideas

10   and then she followed up with a memorandum explaining the

11   process, boom, boom, boom, boom, boom, this is how it happens.

12   And then she even included the contracts, reasonable reliance.

13           The Government has not proven to you beyond a

14   reasonable doubt that they did not justifiably rely on her.

15   The core of what she said, and they made it clear, that their

16   plan was to get the buyer incentives to the buyer -- to get the

17   seller concession to the buyers.  They were up front about

18   that, and what are buyer incentives, HOA fees, cash to close,

19   down payment assistance, rental guarantees.  They explained

20   that to her.

21           Don't fall for the Government's trap that there is a

22   difference between cash to close and cash back.  It's all the

23   same.  It is an incentive that is going from the seller to the

24   buyer and they let Rashmi know, they let Attorney Pace know

25   about this before they even entered into the contract.

1          I want to close with this.  My senior partner started

2    with this defense and I want to close with it.  Good faith is a

3    complete defense.  That's it, complete defense, when they make

4    a full and complete good-faith report of all material facts.

5    There has been no evidence that Mr. Riesel's disclosure to her

6    was not in good faith and they have not proven to you beyond a

7    reasonable doubt that there was not a good-faith report of all

8    their material facts.

9          In fact, they were quite honest with her.  They let her

10   know, we are having problems with the banks and we are trying

11   to figure out is there a legal way that we can do this?  They

12   let her know the conundrum.  That's why you get a lawyer.  You

13   get a lawyer because you want to do things the right way.  They

14   did.

15          Received the attorney's advice as to specific course of

16   conduct.  Here they went beyond that.  They didn't stop at that

17   first meeting.  They didn't stop at the October e-mail that

18   they received.  She was involved through the process throughout

19   the entire time.  And you saw that March e-mail where they are

20   streamlining the process and they lay out the timeline for how

21   things are to go.  She replies and says, "Oh, oh, wait a

22   second.  Wait a minute.  You need to revise this.  I need to

23   get this ahead of time so I can give the information, the

24   disbursements, that is, to the banks."

25          They went above and beyond that.  Not only did they get

     1      her advice and follow it, but they kept her on board.  And she

     2      offered legal advice.

     3              COURTROOM DEPUTY:  Two minutes.

     4              MR. DAVIS:  Then reasonably relied upon the advice and

     5      good faith.

     6              Not only did Mr. Riesel rely on her evidence -- I'm

     7      sorry, on her opinion, but you saw Ms. Tarver, not charged with

     8      a crime, nothing to lose, not under a plea agreement, not under

     9      pressure to say something to benefit the Government.  She said

    10      to you, we relied on it.  And at points I didn't understand it

    11      but, you know, I do criminal law and she is the real estate

    12      lawyer.

    13              Ende Tobel testified she relied upon it.  She asked

    14      her.  And actually, it was really ironic about her testimony,

    15      if you recall.  She said that she initially went to Eli, Eli

    16      who is not a lawyer, cannot explain it.  And so Eli said, "You

    17      know, I'm sorry, I can't explain this well to you.  Talk to the

    18      lawyer."  She went to the lawyer and even got a written opinion

    19      from the lawyer.

    20              Not only did Mr. Eli reasonably rely upon it, but

    21      others reasonably relied upon it.  The Government cannot prove

    22      to you beyond a reasonable doubt that there was an intent to

    23      defraud because they cannot overcome the good-faith reliance on

    24      the advice of counsel.

    25              I just want to remind you what the duty to deliberate.

1    Each of you must make your decision and for each of you -- the

2    great thing about reasonable doubt is it doesn't have to be the

3    same for everyone.  Each of you can have your own reasonable

4    doubt and that is perfectly proper and that is perfectly

5    allowed.  For some of you the reasonable doubt may be I just

6    don't believe Rashmi.  Others of you the reasonable doubt may

7    be, this is a very complicated area of business, I get it, but

8    for whatever it is, as long as it's your personal reasonable

9    doubt, that's good enough for you.

10            So you are going to get the verdict and there are going

11   to be a lot of lines on there because there is 26 counts, and

12   the right and only thing for you to do, based on all of the

13   evidence that you have heard and the lack of evidence that have

14   you not heard, is to mark not guilty Count 1, not guilty

15   Count 2, not guilty Count 3 -- I am not going to go through all

16   of them, but until the end, 26, not guilty.  That is the one

17   true and only verdict.

18            Thank you.

19            THE COURT:  For the Government.

20            REBUTTAL CLOSING STATEMENT

21            MR. CAPONE:  Power of attorney was a great thing back

22   in 2008, wasn't it?  Mr. Riesel was happy to have

23   Ms. Airan-Pace sign all those documents until they became

24   evidence in a criminal trial against him.

25            There is a big difference between cash to close and the

1    other incentives.  Remember, cash to close, guaranteed rent and

2    cash back, three distinct incentives.  If you think for a

3    minute that if any one of those buyers had their own cash to

4    close, Mr. Riesel would have paid it.  He paid the cash to

5    close because that's what it took to sell the condominiums.

6         You heard a lot of law firm names in this courtroom

7    during the trial.  You heard Mr. Kuehne mention Greenberg

8    Traurig and Greenspoon Marder, and some other of these big

9    national firms, and Mr. Kuehne mentioned that in the context of

10   those firms being involved in this transaction.

11        So I ask you, why doesn't Mr. Riesel just use that

12   firm?  Why not just use Greenspoon Marder or Greenberg Traurig

13   to do this work?  Because he needed a lawyer who would not blow

14   the whistle.  He needed a lawyer who would keep it secret.  He

15   needed a lawyer who would go along with the scheme.  That's why

16   he didn't ask Greenberg Traurig and Greenspoon Marder to

17   participate in this.

18        Where is the good faith here?  Where is the good faith

19   in not putting in his sale and purchase contract the

20   incentives?  Why aren't they there?  Where is the good faith in

21   not putting the seller contribution, all of this money that's

22   being paid to the buyers on the HUD-1?  Where is the good faith

23   in moving money from account to account to account to put as

24   much distance as you can between the source and the buyer?

25        Where is the good faith in that?  What happened here

1    was a scheme to blow this by the banks, make sure the banks

2    don't find out about it.  That's what this was all about.  That

3    was the whole purpose for all of this rigamarole is to give

4    money to the buyers so that the banks wouldn't see it.

5           Where is the good faith in keeping the buyers honest?

6    Where is the good faith in collecting 20, $30,000 in rental

7    reserves and just taking it?  These buyers were upset because

8    they couldn't make their mortgage payments without that

9    incentive.  That means they couldn't afford the condominium.

10   They couldn't afford the condominium without Mr. Riesel paying

11   for them to buy the condominium.

12          When I spoke to you in opening statement, I told you

13   that first you would see that huge incentives were paid to

14   buyers, that you would learn that the banks were not told about

15   those incentives, and that you would agree that Mr. Riesel is

16   guilty.

17          You have seen the evidence.  You know huge incentives

18   were paid to buyers.  You know the banks weren't told about it,

19   and now you know that Mr. Riesel is guilty.

20          Thank you, Your Honor.

21          (Excerpt concluded)

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3           I hereby certify that the foregoing is an

 4   accurate transcription of the proceedings in the

 5   above-entitled matter.

 6

 7

 8   May 7, 2015            /s/Patricia Diaz
     DATE                   PATRICIA DIAZ, FCRR, RPR, FPR
 9                          Official Court Reporter
                            United States District Court
10                          400 North Miami Avenue, 11th Floor
                            Miami, Florida 33128
11                          (305) 523-5178

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```