**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 14-80067-Cr-Gayles**

**UNITED STATES OF AMERICA**

**vs.**

**ELI RIESEL**

_____/

**DEFENDANT'S MOTION FOR POST-VERDICT JUDGMENT OF ACQUITTAL OR**
**NEW TRIAL, WITH INCORPORATED MEMORANDUM OF LAW**

Mr. Eli Riesel was tried on 25 counts of bank fraud and 1 count of conspiracy. At trial, Mr.

Riesel presented a persuasive defense of good faith reliance on the advice of competent counsel, a

complete defense to all charges. Following deliberations, the jury acquitted Mr. Riesel of all

substantive bank fraud counts, but convicted him of the conspiracy to commit bank fraud. These

factually inconsistent verdicts plainly present a meaningful case for post-verdict relief,[1]

underscoring the necessity for post-trial reconsideration of key evidentiary rulings that adversely

impacted the jury's consideration of the case.

The first concerns the court's exclusion of evidence that attorney Rashmi Airan Pace

marketed her Trust Scenario to others who, like Mr. Riesel, considered the merits of attorney

Pace's proposal and found it persuasive. The second critical ruling centers on the admission of

attorney Airan Pace's file information sheets, key physical evidence potentially linking Mr. Riesel

to the fraudulent HUD-1 forms that formed the core of the alleged conspiracy. Reconsideration is

warranted because these rulings, independently and collectively, materially prejudiced Mr. Riesel,

---

[1] *United States v. Powell*, 469 U.S. 57, 67 (1984).

entitling him to a post-verdict judgment of acquittal or a new trial. Mr. Riesel files this motion pursuant to Rules 29 and 33(a) of the Federal Rules of Criminal Procedure.

## STANDARD OF REVIEW

The Eleventh Circuit has given this Court considerable discretion in deciding a motion for post-verdict judgment of acquittal or new trial. Rule 33 expressly authorizes the vacating of a judgment and the grant of a new trial "if the interest of justice so requires." As such, the court is not bound to the appellate standard of review of the evidence in the light most favorable to the verdict. "In evaluating a motion for a new trial, a district court . . . may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Ward*, 274 F.3d 1320, 1323 (11th Cir. 2001). "Where a motion for new trial argues that the court committed errors during the trial, 'the convicted defendant has the burden of showing that (1) some error was in fact committed and (2) that such error was prejudicial to him.'" *United States v. Blair*, 8:08-CR-450T33EAJ, 2010 WL 1997639, at *2 (M.D. Fla. 2010) (quoting *United States v. Simms,* 508 F.Supp. 1188, 1203 (W.D. La. 1980)); *accord United States v. DeLaughter,* No. 8:07–Cr–201, 2007 WL 3034645, at *1 (M.D.Fla. Oct.16, 2007). Prejudicial harm occurs where a substantial right is adversely affected by the evidentiary ruling, and includes the right of the accused to present a defense. *United States v. Yates*, 733 F.3d 1059, 1065 (11th Cir. 2013).

 "An error [likewise] affects the defendant's substantial rights if it probably had a substantial influence on the jury's verdict." *United States v. Rodriguez,* 259 F. App'x 270 (11th Cir.2007) (internal quotation marks omitted) (quoting *United States v. Stephens,* 365 F.3d 967, 976–77 (11th Cir.2004)). The court must inquire whether the error "was more likely than not a substantial factor" in the conviction. *See Stephens,* 365 F.3d at 980 (remanding for new trial after

concluding that district court's evidentiary error "was more likely than not a substantial factor in [the defendant's] conviction").

## BACKGROUND

I.    **Evidence Regarding the Court's Exclusion Of Evidence That Attorney Airan Pace Strategically Marketed Her Trust Scenario In The Florida Real Estate Market.**

A.    **At Trial, The Banks Argued That The Buyer Incentives Offered By Mr. Riesel Could Never Be Approved By The Banks.**

The government opened its case with representatives from major banking institutions, whose collective testimony suggested there was no lawful way of offering buyer incentives in property sales involving mortgage loan proceeds.[2]

Timothy Lockwood, a Financial Crimes Consultant with Wells Fargo with fifteen years of mortgage loan underwriting experience, explained that seller contributions are limited by the loan-to-value ratio (LTV), defined as the ratio between the mortgage amount and the property's appraised value:

$$\text{Loan to Value Ratio} = \frac{\text{Mortgage Amount}}{\text{Appraised Value of the Property}}$$

Though agreeing that **seller contributions** are allowed, Mr. Lockwood explained that seller contributions exceeding 6% of the total sales price are **seller concessions/buyer incentives** that must be subtracted from the sales price.[3] For this reason, according to Mr. Lockwood, it was

---

[2] The defense has not transcribed the testimony of the bank representatives, but is willing to do should the Court find it so necessary.

[3] Mr. Lockwood's testimony suggested that Wells Fargo would not approve an $85,000 mortgage on a property sale of $100,000, if there were $20,000 in buyer incentives. This is because the $20,000 buyer incentive, once subtracted from the sales price, would result in a LTV of 106.25%,

imperative that all seller concessions be disclosed to the bank during the underwriting process. Mr. Lockwood did admit, that per Wells Fargo policies, questions regarding buyer incentives and seller concessions are asked during the loan application process by the Wells Fargo loan officer.

RJ Anderson, a twelve-year veteran of Bank of America, who served as the Site Underwriting Leader gave similar testimony. Mr. Anderson explained that buyer incentives must be disclosed to the bank and ultimately subtracted from the borrower's requested mortgage loan amount in order to prevent sales price inflation.

Regan Nelson, Chase Bank's underwriting supervisor, who had been in the mortgage industry for seventeen years, offered testimony similar to Lockwood and Anderson. She explained that buyer incentives can be disclosed in several ways, including the contract, loan application, appraisal report, and the HUD-1. On the HUD-1, she explained that the seller contributions should be reflected on Line 509, Seller Contributions.

These witnesses left the collective impression that buyer incentives exceeding the 6% seller contribution limit were essentially impossible, because if they were disclosed, the requested mortgage loan amount would be rejected or reduced by the value of the buyer incentive.

**B. The Government Established Mr. Riesel Has A Mortgage Broker's License And Is Aware Of The Difficulty In Getting Buyer Incentives Approved.**

Toward the end of its case, the government called Robert Hagberg, Director of Fraud Management at Freddie Mac for the purpose of establishing Mr. Riesel's knowledge of the mortgage rules. The government introduced Riesel's mortgage broker's license (GX42). Hagberg,

---

($85,000/$80,000) far beyond the .85 LTV banks require for mortgages. Accordingly, the $100,000 sales price would be reduced to $80,000 and the approved mortgage ultimately reduced from $85,000 to $68,000 to satisfy the bank's .85 LTV ratio.

who conceded that buyer incentives were common in South Florida, recounted his November 2008 interview with Riesel wherein Riesel detailed his reliance on counsel in structuring his buyer incentives. According to Hagberg, Riesel asked him to advise him of the proper way of getting these industry-standard buyer incentives approved.

Hagberg did not directly answer. He instead replied that all buyer incentives should be disclosed in the purchase contract and on the HUD-1. Mr. Riesel replied, based on his experience, that banks did not approve buyer incentives presented that way. There was no evidence of Hagberg ever ultimately answering the question or otherwise informing Mr. Riesel that such incentives could not be lawfully approved and that the common South Florida practices were all fraudulent.

With this evidence in the background, Mr. Riesel sought to establish that he in good faith sought counsel from attorney Airan Pace and reasonably relied on her advice in using the attorney-prepared and implemented trust scenario as a legal, viable means of complying with banking requirements for approvals of buyer incentives.

### C. In Its Discovery Submission, The Government Disclosed Several Correspondences Involving Attorney Airan Pace's Marketing Of Her Trust Scenario To Other Third Parties.

In a January 30, 2008 email, Airan Pace marketed her proposal to Gregory McCoskey, a lawyer for Homes for America. In her email, Airan Pace attached a copy of her trust structure that she had "used and would propose to use in structuring the deals for Homes for America with its buyers." (DX20a). Upon receipt and review, Attorney McCoskey responded that he did not "find anything illegal with what the borrower proposes," but that he believed the transaction was cumbersome and possibly inadvertently misleading:

| From: | McCoskey |
|---|---|
| To: | "Rashmi Airan-Pace" |
| Cc: | "Guyton, Ginny" |
| Subject: | RE: Draft of Declaration of Trust Document |
| Date: | Wednesday, January 30, 2008 2:07:27 PM |

Rashmi:

I have indeed received and reviewed your trust document.  I do not necessarily have concerns regarding the form of the document itself, but my client and I are still struggling to rationalize the necessity for these closing machinations altogether.  As you and I discussed, although I do not find anything illegal with what the borrower proposes, the economic rationale for this closing "system" escapes me, particularly in light of the additional transaction costs, including the costs of the trust arrangement itself and the additional layer of doc stamps.  In discussing this matter with my client, who is quite sophisticated in real estate lending, we also fail to see how this system is preferable to buyers' retail lenders.  I still find it likely that the added complexity of the intermediate trust transaction obfuscates marketing payments, enhanced commissions, or seller rebates that would otherwise appear on the closing statement, and thus is misleading (whether or not intentionally so).

Fifth Third will separately address these concerns with its borrower.  I merely wanted to confirm receipt of the trust document, as you asked, and give you the benefit of my current analysis for my client.

Greg

**Gregory M. McCoskey**
**GLENN RASMUSSEN FOGARTY & HOOKER, P.A.**
**100 South Ashley Drive, Suite 1300**
**Tampa, Florida  33602**
**(813) 229-3333  Fax (813) 229-5946**
**gmccoskey@glennrasmussen.com**
**Member of MERITAS Law Firms Worldwide**

Mr. Riesel is not a party to the email, nor does Airan Pace's proposal relate to any property

under Mr. Riesel's responsibility.

In a June 11, 2008, email, attorney Alan J. Polin similarly discussed his review of Airan

Pace's trust scenario that she sent to him. Though he finds some issues with her plan,[4] he states he

would permit his client, Shelby Homes, to use her plan if she could provide a written legal opinion

---

[4] Including the fact that the BID, in the amount of 30% of the purchase price appeared to be a
Seller discount in excess of the 6% limit.

6

letter of approval from the large firm she claimed had already verbally approved her plan. An

excerpt of the email follows:

> **From:** Alan J. Polin [mailto:alanpolin@polinlaw.com]
> **Sent:** Wednesday, June 11, 2008 12:37 PM
> **To:** 'Rashmi Airan-Pace'
> **Cc:** smorgareidge@shelby-homes.com; 'Jack Short'; alanpolin@polinlaw.com
> **Subject:** RE: Trust Scenario
>
> Dear Rashmi:
>
> This will confirm our telephone conversation regarding my review with you of your "Trust Scenario" real
> estate purchase transaction closing structure proposal ("closing structure proposal").  Very simply,
> unless you can share (provide) an attorney's legal opinion letter from a large law firm such as a
> Greenberg, Traurig, P.A. or a Shutts & Bowen, P.A., for example, (as you say you have received
> verbally) stating that they have reviewed your closing structure proposal and approve it as being totally
> in compliance with all applicable state and federal law, I cannot give Shelby my blessing or approval as
> to legal form of your suggested closing structure proposal.

(DX20g). A portion of attorney Polin's email claimed that Airan Pace's plan did not fully disclose

all buyer incentives.  Airan Pace replied, in pertinent part, that she made full disclosures to all

parties involved and did not need a large law firm to confirm the legitimacy of her trust scenario:

> **From:** Rashmi Airan-Pace [mailto:rashmi@fap-law.com]
> **Sent:** Wednesday, June 11, 2008 1:48 PM
> **To:** 'Alan J. Polin'
> **Cc:** smorgareidge@shelby-homes.com; 'Jack Short'; 'Jordana Ende'
> **Subject:** RE: Trust Scenario
>
> Dear Alan,
>
> It was a pleasure to speak with you this morning and I look forward to working with you on future
> transactions with Shelby Homes.
>
> Regarding your email, I would like to point out a few things.  First and foremost, every transaction that
> closes in this office is done with full disclosure to all parties and in compliance with state and federal
> law.  I do not believe it is necessary to get a legal opinion from a large law firm to legitimize a
> transaction as a legal transaction.

Again, Mr. Riesel is not a party to the email, nor does it concern a property he sold. Yet,

Airan Pace continues to market her trust scenario and vouch for its credibility. The defense sought

to reference these two documents in opening statement, but withdrew them following the government's objection.

The government produced several other documents detailing Airan Pace's extensive efforts at marketing her trust scenario to others unassociated with Mr. Riesel, including a February 25, 2008 correspondence to a "Bob" (DX20c) and a March 27, 2008 correspondence to attorney Yael Doron (DX20f).

### D. At Trial, The Court Excluded Evidence That Attorney Pace Marketed Her Trust Scenario And Vouched For Its Credibility To Others Not Associated With The Kensington Project.

Notwithstanding the bank representatives' clear implications that Airan Pace's trust scenario was fraudulent, Mr. Riesel sought to establish that he reasonably relied on Airan Pace's advice that such buyer incentives could lawfully be awarded by a seller. In support of his claim of reasonable reliance, Mr. Riesel sought the introduction of evidence that co-conspirator Jordana Ende-Tobel relied on Airan Pace's advice and that Airan Pace even submitted a written opinion letter vouching for the scenario's credibility.

At trial, Ms. Tobel recounted her speaking with Mr. Riesel about the questions she had about Airan Pace's trust structure for processing loans (DE220:19-20). She initially spoke to Mr. Riesel about the structure, who referred her to Airan Pace (DE220:20). In this conversation, which was toward the end of 2007, Airan Pace explained the trust's validity, "She explained that because these transactions were using a trust and anything the trust did the lender didn't necessarily care about that that was okay for the trust to make disbursements." (DE220:20-21). Ms. Tobel later requested a legal opinion (DE220:21). After several follow ups, Airan Pace provided it

(DE220:22). Ms. Tobel explained that the developers' questions regarding Airan Pace's trust scenario encouraged Ms. Tobel to ask the lawyer for the legal opinion (DE220:22-23).

The defense sought the opinion letter's admission over the government's objection. (DE220:23). The government maintained the letter would confuse the jury as to the applicable law (DE220:23-24). The defense explained that evidence of alleged co-conspirator Tobel's reliance on the legal advice of Airan Pace was relevant to the question of whether there was in fact a conspiracy and whether Mr. Riesel reasonably relied on Airan Pace's advice (24). The defense contended that Ms. Tobel's reasonable reliance on the lawyer bolstered Mr. Riesel's reasonable reliance because it would not "make sense if you have one person relying on the lawyer but nobody else rel[ying] on the lawyer." (DE220:24). The Court excluded the evidence, because there was no evidence that Mr. Riesel relied on the letter (DE220:24-25). The defense requested that the letter be admitted with a limiting instruction to cure the government's fear of confusion, which was denied (DE220:25).

The defense made a second attempt to introduce this evidence during Airan Pace's testimony. She admitted that she claimed a familiarity with the trust scenario to Mr. Riesel, Ms. Tobel, and others (DE218:15-16). And admitted that she provided a written opinion about the legality of the trust scenario to Ms. Tobel (DE218:16). The government again objected to its admission, which was sustained (DE218:18-21).

The defense next sought admission of evidence that Airan Pace marketed her trust structures to others, without admitting the particulars of the legal conclusions contained in the correspondences. Airan Pace admitted that she discussed the legality of the trust scenario with

9

other lawyers, including Allen Polin (DE218:24). The government, however objected to this line

of questioning, because it "involved developers that have nothing to do with this case":

> Ms. Tobel was out trying to market to other developers. Ms. Tobel introduced Ms.
> Airan-Pace as the person with the trust scenario and I think it is wandering off to
> other developers and other projects that are not at issue in this case. It's going to
> confuse and mislead the jury and we are sidetracking to other issues not related.

(DE218:25-26). The defense explained that it was narrowing its inquiry based on the court's prior

ruling and that it was merely attempting to detail Airan Pace's trust scenario distribution to others

during **the time of Kensington** (DE218:25). The court sustained the government's objection,

finding that the danger of the evidence confusing the jury outweighed its minimal relevance:

> I am going to sustain the objection. One, it's not really appropriate with the central
> issue here. There is too much of a danger regarding other people that may have
> relied on her legal advice, and their assessment of what she was doing may be very
> different than what you believe it to be. Communications may very well be
> privileged, so I am going to sustain the objection.

(DE218:26). The defense ended its line of questioning regarding the evidence of Airan Pace

discussing and marketing her trust structure to others, including attorneys, and their willingness to

use her trust scenario.

### E. The Government Argues In Closing Argument That Eli Risel Hired Attorney Airan Pace and Relied On Her Solely To Hide His Fraudulent Transactions.

Having successfully excluded all evidence of Airan Pace marketing and vouching her trust

scenario's validity to others, independent of Mr. Riesel, the government argued in closing

argument that Mr. Riesel sought out and hired Airan Pace not because of her expertise but because

needed someone who would rubber-stamp his illegal conduct:

> You heard a lot of finger pointing. The lawyers said this was okay. Ms. Airan-Pace
> said this was okay. I relied on the advice of my lawyer. You have heard that
> throughout the trial. You will hear that again in closing argument.

***

10

> Mr. Riesel relied on Ms. Airan-Pace but not for the reasons that Mr. Kuehne says. He relied on Ms. Airan-Pace to be in on it, to not blow the whistle, to not ruin the scheme, to go along, conduct the closings as arranged, and send the money back to the buyers.

(DE231:15-16).

With the exclusion of the evidence of Airan Pace marketing and vouching for the trust scenario's validity to others outside of Riesel-involved transactions, the most the defense could counter with was Paige Tarver's testimony that the lawyer affirmatively marketed her trust scenario to Mr. Riesel. The defense countered that Airan Pace was "a lawyer who [was] not sought out by the Berkowitz Group, not sought out by Eli Riesel or Abbey Berkowitz." (DE231:20). The defense discussed her confidentiality agreement and recounted how she came to the meeting with the plan and followed up with a memorandum detailing her trust scenario plan (DE231:46). However, given the court's evidentiary rulings, the defense was foreclosed from making the very powerful argument that Mr. Riesel was one of several people to whom Airan Pace marketed her trust scenario and one of several people who saw its viability and had a willingness to use it.

In its rebuttal closing argument, the government reargued its claim that Mr. Riesel used the Airan Pace as a lawyer because he needed a lawyer who would cover his illegal conduct (DE231:50):

> You heard a lot of law firm names in this courtroom during the trial. You heard Mr. Kuehne mention Greenberg Traurig and Greenspoon Marder, and some other of these big national firms, and Mr. Kuehne mentioned that in the context of those firms being involved in this transaction.
>
> So I ask you, why doesn't Mr. Riesel just use that firm? Why not just use Greenspoon Marder or Greenberg Traurig to do this work? Because he needed a lawyer who would not blow the whistle. He needed a lawyer who would keep it secret. He needed a lawyer who would go along with the scheme. That's why he didn't ask Greenberg Traurig and Greenspoon Marder to participate in this.
>
> Where is the good faith here?

11

Although the court instructed the jury that Mr. Riesel had to reasonably rely upon the advice of counsel in good-faith in order for the defense to apply, the evidence on which the jury had to consider was limited. It could not consider the written opinion Ms. Tobel received from the lawyer. Nor could the jury consider the fact that Airan Pace marketed her trust scenario to other individuals, including lawyers, who, like Mr. Riesel, saw her trust scenario as a viable means of structuring loans. Likewise, in weighing the merits of the government's argument that Mr. Riesel hired Airan Pace because he "needed a lawyer who would go along with the scheme," the jury did not have this compelling contrary evidence. The jury was instead left with the mountains of evidence from the bank representatives that such a transaction could not be lawfully structured.

**II.     Evidence Regarding The Admission of Airan Pace's File Information Sheets.**

> **A. The Government Elicits Testimony from Airan Pace, Over The Defense Objection, That Combo's Handwritten Notes Indicate, Per Airan Pace's Established Business Practices, That Mr. Riesel's Approved The HUD-1 Forms For Each Transaction.**

At trial, the government attempted to link Mr. Riesel's knowledge of the fraudulent HUD-1 forms through Airan Pace's file information sheets. At trial, after the admission of GX251, the government sought to elicit testimony regarding the bottom of the file information sheet, which had the names, "Rashmi," "Eli," and "Jordana" with check marks next to them (RAPM, at 42). The pertinent part of the evidence follows (GX251):

Airan Pace suggested the information sheet indicated Eli approved the HUD-1 (DE206:42). The defense objected on hearsay grounds noting the government's failure to lay a proper foundation for Attorney Pace's claim the document established that the note meant Nicole Cambo contacted Mr. Riesel who personally approved the HUD-1 (DE206:42). The defense asserted that the notation was "being offered for the truth of the matter asserted that Ms. Cambo contacted Mr. Riesel and Mr. Riesel said something." (DE206:44).

The court asked if Nicole Cambo, the note's author would testify, and whether Attorney Pace would testify that Cambo's note indicated Mr. Riesel approved the HUD-1 (DE206:43). The government explained it would not call Ms. Cambo and that Airan Pace testimony would be that Ms. Cambo's note indicated Mr. Riesel approved it (RAPA, at 43). The government contended the defense's concerns went to the weight to be given the evidence: (DE206:44-45).

> That's an argument as to the weight of the evidence, not admissibility. A classic business record is made up of a number of different things. The process is what makes it alive. Under the exception of the business hearsay rule, the process is the reliance of how things are done determines its reliability.

The court sustained the objection, explaining that Ms. Cambo should be brought in to testify because it was not clearly established that the subject notations were part of the regular business practice (DE206:45). The court did give the government leave to establish the necessary foundation, "It would have to be a regular practice that there would be approval from the defendant and it would be notated on every file in the regular course of the business practice." (DE206:45-46).

During a voir dire proffer, Airan Pace explained that Mr. Riesel's office received a copy of each HUD-1 (DE206:48). The government stated, "Now when I say his office, who did he work with? (RAPA, at 48). Airan Pace replied, "He worked with a woman named Donya Litowitz."

13

(DE206:48). She further detailed alleged conversations she had with Mr. Riesel about sending him HUD-1 forms for review and how he would indicate he reviewed them and would email back approvals (DE206:48). With regards to GX251, Airan Pace represented to the court that she told her employees to mark the names of people who she sent HUD-1 forms to and to check off each name as she received approvals from each person:

> It's like a quick note for Nicole to make sure she has done what she is supposed to do. I had instructed her along with my partner, Donya, to make sure that every time HUDs were sent out to the various parties involved to make a notation of it, and then when the approvals were provided by each person, to make a check.

(DE206:49). The court specifically asked Airan Pace if this process was done on every single form (DE206:49). Airan Pace replied "Yes," explaining that there were times where checkmarks were missing, but that the names were still there (DE206:49).

### B. The Government Learned, In Its Pretrial Interviews With Ms. Cambo And Donya Litowitz, That Mr. Riesel Did Not Typically Approve Preliminary HUD-1 Forms, Ms. Litowitz Did.

The Court indicated its bewilderment as to why the government chose to rely on this evidence as opposed to having live testimony from Ms. Cambo, "While I am scratching my head that the Government would simply rely on this as opposed to having a live witness is beyond me, but I do think that you have met the predicate. This isn't just a mere commentary on the document." (DE206:53). The defense did not volunteer the *very real and possible* reason that the government chose not to call Ms. Cambo to testify, based on the government's pre-trial investigation evidence from both Ms. Cambo and Ms. Litowitz that Mr. Riesel did not approve the HUD-1 forms (Exhibit 2). Nor did the government respond with this information. This evidence was admitted, corroborating Attorney Pace's claims that Mr. Riesel knew the BID entries were removed from

14

the HUD-1 forms and personally approved the alleged fraudulent HUD-1 forms she admitted to

signing.

    **F.  The Government Argues in closing that Eli Riesel was the maestro of the scheme who orchestrated everything.**

In closing, the government argued that Mr. Riesel was the maestro of the scheme

(DE231:5):

> In his opening statement, Mr. Kuehne told you that Mr. Riesel did not initiate or
> orchestrate this scheme. The evidence shows that he was the maestro of the scheme.
> This was his money he was giving away, his money, not somebody else's money.
> If he doesn't give it to the buyer, he gets to keep it. But, of course, the whole purpose
> for the scheme was if you don't give the buyer the money, you can't sell the unit.
> The person who makes the decisions about who gets the money was Mr. Riesel,
> nobody else.

During deliberations, the jury was given Government Exhibits 203, 204, 205, 227, 250,

and 251, which contained the file information sheets with checks next to them that indicated, as

Attorney Pace claimed, that Mr. Riesel was personally aware that the HUD-1 forms contained the

alleged fraudulent omissions.

In the end, the jury returned a split verdict. It acquitted Mr. Riesel of the 25 substantive

counts of bank fraud, but found him guilty of the conspiracy to commit bank fraud count.

## <u>ARGUMENT</u>

    **I.    Mr. Riesel Is Entitled to a Post-Verdict Judgment of Acquittal or a New Trial, Based on the Court's Exclusion of Critical Evidence Supporting His Good Faith Reliance on the Advice of Counsel Defense.**

The Eleventh Circuit has consistently recognized the validity of Mr. Riesel's asserted

defense of good faith reliance on the advice of counsel. "In order to take advantage of this defense,

the defendant must show that he relied in good faith after first making a full disclosure of all facts

that are relevant to the advice for which he consulted the attorney." *United States v. Eisenstein*,

731 F.2d 1540, 1543 (11th Cir. 1984). The Eleventh Circuit has recently remarked that "the reasonableness of any reliance turns on the **quality of the advice** and whether, under the circumstances, it was objectively reasonable for the taxpayer to rely on that advice." *Gustashaw v. C.I.R.*, 696 F.3d 1124, 1139 (11th Cir. 2012) (emphasis added). "Whether the defendant fully disclosed the relevant facts, failed to disclose all relevant facts, or concealed information from his advisor, and relied in good faith on his advisor are matters for the jury—and not the court—to determine, under proper instruction." *United States v. Kottwitz*, 614 F.3d 1241, 1271-72 (11th Cir. 2010). It was therefore imperative that all relevant evidence of Mr. Riesel's defense be admitted and placed before the jury for consideration.

A core aspect of the government's case-in-chief focused on the idea that buyer incentives of the type offered by Mr. Riesel were not kosher and that no reasonable mortgage broker could expect their lawful approval. The bank representatives collectively testified that, as a matter of banking policy, buyer incentives in excess of 6% are ultimately deducted from the borrower's requested mortgage loan amount. This unrebuttable evidence, combined with Hagberg's testimony that Mr. Riesel knew of this policy and had a mortgage broker's license, suggested he could not reasonably rely on contrary advice from Attorney Pace. Yet, Mr. Riesel was entitled to raise the defense and bore an "extremely low" threshold to justify a good faith reliance instruction. *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995).

Mr. Riesel sought to convince the jury of the reasonableness of his reliance on Airan Pace's trust scenario with evidence that the lawyer vouched for the lawfulness of her trust scenario not to just Mr. Riesel, but to other alleged members of the conspiracy, including Ms. Tobel, as well to other real-estate industry professionals. This evidence was relevant for several purposes. First, it

16

directly rebutted the clear implication of the government's case-in-chief that no reasonable person could lawfully construct a property sale transaction, funded by a mortgage, which provided for buyer incentives in excess of the "6% cap." It likewise bolstered the reasonableness of Mr. Riesel's reliance on Airan Pace's advice with evidence that she successfully marketed her plan plans to others. Third, the admission of the tangible emails showing Airan Pace marketing her trust scenario to others, including attorneys Alan Polin and Gregory McCoskey, would have tipped the scales of credibility in favor of Paige Tarver on the question of who hired Airan Pace and how Airan Pace became company counsel in the Kensington transactions by showing that Kensington was one of several clients to whom she proposed her trust scenario structure. Third, the admission of the opinion letter to Ms. Tobel would have bolstered Mr. Riesel's defense by showing others in the alleged conspiracy also reasonably relied on Airan Pace.

The Eleventh Circuit has granted a new trial where the district court excluded evidence from the defendant's lawyer that would have corroborated the defendant's good faith reliance on the advice of his counsel defense, his only viable defense:

> We are not convinced by the Government's "harmless error" argument.[4] As we have said, it might have been unrealistic to suggest that Ghitis and Eisenstein, operators of a business of this magnitude, relied in good faith on the advice of their attorney that they were not required to file these reports. However, even though it might be true that appellants would have been convicted for the lack of credibility of their only defense, the harm in having been denied such a defense is highlighted by the fact that, weak as it might have been, reliance on advice of counsel was appellants' only defense. The evidence of full disclosure, consisting entirely of Ghitis' unsupported testimony, could have been corroborated by his lawyer. The trial judge's failure to permit this highly relevant testimony cannot be dismissed as harmless error. Therefore, we reverse.

*United States v. Eisenstein*, 731 F.2d 1540, 1546 (11th Cir. 1984). This is such a case. Mr. Riesel's only defense was the advice of counsel. The jury accepted it on the substantive counts

but rejected it in deciding whether he conspired with others to commit mortgage fraud. One reading of the jury verdict suggests that the excluded evidence of his reasonable reliance on counsel would have tipped the scales in favor of the jury concluding he did not conspire with Airan Pace to commit mortgage fraud.

Moreover, even if the relevance of Airan Pace marketing, vouching for, and convincing others of her trust scenario's lawfulness was unclear during the lawyer's testimony, its relevance became crystal clear during the government's closing argument. The government's main response to Riesel's good-faith reliance defense was that he did not rely in good faith on Airan Pace's advice, but that sought her out and hired her because he needed someone to cover his tracks:

> Mr. Riesel relied on Ms. Airan-Pace but not for the reasons that Mr. Kuehne says. He relied on Ms. Airan-Pace to be in on it, to not blow the whistle, to not ruin the scheme, to go along, conduct the closings as arranged, and send the money back to the buyers.

(DE231:15-16). The government made similar arguments in its rebuttal argument:

> So I ask you, why doesn't Mr. Riesel just use that firm? Why not just use Greenspoon Marder or Greenberg Traurig to do this work? Because he needed a lawyer who would not blow the whistle. He needed a lawyer who would keep it secret. He needed a lawyer who would go along with the scheme. That's why he didn't ask Greenberg Traurig and Greenspoon Marder to participate in this.

(DE231:50). Had the jury received the tangible evidence of Airan Pace's personally drafted emails "proposing" the use of her trust scenario and defending its validity to members of the alleged conspiracy as well as members of the larger legal and real estate community during the time period she represented Kensington, the government would have been hard pressed to argue Mr. Riesel sought her out, much less that he picked her because he "needed a lawyer who would go along with the scheme." The ultimate exclusion of this critical evidence opened the door to the very

18

resonant argument that Mr. Riesel hired Airan Pace for the nefarious purpose of covering his mortgage fraud.

## II. The Trial Court Should Reconsider Its Decision To Admit The Evidence From Attorney Pace That The Loan Information Sheets Established Mr. Riesel Reviewed And Approved The Preliminary HUD-1 Forms.

The Court specifically asked Airan Pace if her employees used the same marking process when documenting whether each preliminary HUD-1 form was approved (DE206:49). She responded yes, explaining that there were times where checkmarks would be missing, but that the names were always listed (DE206:49). This was patently false and misleading. Almost half of the forms actually contained the word, "approved." (Exhibit 1). This evidence, as the Court explained, was a critical piece of evidence. Its admission must be revisited and new trial granted because of its erroneous admission.

The government never established a sufficient predicate for this evidence under Fed. R. Evid. 803(6)'s business records exceptions. "The touchstone of admissibility under the business records exception to the hearsay rule is reliability." *United States v. Durrett*, 524 Fed. Appx. 492, 495 (11th Cir. 2013). The reliability of Ms. Cambo's handwritten notes were never established. Indeed, Attorney Pace never actually claimed in voir dire that the HUD-1 forms were actually sent to Mr. Riesel as a matter of practice. The government asked Attorney Pace if she was aware of the HUD-1 forms going to Mr. Riesel's office, specifically to Donya Litowitz:

Q.   Do you know from your own personal knowledge if for every one of these Kensington closings a HUD-1 was sent to Mr. Riesel's office?

A.   Yes.

Q.   Now when I say his office, who did he work with?

A.   He worked with a woman named Donya Litowitz. I don't know. Four or five months into my relationship with these entities, he hired her.

19

(DE206:48). With respect to Mr. Riesel, she only testified to conversations she had with Mr. Riesel and him replying with his approval by e-mail (DE206:48). Incidentally, no such email was introduced into evidence.

United States District Judge Timothy J. Corrigan granted a new trial under similar circumstance in *United States v. Jenkins*, 499 F. Supp. 2d 1268, 1269 (M.D. Fla. 2007). There, the court admitted a ten-page composite exhibit of a Bank of America record of activity in one of the defendant's loans that purported to document details of a phone call the government claimed established the defendant knew his loans were fraudulently obtained. *Id*. at 1280, 1282. The defense, in its objection, made an argument similar to the argument made by counsel at trial:

> Jenkins' counsel objected to the admission of Gov't 1E on grounds of hearsay. The government responded that Gov't 1E was "simply a business record" that had been properly authenticated and did not raise a hearsay concern. Doc. 92 at Tr. 16. Jenkins' counsel responded, explaining that he did not have the ability to cross-examine the document, but if a person were sitting in the witness stand, he could ask them questions about whether they remembered making the call and what procedures were used to input the information. Doc. 92 at Tr. 17. The Court overruled the objection and Gov't 1E was admitted into evidence.

*Id*. at 1281. Following its admission, the government took "advantage of all opportunities to display page 8 of Gov't 1E to the jury, using it to demonstrate its theory that . . . he knew his loans were fraudulently obtained." *Id.* at 1282. Post-trial, the defense argued that the government failed to establish the reliability of the note contained within the Bank of America record, namely whether it was reliable and trustworthy:

> Jenkins did not object to the determination that this record was created as part of Bank of America's regularly conducted business activity nor to Ms. VanZee's testimony about the bank's records generally. Rather, Jenkins' focus is on the "trustworthiness" and "reliability" of this particular statement in this document, arguing that, without testimony from the actual bank collector who handled the call and took the notes reflected in the particular line on page 8 of Gov't 1E, Jenkins had no opportunity to probe whether the caller was actually talking to Jenkins or to

20

someone else; whether it was that particular caller's habit to record a customer's exact words or to paraphrase them; whether the notes were taken contemporaneously or were recreated from earlier sketch notes; and whether the caller was usually accurate or prone to errors.

*Id*. at 1284. On second thought, the court concluded the note did not meet the threshold of reliability and trustworthiness necessary for its admission to the jury because she could only testify generally how the notes were made. The court relied on inconsistencies in the bank notation, ultimately concluding that it would be pure guess work and speculation to guess the meaning of the note without its author:

> Now, upon reflection, the Court finds Gov't 1E is "simply too inscrutable" to meet the business record exception because "pure guesswork and speculation" would be required "to divine the source of the information" contained therein. *Petrocelli,* 679 F.2d at 291. Permitting this exhibit to be admitted under these circumstances deprived defendant of the key tool in the defense arsenal-the opportunity to cross-examine the source of the evidence being provided to the jury.

*Id*. at 1286. Given the evidence's importance to the contested issues, the court found the error to be sufficient in of itself to warrant a new trial. *Id.*

This court should similarly reconsider the admission of Airan Pace's testimony that the check marks in Government Exhibits 203, 204, 205, 227, 250, and 251 meant Ms. Cambo personally received approval of the preliminary HUD-1 forms from Riesel. A review of the forty-eight file information sheets contained in Government Exhibits 220-32, 234-40, and 242-50,[5] severely undercuts Airan Pace's trial claim that the check mark uniformly meant approved (Attachments A). At the outset, 7 of the 49 (14%) information sheets contained no check marks at all. But the most damning statistic is the number of information sheets with some version of the

---

[5] The defense has no record of receiving Government Exhibits 233 and 241. A compilation of all file information sheets is attached as Attachment G.

word "approved" next to an individual's name. Of the 49 information sheets included in the government exhibits, 22 (44.9%) had an "approval" notation by the person's name listed, suggesting the "approval" notation meant approved, as opposed to the "check" notation (GX226A):



Still, from the 18 of 49 file information sheets where the "approval" notation could arguably be attributed to Eli Riesel, it is difficult to so determine because two-thirds of them (12) combine Donya's and Eli's name:



(GX220A). Moreover, nine of the file information sheets have asterisks around Jordana (GX204A):



The meaning of the check marks, the approved marks, and the asterisks was pure guess work. Indeed, defense counsel properly noted, "There is no standardized form. These are information that are put on form by form, and she even indicates that the forms are not uniform. Sometimes it's on there. Other times it's not on there from her review." (DE206:51).

Although the government did not take every opportunity to use this evidence at trial as the government did in *Jenkins*, the Court should take into consideration the more egregious nature of this evidence's admission. Without the Court's evidentiary ruling, the government could not have established that Mr. Riesel personally approved the HUD-1 forms. Had the government been required to call Ms. Cambo to get the evidence admitted, she would have testified that Ms. Litowitz reviewed all preliminary HUD-1 forms and that she had "no dealings" with Mr. Riesel, beyond possibly setting closing dates.

That live testimony from Ms. Cambo would have established the direct opposite of Airan Pace's trial testimony illustrates the injustice that occurred as a result of this evidence's admission. Indeed, Ms. Cambo, in her February 9, 2012 interview with the FBI, explained that Donya Litowitz, from Mr. Riesel's office, typically reviewed and approved the preliminary HUD-1 forms. When shown Mr. Riesel's picture during that same interview, she said the person looked familiar but was not sure she ever saw him in person (Attachment B). In her March 19, 2014, interview with the FBI, at which SAUSA Capone was present, Ms. Cambo again explained that Litowitz approved the HUD-1 forms on behalf of Mr. Riesel and that she had "no dealings with Eli."

(Attachment C). All this evidene was corroborated by the FBI's interviews with Ms. Litowitz, one of which SAUSA Capone attended.[6]

In a close case as this, when the jury acquits the defendant of all 25 substantive counts of bank fraud, but convicts him only of conspiracy, the effect of significant evidentiary rulings found on second thought to be erroneous cannot be overstated.

## CONCLUSION

For these reasons, Mr. Riesel respectfully requests that this Court grant a post-verdict acquittal or order a new trial.

Respectfully submitted,

**LAW OFFICE OF
BENEDICT P. KUEHNE, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

By:    *S/ Benedict P. Kuehne*
         **BENEDICT P. KUEHNE**
         Florida Bar No. 233293
         **MICHAEL T. DAVIS**
         Florida Bar No. 63374

---

[6] For example, Ms. Litowitz, in her February 9, 2012 interview, confirmed Ms. Cambo's testimony when she explained that she reviewed the contracts and HUD-1 statements for the Kensington transactions (Attachment D). Similarly, Ms. Litowitz, in her November 19, 2012, interviewed, told the FBI that she received the preliminary HUD-1 reports from Attorney Pace and would approve them (Attachment E). Finally, at her March 19, 2014, FBI interview where SAUSA Capone attended, Litowitz explained that she would review the preliminary HUD-1's for the closing agents in preparation for closing (Attachment F).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on May 19, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

By:     S/ *Benedict P. Kuehne*
           **BENEDICT P. KUEHNE**