```
 1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2                            MIAMI DIVISION
                        CASE NO. 14-CR-80067-DPG
 3


 4   UNITED STATES OF AMERICA,           Miami, Florida

 5              Plaintiff,               July 16, 2015

 6   vs.                                 9:30 a.m. to 1:23 p.m.

 7   ELI RIESEL,

 8              Defendant.               Pages 1 to 121
     _____

 9

10                            SENTENCING
                  BEFORE THE HONORABLE DARRIN P. GAYLES
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   FOR THE GOVERNMENT:      JOSEPH CAPONE, ESQ.
                              FEDERAL HOUSING FINANCE AGENCY
14                            400 7th Street SW
                              Washington, DC 20024
15

16   FOR THE DEFENDANT:       BENEDICT P. KUEHNE, ESQ.
                              MICHAEL DAVIS, ESQ.
17                            LAW OFFICE OF BENEDICT P. KUEHNE, P.A.
                              100 S.E. Second Street
18                            Miami, Florida 33131

19   FOR U.S. PROBATION:      WENDY SQUITTERO, Probation Officer

20

     STENOGRAPHICALLY REPORTED BY:
21
                              PATRICIA DIAZ, FCRR, RPR, FPR
22                            Official Court Reporter
                              United States District Court
23                            400 North Miami Avenue
                              11th Floor
24                            Miami, Florida 33128
                              (305) 523-5178
25
```

```
 1                  (Call to the order of the Court).

 2             COURTROOM DEPUTY:  Calling United States versus Eli

 3   Riesel, Case Number 14-CR-80067.  Counsel, please state your

 4   appearance for the record.

 5             MR. CAPONE:  Good morning, Your Honor.  Joseph Capone

 6   for the United States.  With me at counsel table is case agent

 7   Mark Higgins and investigative analyst Rebecca Lee.

 8             THE COURT:  Good morning.

 9             MR. KUEHNE:  Good morning, Judge Gayles.  Ben Kuehne

10   and Michael Davis present for and with Eli Riesel.  We are

11   ready to proceed.

12             THE COURT:  All right.  Good morning.

13             And from Probation?

14             THE PROBATION OFFICER:  Good morning, Your Honor.

15   Wendy Squittero on behalf of Probation.

16             THE COURT:  Good morning.

17             We are here for Mr. Riesel's sentencing.  Are we ready

18   to proceed?

19             MR. CAPONE:  Yes, Your Honor.

20             MR. KUEHNE:  Yes, Judge.

21             THE COURT:  There were a number of objections that were

22   filed to the presentence report.  Mr. Davis, Mr. Kuehne, do you

23   want to begin with those?

24             MR. KUEHNE:  Yes, Your Honor, thank you.

25             Your Honor, with regard to today's sentencing,
```

 1    Mr. Riesel and his counsel have reviewed the amended revised

 2    second amended PSI.  We have, after attempting to resolve a

 3    number of disputed issues with the probation office, we put in

 4    our objections DE-270, the significant matters for which we

 5    believe the Court needs to make a ruling that impact the

 6    potential application of the guidelines as well as an

 7    evaluation of the case.

 8         Although the objections have significant narrative, we

 9    focus the objections on identifiable paragraphs of the PSI,

10    recognizing that the PSI is a product of a complicated multi-

11    defendant case with much facts and activity.  We believe that

12    some of the facts stated in the PSI are not appropriately drawn

13    from the trial evidence or other evidence that has been

14    presented in this case.

15         We ask the Court to first start on page five, paragraph

16    nine, which is a summary of the conspiracy and the role of

17    Kensington.

18         We have offered at pages four and five what we believe

19    should be the appropriate description of the Kensington

20    transaction.  We think it is critical and factually accurate

21    that the PSI reflect the early role of former codefendant

22    Rashmi Airan-Pace as counsel in effecting the entire Kensington

23    transaction and her role in the presentation of the trust

24    scenario that the Court heard about during the course of the

25    case.  We believe that without that information, paragraph nine

```
1    is factually incorrect, inaccurate and fails to describe the

2    process by which Kensington came to be controlled by the

3    Berkowitz Group for purposes of the sales at issue in this

4    case.

5          THE COURT:  Okay.  Why don't we just deal with all

6    those paragraphs where you are objecting to the language of the

7    paragraph?

8          MR. KUEHNE:  Yes, Your Honor.  Paragraph 9, paragraph

9    13, Your Honor, deals with -- just to summarize, paragraph 13,

10   we object to a particular sentence and it's stated on page five

11   of our objections.  He and his partners purchased approximately

12   103 units of the Kensington Trust for resale with the intent of

13   selling them with incentive packages not disclosed to the

14   banks.

15         We believe that that is factually inaccurate.  We have

16   proffered a paragraph, actually two paragraphs that we believe

17   correctly reflects the facts about the purchase of Kensington

18   and the business model for Kensington, supported by the

19   evidence at trial.

20         Next, Your Honor, factually, paragraph 14, we object to

21   the first sentence that deals with the process of receiving

22   preliminary HUD, HUD-1 forms.  We believe that it is factually

23   inaccurate and incomplete in that the testimony was not that

24   Eli Riesel personally reviewed HUD-1s, rather his office and a

25   particular person, Donya Litowitz at the office reviewed those
```

1    HUD-1s, and we have some citations to that information.  So we

2    offer on page seven what we believe is the appropriate factual

3    statement to be included in place of the existing paragraph 14.

4          Next, Your Honor, paragraph 15, we object because the

5    first sentence suggests, we believe inaccurately, that it was

6    Mr. Riesel who in every case caused cash to close funds to be

7    wire transferred.  We maintain that that is outside the

8    evidence in this case.  It is not supported by the evidence.

9    We cite in our memorandum our support, and we have the proposed

10    language recognizing that the trial evidence was that

11    Mr. Riesel caused the cash to close funds to be transferred on

12    a limited number of occasions and that is our preferred or

13    proffered language.

14          Next, Your Honor, paragraph 16, factually, we point out

15    that although the PSI broadly describes transactions in

16    general, the evidence was limited to a specific transaction and

17    we ask the Court to correct paragraph 16 to reflect that the

18    paragraph is referring to a singular transaction which is

19    supported by the evidence.

20          Paragraph 17 deals with Mr. Riesel's purported

21    knowledge of the HUD-1 forms.  We believe it is inaccurately

22    overstated and we offer our view of what the evidence was at

23    trial and what paragraph 17 should, in fact, reflect.

24          Paragraph 18 omits any reference to the advice of

25    counsel that was a major part of this case, and, in fact,

1    testified to by witnesses on the prosecution side and the

2    defense side.  To include a factual paragraph that identifies

3    the conduct of Rashmi Airan-Pace without identifying her role

4    and advice in these transactions is both incorrect and

5    misleading.  Our proposed language found in the memorandum

6    identifies that key ingredient that she was acting in the

7    capacity as a lawyer providing legal advice to those

8    participating.

9         Then, Your Honor, we move to paragraph 30, which comes

10   to the tail end of the factual statements, and we object to the

11   language that Kensington Trust completely failed to provide the

12   buyers with the full amount of guaranteed rent.  We believe

13   that is not consistent with the evidence.

14        In fact, it is inconsistent with the evidence.  Not

15   only Yeshaya Gross's testimony, but Cossio's testimony, we

16   believe that the conclusion of the rental guarantees was a

17   product of the agreements entered into with the buyers through

18   the third party and we believe that language should be

19   stricken.  If the Court prefers to include that language, we

20   have what we believe is the accurate language that should be

21   inserted in its place.

22        Paragraph 31, the final factual statement before we get

23   to trial testimony we believe should be stricken in its

24   entirety.  It utilizes a reference to Michael Zaric and it

25   argues that Michael Zaric made false testimony to the grand

```
 1   jury for which there is no evidence or any suggestion or

 2   knowledge that Mr. Riesel had any knowledge or involvement in

 3   any such false testimony, if it was given.  We believe that

 4   testimony should be stricken.

 5        Then in the section that deals with trial testimony, we

 6   object to paragraph 32, particularly the language that says in

 7   the last sentence, quote, he was the boss of Abbey Berkowitz,

 8   end quote.  The sentence continues.  There was absolutely no

 9   trial testimony that Mr. Riesel was the boss of anybody, let

10   alone Abbey Berkowitz, and we believe that should be stricken

11   as factually incorrect.

12        Paragraph 33, we object to the inclusion of a number of

13   individuals as conspirators or criminally responsible persons.

14   Certainly, there was no testimony that Paige Tarver, a lawyer

15   who testified in this case who had no agreement, who had no

16   plea agreement, no charges against her, we disagree that there

17   was any evidence suggesting she was a co-conspirator or a

18   criminally responsible person or engaged in any wrongdoing and

19   the same as to the other individuals, Gary Hughes, Jay Martin

20   and Jordan Chaikin.  We ask that that language be stricken.

21        Paragraph 34 deals with Michael Zaric and we believe

22   that the statement is inaccurate.  There was no evidence

23   reflecting that Michael Zaric was in any way a participant in

24   or aware of the incentive package.  The only testimony is that

25   he was requested to go to Rashmi Airan-Pace's office for the
```

1   purpose of assisting in updating the trust documents that had

2   been neglected by Rashmi Airan-Pace and her staff.

3        Paragraph 35, Your Honor, is both factually inaccurate

4   and it deals with what we will present to the Court as our

5   legal argument on an enhancement for organizer leader.

6        THE COURT:  Well, before we get to that, why don't we

7   take up the other paragraphs first?  Let me have the

8   Government's response as to the paragraphs 9, 13, 14, 15, 16,

9   17, 18, 30, 31, 32, 33 and 34.

10       MR. CAPONE:  Your Honor, I will begin by saying that

11  the facts that I provided to Probation Officer Squittero came

12  from the factual proffers in support of all of the

13  co-conspirators and co-defendants who plead guilty in this

14  case.  Each of those individuals, when they pleaded guilty,

15  signed a factual proffer and agreed with the Government that

16  those facts were true, that that was a true and accurate

17  representation of the facts supporting their guilty plea.  So

18  that's where all of the facts came from that I provided to

19  Ms. Squittero.

20       Paragraph nine is accurate.  It doesn't say as much as

21  Mr. Kuehne would like it to say but it's accurate.  In or

22  about November '07 is when Kensington Trust entered into the

23  agreement and purchased about a hundred units.  There is

24  nothing inaccurate about that at all.

25       Some of the language Mr. Kuehne proposes I think is

```
1    against the weight of the evidence at trial.  Ms. Airan-Pace
2    testified that she did not negotiate this transaction, others
3    did.  She drafted documents -- she reviewed documents that
4    others had, but she was adamant that she did not negotiate this
5    transaction.
6            Paragraph 13, if you recall the way the evidence came
7    out at trial, Mr. Riesel and his partners were selling
8    condominiums at Tampa properties for a year before
9    Ms. Airan-Pace got involved.  Ms. Tobel actually purchased
10   three of those units from Mr. Riesel at a Tampa condominium
11   complex with incentives, cash incentives that she received that
12   were not disclosed to the banks and she acknowledged that.  So,
13   for a year, Mr. Riesel is selling condos in Tampa with
14   undisclosed incentives.
15           When Ms. Airan-Pace comes along, it's because -- and
16   this is how she testified -- their HUDs were getting rejected
17   by banks on the Tampa properties.  What Ms. Airan-Pace said was
18   she was invited to this meeting because their HUDs, not the
19   sale contracts, not something else, the banks were starting to
20   reject the HUDs on the Tampa properties because they had
21   something on there called a design credit or they had some
22   other amount of money on the HUD that was, in fact, incentive
23   money and the banks just weren't funding them anymore.
24           So what they needed was a way to be able to pay
25   incentives to people and blow it by the banks.  I mean, that's
```

 1  the simplest way to put it.  That's why she came to this

 2  meeting and this was the whole basis for this trust scenario

 3  thing which was implemented in Tampa.

 4       If you recall, Ms. Airan-Pace got involved and the

 5  trust scenario got developed and they were using it in Tampa

 6  before the Kensington property was even purchased.

 7       So, at the time the Kensington property was purchased,

 8  Mr. Riesel was paying undisclosed incentives on Tampa

 9  properties.  It's logical, supported by the evidence in this

10  case that when they bought the Kensington, and I think there

11  was testimony about this, that they intended to pay incentives.

12  They bought the Kensington complex intending to sell them with

13  incentives.  Intending to sell them with incentives were not

14  disclosed to the bank.  They just had the experience in Tampa

15  with their HUD-1s getting rejected because of these incentive

16  packages, so they needed a way to sell condos at Kensington

17  without the banks finding out about it.

18       That is what the evidence showed at trial.  So that

19  supports paragraph 13's recitation of the facts.

20       Paragraph 14, there was evidence at trial that HUDs

21  were sent to Mr. Riesel.  We saw his e-mail address.

22  Ms. Airan-Pace testified that as a matter of routine course,

23  HUD-1s were sent to Mr. Riesel.  Ms. Airan-Pace testified that

24  she knows he got them because they had discussions about the

25  HUDs.  And we know that Mr. Riesel was aware of the HUDs and

 1    what was on the HUDs because when Wells Fargo rejected that
 2    Henry Regan unit in January of 2008, the decision was made to
 3    remove this so-called beneficial interest disbursement from the
 4    HUDs.  That was a decision Mr. Riesel made.  Ms. Airan-Pace
 5    carried out that decision.  So Mr. Riesel knew because he saw
 6    the HUDs before, he knew because he saw the HUDs after and, in
 7    fact, I submitted a number of e-mails attached to my response
 8    to the new trial motion to which I gave examples of where
 9    Mr. Riesel was saying, send me those HUDs.

10         The first two properties, Campos and the first Regan
11    property, Mr. Riesel sent an e-mail to Nicole Cambo saying,
12    please send me those HUDs.  He was tracking the HUDs.

13         The evidence as a whole and, again, in the light most
14    favorable to the Government shows that he saw the HUDs
15    beforehand.  He saw the HUDs after, and he knew what was on the
16    HUDs and he knew what was not on the HUD-1 forms.

17         Paragraph 15, we introduced evidence through Ernesto
18    Rodriguez that all the condos at Kensington were to be sold
19    with the incentive packages, which including cash to close.

20         We introduced a number of e-mails between Mr. Riesel
21    and Mr. Rodriguez showing that Mr. Riesel was fronting the cash
22    to close.  He was wiring large sums of money from which
23    Mr. Rodriguez went and bought cashier's checks and gave to
24    Ms. Airan-Pace.

25         We introduced summary exhibits, Government Exhibits 63

 1   and 64, which showed for each count in the indictment that

 2   large sums of money were being wired from Kensington,

 3   transferred to Arbors Management Guaranteed bank account.  Then

 4   to JAER, Mr. Rodriguez's company, and then oftentimes it went

 5   either to the buyer or perhaps there were other steps to

 6   Ms. Tarver or others for distribution.

 7        Those summary exhibits showed that Mr. Riesel was

 8   wiring money in advance for all of these units and the summary

 9   exhibits themselves show hundreds of thousands of dollars being

10   wired for each of those properties being sold.

11        So the evidence again shows that the cash to close was

12   paid as an incentive on all of these condo units, and that

13   Mr. Riesel was the origination of the money.  The money left

14   the Kensington Trust bank account.  It went into Arbors

15   Management Guarantee, and then it went onto the buyers.

16        Mr. Gross testified about this.  I showed him note

17   after note after note over a long period of time and

18   Mr. Gross's testimony was that Mr. Riesel would hand him a note

19   and say, here, move the money as I am instructing you to do and

20   he did.  That evidence shows that this cash to close was

21   provided for all of the units.

22        Paragraph 16, Ms. Tobel testified specifically about a

23   particular transaction in which eThree fronted cash to close

24   and got back the cash to close they fronted plus $2,500.  My

25   recollection of her testimony when I asked her how often did

1    this happen was she said something like three to five times.   I

2    don't have the transcript in front of me.   My recollection of

3    the testimony was she testified that this fronting of the cash

4    to close and getting reimbursed happened three to five times.

5        Paragraph 17, Mr. Riesel signed every sale and purchase

6    contract at Kensington.   His signature is on every one of them.

7    Not a single one of these purchase and sale contracts disclosed

8    any of these incentives.   Mr. Riesel was aware that the banks

9    were not being told for each and every one of those condos that

10   these incentives were not part of the sale and purchase

11   contract because he signed the contract and it wasn't there.

12       The HUD-1 forms, to the extent they don't disclose that

13   these incentives are being paid, then they are false.   They are

14   misleading and, again, it's the same evidence that we

15   introduced at trial is -- I will put it another way.   Everybody

16   involved in this scheme, especially Mr. Riesel, knew that the

17   seller -- the buyer had to provide their own cash to close.

18   That's a given.   That's so -- a basic understood fact in this

19   business.

20       Mr. Riesel knows that he is paying the cash to close.

21   It can't be on the HUD-1 form.   If the HUD-1 form truthfully

22   reflects that Mr. Riesel is paying the cash to close, no bank

23   would fund any of these loans.   They don't even look the same

24   on the HUD-1 form.   Instead of the bottom left-hand corner

25   showing 40, 50 or 60,000 and saying cash from buyer, it would

1   show up as a credit on both sides.  It would show up as money

2   paid by the seller and money received by the buyer.

3          It's so -- I mean, it's so obvious that the HUD-1 forms

4   did not disclose the cash to close that it's almost ludicrous

5   to think what the HUD-1 form would even look like.  It would

6   never go to the bank like that.  It's a given.  It's such a

7   basic fact of the scheme that he knows he is paying cash to

8   close for buyers, it can't be on the HUD-1s.  If it's on the

9   HUD-1s, not a single one of these loans is getting approved.

10          The advice of counsel defense was rejected by the jury.

11  It's pure speculation at this point to figure out why they

12  acquitted Mr. Riesel on the substantive counts.  My opinion is

13  perhaps a Pinkerton instruction would have gotten them over the

14  hump.  Who knows?  But we can't say that the jury acquitted

15  Mr. Riesel on the substantive counts based on advice of

16  counsel.  They would have had to acquit him on the conspiracy

17  count.  You instructed them that the advice of counsel defense

18  was a complete defense.  If they find that that's true, he

19  could not have had the intent to commit the crime.  They would

20  have had to acquit him of the conspiracy count.

21          So that issue is over with.  Once the jury came back

22  with a guilty verdict, there is no more advice of counsel.

23          I believe that would be objection to paragraph 18.

24          Paragraph 30, Mr. Cossio testified that his buyers --

25  it was a large group of buyers that he brought into this --

1    weren't getting their payments.  They weren't getting their

2    rental guarantee.  They weren't getting their condominium fees.

3    There was evidence they weren't getting them on time at first.

4            One of the exhibits I offered into evidence, I don't

5    have it handy, I will give the number to the Court in a minute.

6    There was an exhibit in which Mr. Cossio was e-mailing to

7    Mr. Riesel a worksheet, unit by unit and buyer by buyer.  It

8    had calculated for each of those units an amount of money that

9    was late or short.  I quoted it in my sentencing memorandum.

10           Mr. Cossio was pointing out, you are not paying these

11   folks their HOA fees on time and they can't pay them to the

12   condominium association.  It's causing problems.

13           So we have -- we have towards the end of the conspiracy

14   an obvious decision to stop, either cut back or completely stop

15   paying the incentives.  That caused borrowers to get in trouble

16   with their lenders.  That led to negotiations between

17   Mr. Riesel, Mr. Cossio and others, in which he said, I will pay

18   an amount of money, everyone will sign a release, and this will

19   end and then everybody is on their own.  You know, whatever

20   buyer gets a payoff, then after that point in time they are on

21   their own, but that's what started to happen at the end of '08

22   and into '09.  And there were other instances where Mr. Riesel

23   was dealing directly with individual buyers.

24           I am prepared to offer evidence of that today through

25   Agent Higgins, an e-mail exchange in which a buyer named Eddy

 1    Romaguera was negotiating directly with Mr. Riesel to get a

 2    payment amount to settle his claim of not getting his

 3    guaranteed rent and his HOA fees.

 4         The settlement, the very settlement of the claim is in

 5    itself part of the crime because what they are settling is

 6    illegal proceeds.  When a buyer buys one of these condominiums

 7    and the bank doesn't know that they are getting all these

 8    incentives, it's a fraud.  It's a crime.

 9         If Mr. Riesel stops paying that guaranteed rent that he

10    promised and instead says, I will write you a check for $5,000

11    or $6,000 for you to release me from any further obligation to

12    pay the incentive, it's in furtherance of the conspiracy

13    because it's the payment of incentive money.  It's a lump

14    payment of incentive money to settle what would otherwise have

15    been perhaps another year's worth of incentive payments.  So

16    the settlement itself is, in fact, in furtherance of the crime.

17         Paragraph 31.

18         THE COURT:  There is no testimony about that?

19         MR. CAPONE:  No, Your Honor, but I don't think it's

20    meant to be testimony in the Presentence Report.  I don't take

21    this as Ms. Squittero offering this as testimony.  Mr. Zaric is

22    a co-conspirator.  He is another party that she disclosed

23    earlier in her Presentence Investigation Report as a related

24    case.  I don't think this in any way is meant to say that

25    Mr. Riesel was involved in this perjury.  Obviously, he wasn't.

1    This occurred long after the conspiracy ended.

2         So when I read paragraph 31, I don't see this as

3    implicating Mr. Riesel.  In fact, it doesn't by its own terms.

4    It doesn't implicate Mr. Riesel in what Mr. Zaric did.

5         Paragraph 32, I think that's just a typo or mistake.  I

6    don't think Ms. Squittero meant to say that.  I agree,

7    Mr. Berkowitz was the boss of Mr. Riesel, not the other way

8    around, but I suspect that was just a drafting error.

9         Paragraph 33, Gary Hughes and Jay Martin.  If you

10   recall, when Wells Fargo Bank declined the Henry Regan loan,

11   the second loan, the second unit he was about to buy,

12   Ms. Airan-Pace testified, and I introduced an e-mail with Jay

13   Martin and Nicole Cambo in which Jay Martin was saying, hey, I

14   just heard from Gary that we are not putting that thing on the

15   HUD-1 anymore.  Mr. Martin discusses the fact that he just

16   spoke to Mr. Hughes, his partner, and they are telling Nicole

17   Cambo, hey, it's great that we are not going to put that on the

18   HUD-1 form anymore.  Wells Fargo is being a pain -- I'm

19   paraphrasing the e-mail -- Wells Fargo is being a pain, they

20   won't let this go.  It will just make it so much easier if we

21   don't put anything on the HUD-1 anymore.

22        That's evidence of intent.  That's evidence of

23   participating in the scheme, paying incentives and deliberately

24   in response to an objection from a bank removing any indication

25   at all of incentive money being paid.

1       So that evidence enough is to show that Martin and

2   Hughes were co-conspirators.  Ms. Airan-Pace testified that

3   they were finders for Mr. Riesel.  She testified to a

4   conversation in which Mr. Riesel acknowledged having finders.

5   And I think she said -- my recollection is she specifically

6   mentioned that Hughes and his partner Martin were, in fact,

7   California-based mortgage brokers who brought people in to buy

8   the condo units.

9       Jordan Chaikin, Vertical Unlimited Realty, he is the

10  guy that told Jordana Tobel how to divide up the incentive

11  money for her buyers.  She testified about Mr. Chaikin.  She

12  said he brought the buyers in, he's the one that told me,

13  here's how I want it divided up.  Either I don't want -- you

14  know, I don't want guaranteed rent or I do want guaranteed rent

15  or I want my incentive money in a lump sum.  Ms. Tobel

16  testified about that.  So Jordan Chaikin is fully aware that he

17  is bringing people into this scheme to buy units to get

18  undisclosed incentives.

19      Paige Tarver, you know, I have never called her a

20  co-conspirator, but I recall, Your Honor, during the litigation

21  over the subpoenas, if you recall back in January, February,

22  before Ms. Tobel plead guilty, her lawyers were subpoenaing

23  Ms. Tarver, I moved to quash the subpoenas.  My recollection is

24  when we were arguing those motions, one of the defense counsels

25  called Ms. Tarver a co-conspirator.  They were seeking her

 1    records as part of a defense in this case.

 2         I don't recall who said it, but I do know that all of

 3    defense counsel were joining in this.  They wanted Ms. Tarver

 4    to produce these records.  They had issued a subpoena.

 5    Mr. Kuehne, I think, filed a motion later to adopt all the

 6    subpoenas that had been issued pretrial by Mr. Srebnick, but

 7    somebody at that hearing called her a co-conspirator.  I did

 8    not call her a co-conspirator, but you can tell from the

 9    evidence in this case, she was distributing incentives.  She

10    was running incentive money through multiple bank accounts,

11    through her law firm trust account and through a Realty

12    Investment Services account, and then giving it to buyers.

13    She's a participant.  I can't tell you exactly what was in her

14    mind, but she was a participant.

15         I think we stopped at --

16         THE COURT:  I think there was finally paragraph 44

17    regarding Mr. Zaric.  That was the last objection before we

18    stopped.

19         MR. CAPONE:  Mr. Zaric appeared in a number of e-mails

20    we introduced into evidence.  He was the on-site sales guy at

21    Kensington.  He was tracking the sale of condominium units.  He

22    has subsequently pleaded guilty to perjury before the grand

23    jury.  His factual basis establishes that he was aware that

24    incentives were being paid but I think, more importantly, the

25    evidence as a whole shows that Mr. Zaric was in the middle of

1   this in the sense that he was tracking which condos had been

2   sold.  He was preparing spreadsheets.

3        I am prepared to offer another exhibit.  I think I

4   attached it to my sentencing memorandum.  It's an exhibit from

5   Mr. Zaric showing disbursement money, money that's been paid to

6   buyers.  It's a spreadsheet.  It's a follow-up e-mail to the

7   one that was introduced in evidence at trial.  I think it's

8   dated October 3rd.  Mr. Zaric sends a spreadsheet to Donya

9   Litowitz, Ms. Airan-Pace and his, Peter Mead, and says, here is

10  where I am with the preparation of the trusts, and the attached

11  spreadsheet has a column in which it shows money being

12  disbursed to buyers.

13       Again, the standard being the light most favorable to

14  the Government and the evidence as a whole, and I think the

15  evidence is clear that Mr. Zaric was fully aware of what was

16  going on here.  He is a participant.  If we are counting the

17  number of participants for purposes of a role enhancement here,

18  remember the standard is either five or more or otherwise

19  extensive.  I think we have proved that to the Court way beyond

20  what we had to, but if the quibble is whether Mr. Zaric counts

21  as a participant, the evidence shows he was a participant.

22

23            THE COURT:  Okay.

24            MR. CAPONE:  I think that's where we left off, Your

25  Honor.

```
 1              THE COURT:  That's where we left off.

 2              Anything you want to say as far as a reply?

 3              MR. KUEHNE:  Your Honor, just three things generally.

 4    One, I think it is critical in evaluating the Government's

 5    response that the Court note the significant charging

 6    differences in the indictment between the conspiracy,

 7    particularly as the Government describes the purpose and

 8    objects of the conspiracy, page five, paragraph 15, and then

 9    comparing that with the narrow charge alleged in each of the

10    substantive counts, specifically, Your Honor, the substantive

11    counts deal with the HUD-1s exclusively.

12              The conspiracy as alleged deals with transactions

13    involving the buyers, the contracts themselves, the incentives,

14    not simply the HUD-1s.  So to the extent the Government is

15    attempting to recast what was charged by the grand jury and

16    present it to this Court and the jury, we believe that is

17    inaccurate and the Court should hew to the actual charges.

18              That does, in fact, offer significant insight into the

19    validity of our arguments, particularly as focused on including

20    in the PSI with regard to Rashmi Airan-Pace, her role as

21    counsel and the reliance on defense -- the defense of reliance

22    on counsel's advice.

23              Second, Your Honor, we believe that given the

24    Government's discussion of the individuals that include Paige

25    Tarver, Gary Hughes, etcetera, although the Government may have
```

1    speculation that they were participants, there is neither

2    evidence nor any compelling preponderance of the evidence that

3    they were criminally knowledgeable participants, what is

4    required in -- for purposes of sentencing under the guidelines.

5         Finally, Your Honor, I would just note -- we would just

6    note generally that the Government certainly has a theory as to

7    why their presentation of facts that they gave to the probation

8    officer is accurate.  That theory is not evidence.  It's not

9    supported by evidence.  It's contrary to, in many respects, the

10   evidence adduced at this trial, and more importantly, the

11   information that we have asked to be included in the PSI for

12   completeness and to correct mis-impressions as well as

13   misstatements is not inaccurate.

14        And we believe for purposes of a complete and

15   comprehensive PSI, the Court should adopt the objections raised

16   by the defense.

17        THE COURT:  Okay.  The Court having considered the

18   objections and the response and the record as a whole, I am

19   going to overrule the objections as to paragraphs 9, 13, 14,

20   15, 16, 17, 18, 30, 31, and 34 as I find that those paragraphs

21   are not factually incorrect.  They are, in fact, consistent

22   with the evidence introduced at trial, as well as the record in

23   what is relevant conduct based on the Court's knowledge of all

24   of the codefendants and their guilty pleas and the factual

25   proffers made during each of those pleas.

1          I am going to sustain the objection as to paragraph 32

2    because there was no evidence that Mr. Riesel was the boss of

3    Abbey Berkowitz and I think the Government even conceded that

4    issue.

5          I am going to sustain the objection in part as to

6    paragraph 33.  I think it would be more appropriate to say in

7    that paragraph that the Government provided details regarding

8    additional unindicted alleged co-conspirators so I will insert

9    that word "alleged" as a part of the record.

10         I believe that takes care of all of the issues up until

11   paragraph 35.

12         Now, the issue regarding the objection as to whether or

13   not Mr. Riesel was an organizer or leader for which he received

14   the point enhancement, I was just pulling up the -- my computer

15   is slowed down.  I am having a technical issue.

16         Ms. Airan-Pace, she did not receive an enhancement as

17   an organizer leader, did she?

18         MR. CAPONE:  No, Your Honor, she did not.

19         THE COURT:  So considering -- well, it wasn't even

20   asked -- the Government didn't even ask for the enhancement.

21   Correct?

22         MR. CAPONE:  It was.  I mean, she had a negotiated plea

23   agreement and it was not, the parties did not agree to

24   recommend that, but also she didn't supervise or direct a

25   criminally culpable person.  The people that worked in her

 1   office were low level loan processors, administrative

 2   assistants.  There was nobody below her that she managed,

 3   supervised or directed.

 4        So factually, there wasn't a basis for her to get a

 5   role enhancement because of the people that were underneath of

 6   her in the scheme, but it was a negotiated plea agreement but

 7   it was based on those facts, Your Honor.

 8        THE COURT:  But, arguably, she would have been an

 9   organizer or leader?

10        MR. CAPONE:  The way I view the evidence, Your Honor,

11   is she was brought into this for a purpose, there was already

12   an ongoing plan.  They wanted someone to come in and tell them

13   how can we do this in a way to blow it by the banks?  She told

14   Mr. Riesel and Mr. Berkowitz and others, here is a way to do

15   it, but it's a way to do it to conceal it from the banks.

16        I would not describe that as an organizer.  She wasn't

17   the business person in the deal.  She wasn't the developer.

18   She had nothing to do with selecting the condominium complex to

19   buy.  She had nothing to do with negotiating the deal between

20   Carmelken and Kensington, how much money they were going to pay

21   for the units.  She did not come up with the incentives.  The

22   incentives had already been implemented in Tampa.  They were

23   going to be implemented at Kensington, but she didn't decide

24   how much of the money was going to go to rental guarantee or

25   how much of it was going to go to cash back or how much was

1    going to go to cash to close.  She couldn't because it wasn't

2    her money.

3              She was an advisor, if you will, and she carried out

4    the scheme.  She executed it by putting the paperwork together

5    and submitting it to the banks, but that's not a leader

6    organizer type activity.  This thing was decided before she was

7    brought in.

8              THE COURT:  All right.  Mr. Kuehne, your objection in

9    reverse order.

10             MR. KUEHNE:  Yes, Your Honor.  The Court notes that --

11   or we note that our objections to the PSI reflect our detailed

12   objection to the organizer leader enhancement as not being

13   applicable.  We also ask the Court and direct the Court to DE-

14   271.  That's our response to the Government's sentencing

15   memorandum where the Government offered their views as to why

16   Mr. Riesel should receive that enhancement.

17             That objection more fully articulates with factually

18   identifiable references why Mr. Riesel is not an organizer

19   leader and we ask the Court to take account of that.

20             We want to point out that as is critical in this

21   evaluation, the Court has to identify Mr. Riesel's conduct in

22   context of all the other individuals, and the fact that

23   somebody else who is culpable, significantly culpable provided

24   advice, guidance and actually handled all of the transactions

25   to the exclusion of every transaction for which there was

1    testimony involved with the banks, the very victims that the

2    Government claims were misled by the disclosures, where Rashmi

3    Airan-Pace did not receive that enhancement, Mr. Riesel is not

4    a person who should receive that enhancement, not only by

5    reason of how the guidelines are written, but factually.

6           And, additionally, Your Honor, with regard to the

7    reasons why that enhancement is not appropriate, that requires

8    a determination that Riesel exercised decisionmaking authority

9    over every participant in the scheme.

10          There is an absence of evidence that was Eli Riesel's

11   involvement in the case.  Not only did Rashmi Airan-Pace not

12   say that, or Jordana Tobel, or the other witnesses, the fact is

13   the lawyer was crucial to what the Government claims was the

14   fraud scheme here and if the lawyer was not an organizer,

15   leader, Mr. Riesel is of necessity and a matter of law, and we

16   cite the Tejada-Beltran case, 50 F.3d 105.  It's a First

17   Circuit case, Your Honor, 1995, and what it does is suggest the

18   Court look at the role activity in a pyramid, identifying the

19   people at the top, the people at the middle, the people at the

20   bottom.  And in this particular case, Eli Riesel is not

21   factually and legally a person at the top, atop the pyramid

22   based on relative responsibility.

23          As we note in -- referring to specific evidence as well

24   as 302s, Airan-Pace's involvement every step of the way

25   included involvement in activity that Mr. Riesel was not

 1    involved in, and we ask the Court to utilize the guidance of

 2    the cases led by the facts in this particular case, and the

 3    reality that the Government did not even argue or suggest, and

 4    the Court did not find -- although I recognize that nobody

 5    asked the Court to do that -- that Rashmi Airan-Pace was not an

 6    organizer, leader, did not get that enhancement, and for all of

 7    those reasons, Your Honor, Eli Riesel is not factually or

 8    legally appropriate for that significant enhancement.

 9           THE COURT:  One of the factors looking at 3(b) 1.1, the

10    application notes, as I understand it, one of the things for me

11    to consider is who profited more from the offense.  I mean,

12    didn't the record pretty much reveal that Mr. Riesel was the

13    one who profited most?

14           MR. KUEHNE:  I don't believe there is that evidence,

15    Your Honor.  The evidence in the record is that Mr. Riesel was

16    a salaried staff member of the Kensington Group.  There was no

17    evidence that Mr. Riesel received any profit participation,

18    received any money from any of these transactions.

19           The testimony was, just like Yeshaya Gross, they were

20    employees of the Berkowitz Group.

21           To the contrary, the testimony was that for each and

22    every closing, Rashmi Airan-Pace received her compensation.

23    She, based on the evidence in this case, received far more

24    money than Eli Riesel did, whose work was not just on

25    Kensington, but his salary was for Kensington and the other

1    projects that he worked on with the Berkowitz Group during that

2    period of time.  There were six of them.  Kensington, one of

3    six projects he was working on.

4         Rashmi Airan-Pace, the testimony, each and every

5    closing her money came.  She got the money.  We know that

6    because she handled all the closings, and although that amount

7    of money varies depending on what the closing is, it dwarfs the

8    total salary that Mr. Riesel got.

9         That factor, Your Honor -- and we are not suggesting

10   that the Court or anybody made an error in not applying an

11   enhancement to Rashmi Airan-Pace.  We believe that Mr. Riesel

12   is not at any higher level than Rashmi Airan-Pace, was not an

13   additional signatory, an additional supervisory authority, and

14   when it comes to money, he is not at the top of the food chain,

15   the top of the pyramid in that regard whatsoever.

16        So that commentary note to the extent that it does give

17   guidance, does not reach Eli Riesel.  Maybe it reaches the

18   ultimate profit distribution for the Kensington organization

19   but there was no evidence of that, number one.  And number two,

20   there was no profit as the information reflects.

21        This matter resolved itself without any profits going

22   to the Kensington Group whatsoever and certainly, no profit

23   money, no money per transaction, no money per closing going to

24   Eli Riesel at all, just a salary.

25        And, Your Honor, I think -- I can't say this for

```
 1    certain.  I know in our sentencing materials we say it, I think
 2    the evidence was that his salary was in the 75 to $100,000
 3    range during that time, annual salary for doing all the work
 4    that he did for the Kensington Group, for the Berkowitz Group,
 5    not limited to the Kensington Trust.
 6              THE COURT:  Anything else, Mr. Capone?
 7              MR. CAPONE:  Yes, Your Honor, a couple of points.  One,
 8    there are two exhibits in evidence, and if you indulge me I'd
 9    like to put them up on the Elmo if I can take a moment to do
10    that.
11              THE COURT:  Okay.
12              MR. CAPONE:  This is Exhibit Number 49 admitted through
13    Yeshaya Gross.  It's a note Mr. Riesel gave to Mr. Gross that
14    pertains to this unit, 250-101, which was one of the first
15    units sold in this conspiracy, and we have here profit being
16    divided up amongst the three owners of Kensington.  We
17    introduced certified copies of the Kensington corporate
18    records, which show that Mr. Riesel, Mr. Berkowitz and a man
19    named Yoel Damas, were the managing members.  They were the
20    owners of Kensington Trust.  This note here shows the profit
21    being split among the three owners, Abbey, Eli and Yoel, the
22    three owners of Kensington Trust.
23              I also have, and there are some factual issues in
24    dispute and I plan to present some testimony to the Court about
25    loss, for example, but I've got an operating agreement.  I have
```

```
 1    an e-mail that was sent from Ms. Airan-Pace to Mr. Riesel with

 2    an operating agreement attached to it for Kensington Trust.

 3          In that operating agreement the parties set out exactly

 4    how they are supposed to split the profit and the factors that

 5    are listed in that operating agreement match this perfectly.

 6          Mr. Damas gets 50 percent.  Mr. Riesel gets

 7    37 percent -- excuse me, Mr. Berkowitz gets 37 percent and

 8    Mr. Riesel gets 13 percent.  Those percentage splits of the

 9    profit of Kensington are right in the operating agreement, and,

10    lo and behold, when you do the math, that is exactly how this

11    works out.  The profit on the sale of this unit got split

12    percentage-wise, exactly as listed in the operating agreement.

13          This is Exhibit 40 admitted in evidence at trial.  This

14    was an e-mail from Mr. Riesel to Mr. Rodriguez attaching a

15    spreadsheet.  The e-mail is dated May 27th of '08, and the

16    spreadsheet shows the sale of each unit, the incentive money

17    disbursed, building, unit, buyer, broker, price, trust

18    disbursement and profit.  The last column is the profit.

19          If you look like right here, one of the first

20    condominiums sold, Julio Campos, which closed March of '08, the

21    profit is right here, 16,896.96.  That's the exact figure I

22    showed you on the Government exhibit.  This is the amount of

23    money that Kensington Trust had made through May of 2008, over

24    half a million dollars.  That's a calculation of the profit.

25    This is a spreadsheet Mr. Riesel sent to Mr. Rodriguez showing
```

as of late May, Kensington Trust made a half million dollars.

The evidence shows that the three owners of Kensington were going to split those profits.  This figure of 7,500 a month that was quoted in the presentence quote, as far as I can tell, that came from Mr. Kuehne or Mr. Riesel.  There was no evidence introduced at trial as to what his salary was, but this evidence was introduced at trial and it shows that he is an owner of the company.  The company made over a half million dollars in profit by the end of May, and that note that he gave to Shaya Gross shows he is splitting the profit with his business partners.

Ms. Airan-Pace took a fee.  The most you could say about what she did was for every set of paperwork she processed, she got a fee.  That's it.  She didn't make any other decisions in this entire scheme.

THE COURT:  All right.  The Court having considered the argument and the pleadings and the evidence introduced at trial, I am going to --

MR. KUEHNE:  Your Honor, I apologize but I had just two items that I wanted to mention in comment to the Government.

THE COURT:  Okay.

MR. KUEHNE:  First, Your Honor, it is critical to identify with regard to this money that there is no testimony whatsoever and no evidence that Mr. Riesel got any of these moneys, got any profit participation, and although that

 1    spreadsheet for a transaction did reflect what was supposed to

 2    be the profit on these transactions, there was never any

 3    evidence, and, in fact, there is no evidence because it's not

 4    true that Mr. Riesel ever got any profit participation from any

 5    of these transactions whatsoever.

 6          I think the evidence is that that $500,000 went to pay

 7    one of the original investors in the Kensington acquisition,

 8    Mr. Aller.

 9          Secondly, Your Honor, with regard to Rashmi Airan-Pace,

10    we have pointed out in our materials, and I simply want to

11    focus on it, that the testimony is Airan-Pace communicated with

12    the realtors, directed the realtors in what to do, communicated

13    with the banks, the only person who communicated with the

14    banks, communicated with Eli Riesel's office as to what he

15    needed to do.  The e-mails reflect that she is the one

16    directing matters consistent with what the testimony was, her

17    trust scenario advice.

18          So to the extent the Government argues that she

19    received a payment per unit, which is completely accurate, her

20    payment came as a result of her directing the parties as to how

21    to affect the paperwork that went to the banks.  That is the

22    essence of what the Government alleged to be the counts of the

23    indictment, the information disclosed or not disclosed to the

24    banks, and that was Rashmi Airan-Pace, not Eli Riesel.

25          For those reasons, Judge, we believe that enhancement

1  is not applicable.

2          THE COURT:  Okay.  As I was saying, having considered

3  everything, I am going to sustain the objection in part as

4  opposed to the four-level increase pursuant to 3(b)1.1(a).  I

5  am going to increase by two levels the applicable point

6  calculation pursuant to 3(b)1.1(c) as the Court finds, based on

7  the record, that the defendant was an organizer, leader,

8  manager, supervisor in the criminal activity.

9          I do note that this was a fairly large, complex fraud.

10 There were clearly delineated divisions of responsibility.  The

11 defendant was effectively the genesis of the idea to hide the

12 incentives.  While Ms. Pace came up with the mechanism to do

13 that, it was Mr. Riesel's intent to hide these incentives from

14 the bank so that the mortgages would be approved.  He had

15 decisionmaking authority in the offense, and he was to profit

16 more than most, although not as much as Mr. Berkowitz, for the

17 fraud.  Whether there was an actual profit or an intended

18 profit, I don't find that it is material.

19         I think I still arrive at the same conclusion, so I

20 will sustain the objection in apartment.

21         The next issue that we need to take up is what?

22         MR. KUEHNE:  Your Honor, the next objection deals with

23 paragraph 50.  We have -- we have a couple items I just want to

24 not ignore, Judge, and that is, I want to point out on

25 paragraph 38, I did not mention that earlier but paragraph 38

 1   is essentially the connection to paragraph -- our objection to

 2   paragraph 30 dealing with the rental guarantees.  We have

 3   objected to the characterization in paragraph 38, similar to

 4   what we argued in the -- with regard to paragraph 30.

 5        THE COURT:  Okay.  The objection will be overruled.

 6        MR. KUEHNE:  Paragraph 39, Your Honor, contains what we

 7   maintain is a factually inaccurate statement that says

 8   Airan-Pace was recruited by Mr. Riesel.  I know the Court has

 9   made a determination on role adjustment, but factually that's

10   just not right.  There was no testimony that she was recruited.

11   In fact, she made an affirmative presentation based on an

12   opportunity presented to her through Paige Tarver, and she

13   sought this client out.  She was not recruited by Mr. Riesel

14   or, frankly, anybody at the Berkowitz Group.

15        We would ask the Court, although it does not impact the

16   sentencing guidelines, to strike that as being factually not

17   accurate.

18        THE COURT:  Any comment about the use of the word

19   recruited?

20        MR. CAPONE:  Solicited her assistance.  Mr. Riesel

21   asked her to help him find a way to get these incentives past

22   the banks.  So I don't necessarily adopt the word recruited

23   but, certainly, there was a solicitation, a request.  You know,

24   she went to that meeting because Mr. Riesel was looking for

25   someone who could help do this.  Paige Tarver made the

introduction.  Paige Tarver arranged the meeting and made the

introduction.  Ms. Airan-Pace didn't set out to find

Mr. Riesel.  Mr. Riesel was looking for a lawyer to help him do

this.  That's how she got there.

So when she got there, he said, here is what we want to

do, can you help?  She said, here is what you can do, and that

was it.

THE COURT:  All right.  I am going to overrule the

objection.  I understand the point being made.  The actual --

what actually occurred is within the broad scope of that word.

While I understand the objection, I am going to overrule it.

MR. KUEHNE:  Yes, Your Honor.  The Court has already

made the role assessment determination, but just for record

purposes, we did object to paragraph 40 which had the

four-level increase.  The Court determined that two-level

increase was appropriate, so we do want to make certain that

that objection is clear on the record.

THE COURT:  It is.

MR. KUEHNE:  Paragraph 41, Your Honor, it does not

impact the sentencing guidelines and the Court did, in fact,

evaluate and discuss the role of Airan-Pace.  We believe that

the paragraph instead of limiting her role as the attorney

should more fully describe what she did as the attorney

including her initial involvement with the acquisition of the

Kensington properties, as well as her extensive presentation of

1    this trust scenario to others, not just those involved in these

2    particular transactions.

3              The Government has suggested that somehow this case has

4    to do with other properties, Tampa properties.  We disagree

5    that there is any such involvement in this case, but to the

6    extent the Government makes that assertion, we believe that a

7    proper PSI description of Airan-Pace's involvement should

8    include that additional language.  It does not impact the

9    Sentencing Guidelines, however.

10             THE COURT:  Okay.  I am going to overrule that

11   objection.

12             MR. KUEHNE:  Your Honor, we are getting to the next

13   series of objections.  Starting with victim impact, paragraph

14   46 essentially deals with the construct of loss, a factor that

15   does impact significantly in connection with these guidelines,

16   and we have made extensive presentation in our objections to

17   the PSI, as well as our response to the Government's sentencing

18   memorandum on the issue of loss, and we believe it's

19   appropriate to make a presentation at this time.

20             THE COURT:  All right.  Why don't we -- before we get

21   to the presentation that you have on loss, why don't we take

22   about a five-minute break, come back and resume?

23             MR. KUEHNE:  Yes, Judge.  Thank you.

24             COURTROOM DEPUTY:  All rise.

25             (Brief recess)

```
 1                 (Call to the order of the Court)

 2                 THE COURT:  Please be seated.

 3                 Are we ready to proceed?

 4                 MR. KUEHNE:  Yes, Your Honor.

 5                 Your Honor, the significant sentencing guideline

 6       calculation that most impacts the advisory guidelines is loss,

 7       as is always the issue with fraud cases.  Conceptually, there

 8       are three aspects to loss that we are going to focus on that

 9       will require the Court to make a determination.

10                 First, broadly, is Counts 2 through 26, what does the

11       Court do with the specific counts for which Mr. Riesel was

12       acquitted?  There is some case law and there is some factual

13       argument.

14                 Second, what is the conduct, the loss conduct that is

15       part of the Count 1 conspiracy?  Arguably, does it include the

16       substantive count, does it not include the substantive counts?

17       And then third, is there any other conduct that was not charged

18       and proven in this case that adds to the determination of loss?

19                 We have argued to the Court that the Court should find

20       that the actual loss in this case for sentencing purposes is at

21       a loss amount of under $3.5 million.

22                 There are, however, several other steps that provide

23       different guideline calculations depending on what the Court

24       does, recognizing that the Government is seeking an enhancement

25       based on a loss of $16 million.  That is a 20-level increase.
```

1    We believe that's not factually accurate nor appropriate in

2    this case.

3         Undergirding this argument, Your Honor, is the

4    recognition that the guidelines change or will change

5    November 1, 2015, unless Congress decides otherwise.

6         So while the November amendments are not binding as

7    advisory guidelines, they, nonetheless, add to the Court's

8    analysis.  And essentially, what that does is change the

9    guideline calculation of the plus 20 that the Government is

10   arguing instead of starting at $7 million, it starts at

11   $9.5 million.  That's a significant consideration when the

12   Court evaluates what the loss is.

13        So on that point, Your Honor, we don't ask the Court

14   that it must apply the amended guidelines, but to the extent

15   that the numbers come within what would be the transition from

16   the guidelines, the Court should factor that in either as an

17   appropriate consideration under a 5k2.0, something already

18   factored into the guidelines, or as an additional ground for

19   variance.

20        So with regard to our argument, Your Honor, that the

21   Court should, at a minimum, start this case and not include as

22   a calculation the dollar value for the 25 counts for which

23   Mr. Riesel was acquitted, one, we recognize the law in the

24   Eleventh Circuit, the law in the federal system, that the Court

25   can, but is not required to consider acquitted conduct, can but

1    is not required to.  In this case the Court should not.  And if

2    the Court does, as the Cavelo case says, consider acquitted

3    conduct, the Court must necessarily make a finding that that

4    evidence was established by the required burden.  Preponderance

5    of the evidence, or clear and convincing, depending on the

6    standard that is applicable.  We urge the Court to utilize the

7    more strict, clear and convincing, although there is some case

8    law suggesting preponderance of the evidence is what the Court

9    can utilize, we believe the better weight of the authority

10    suggests that clear and convincing is the standard.

11        With regard to acquitted conduct, the jury's

12    determination that Mr. Riesel did not engage in that

13    substantive conduct, specific counts of defrauding the banks

14    with the false HUD-1s is sufficient for this Court to pull out

15    from the alleged bank losses these substantive counts.  Not

16    only was there an acquittal, but the acquittal is the context

17    that Mr. Eli is not responsible for those losses as charged in

18    the indictment.

19        And this is where an evaluation of the indictment

20    becomes critical in the sense of what remains with the

21    conspiracy.  We note and have pointed out in our memorandum

22    that the Government actually presented evidence and argued to

23    the jury that the nature of the conspiracy was different from

24    the substantive offenses and actually presented in evidence in

25    their summary charge, Government's Exhibit 63 and 64, specific

1    identifiers as to what properties were part of the conspiracy,

2    separate and apart from those properties that were part of the

3    substantive offenses.  The two were not joined.  The two were

4    not added on.

5         And when the Court looks at what the Government's

6    theory was, what the Government proof was, and what the jury

7    considered when evaluating this case, the Court's determination

8    should be that the losses identifiable for Count 1 amount to

9    the $3.5 million, and that is based on what was shown to the

10   jury as part of the conspiracy, the $3.5 million gets to a

11   completely different offense level.  We compute it as an

12   offense level 16 based on the current guidelines.

13        The analysis, Your Honor, the Government claims there

14   are 103, 103 units that form relevant conduct and that every

15   single unit is part of the charged conspiracy or relevant

16   conduct, and that every single unit was the result -- the sale

17   of every single unit and closing was the result of the fraud

18   scheme outlined in Count 1 of the conspiracy.

19        First, Your Honor, that was not what was alleged in the

20   indictment.  It's not what was argued to the jury.  It's not

21   the basis on which the evidence was presented to the jury in

22   terms of what the Count 1 conspiracy involved, and,

23   additionally, Your Honor, and most importantly, there is a

24   complete absence of any evidence that any of these loans, any

25   of these properties that closed for which no loan files were

 1    presented, whether it be to the jury or in discovery, show that

 2    these were the result of any fraud on Mr. Riesel's part.

 3          That's 88 units.  That's how the Government goes from a

 4    loss of $3 million or a loss of $7 million, if you include the

 5    acquitted conduct, to the total loss of $16 million, lumping in

 6    every sale, even though there is no evidence, none, that each

 7    of these sales was a product of the conspiratorial conduct,

 8    Mr. Riesel being involved in not disclosing information to the

 9    banks.

10          So for that reason, Your Honor, not only are the other

11    88 units not part of the charged conspiracy, they are not

12    relevant conduct as the conspiracy is alleged in this case, and

13    they are certainly not proven by a preponderance or clear and

14    convincing evidence as an established loss, a loss attributable

15    to criminal activity in which Mr. Riesel was involved.

16          Note, Your Honor, that I have mentioned that the

17    acquitted conduct is about $3 million, $3.1 million if you

18    total up all of the acquitted conduct, and without that

19    acquitted conduct, the guideline level should be 16 for a

20    computed loss of $3 million.

21          To the extent the Court deems it appropriate to

22    consider the acquitted conduct, that still rises only to the

23    level of either a level 16, the same level, or an 18, depending

24    on whether the Court uses the guidance of the amended

25    guidelines, changing that number to -- from $7 million to 9.5.

1        And finally, Your Honor, although we recognize that the

2   Court does have the ability to, if it so decides, consider the

3   acquitted conduct, the most recent decision just a month ago,

4   the Cavelo case, which was cited in the materials, gives the

5   Court great guidance making clear that the Court can consider

6   acquitted conduct, but in doing so must make that specific

7   determination based on the quantum of proof.

8        We believe the quantum of proof, as I said, is clear

9   and convincing evidence and there is simply not that evidence

10  to show even on the acquitted conduct that Mr. Riesel is

11  criminally responsible for those.

12       We also point out in making our argument, Your Honor,

13  that the nature of this charge has already taken into

14  consideration the entirety of Mr. Riesel's conduct, and it

15  would be inappropriate under the guidelines to add the

16  $8 million plus for these other 88 or 80 or so loan files for

17  which there was no evidence presented and no discovery

18  disclosed about these loan files.

19       And to the extent that the Court utilizes the argument

20  under 5k2.0, the Court is allowed to consider a downward

21  departure, not a variance but a downward departure under the

22  guidelines for a circumstance that is already considered in the

23  general offense conduct.  And that would be applicable here,

24  the idea that the crime itself for which Mr. Riesel was

25  convicted and should be sentenced is totally independent of the

```
 1    charges that were presented to the jury and the jury's

 2    determination.

 3          The jury's determination must necessarily have some

 4    meaning and consequence and this Court could utilize the 5k2.0

 5    variant departure analysis to make clear that that factor was

 6    already factored in when the jury made the determination for

 7    guilt on Count 1.

 8          THE COURT:  Okay.  Thank you.

 9          MR. KUEHNE:  Finally, Your Honor, and this is an

10    overarching consideration when the Court looks at the nature of

11    a financial loss, and that is whether the mere counting of

12    numbers is sufficiently equivalent to the conduct or whether in

13    particular circumstances it overstates the seriousness of the

14    losses.  And it is appropriate in this case, and there was

15    evidence in this case that the Court should consider the impact

16    of factors not attributable to Eli Riesel, and that is the

17    essential national recession and the housing crisis that caused

18    losses to be far greater than anybody could reasonably have

19    anticipated at the time of these transactions.

20          In that regard, by simply cumulating the dollar losses

21    that occurred in 2010 and 2011, years after the conduct, that

22    is not reasonably foreseeable and overstates the dollar

23    amounts.  Had the foreclosures occurred closer in time to the

24    defaults, had the foreclosures occurred closer in time to the

25    offense conduct, the losses to the banks would have been
```

1   significantly lower.  In other words, the banks were in some

2   respects victimized by the delay in foreclosures based on the

3   housing crisis and debacle, having nothing to do with Eli

4   Riesel.  The Court should consider that in factoring in the

5   determination of loss.

6          So in summary, Your Honor, the loan files that are

7   shown in the evidence that are part of the discovery amounts to

8   $8 million, a little bit above $8 million.  That's a

9   significantly different guideline computation, under the

10  present guidelines as well as the new guidelines.  Then if the

11  Court draws out from there the acquitted conduct, that results

12  in a loss of $3.1 million.  We ask the Court to determine that

13  the appropriate loss is $3.1 million, and we do have argument

14  on variance to follow.

15         THE COURT:  Okay.

16         Your response.

17         MR. CAPONE:  Your Honor, I will start with the standard

18  burden of proof.  First of all, it's preponderance.  There is

19  no question it's preponderance.  The Siegelman case which I

20  cited in my sentencing memorandum which Mr. Kuehne cited says

21  preponderance.  In fact, Siegelman explicitly rejected a higher

22  standard of proof.  The only thing that Mr. Kuehne can suggest

23  for a higher standard of proof is dicta in the Watts case.

24  That's it.  There is no case in this district, this circuit or

25  anywhere else that says that the standard should be clear and

1    convincing evidence.

2        Secondly, the conspiracy as charged in the indictment

3    is very broad.  It encompasses every act.  If you read the

4    manner and means of this conspiracy, it's soup to nuts.  It

5    talks about everything.  It talks about the purchase of the

6    complex.  It talks about the development of the incentives, the

7    payment of the incentives, the methods by which the incentives

8    were distributed.

9        The individual counts are executions, the taking of a

10   set of documents and giving it to the bank, that's all they are

11   is the executions.  This conspiracy could not have succeeded

12   without the executions.  Everyone could get together and agree

13   they are going to pay incentives and agree they are not going

14   to tell the banks about it.  Part of the conspiracy is giving

15   the documents to the bank.  That's how it maintained.  That's

16   how Mr. Riesel got money that he could then give to buyers

17   through the executions.

18       So he was involved in the executions.  He knew about

19   the executions.  He wanted the executions because that's how he

20   sold condos.  If you don't send the paperwork to the bank, you

21   don't sell a condo.  You don't get any profit.  There is no

22   money to give to a buyer.

23       The real estate crash really has nothing to do with

24   this case and here is why.  When Mr. Riesel, Mr. Berkowitz and

25   Mr. Damas decided to buy the Kensington condo from Carmelken,

1    the previous owner, it was distressed.  Carmelken was in

2    financial straits.  It's bank, Corus, was about to foreclose.

3    They found this deal as a good deal because Carmelken was in

4    bad shape.  So they negotiated a very favorable deal to buy 103

5    units.  The sale and purchase contract is Government Exhibit

6    255.  It's in evidence at trial.  It shows exactly which units

7    were subject to the sale and purchase agreement.  It's 103

8    units.

9         The important point is that Carmelken was in trouble.

10   They couldn't sell these condo units.  Mr. Riesel,

11   Mr. Berkowitz, Mr. Damas bought that condominium complex with

12   the intent of paying people to buy them.  You don't pay someone

13   to buy your condo unless you have to because that's your profit

14   you're giving away.  The market is already declining.  By 2007,

15   2008, the market is declining.  Carmelken can't sell their

16   condos.  Mr. Riesel and his partners swoop in, they pick this

17   up at a favorable price with the precise plan to sell these

18   units with incentives.

19        Government Exhibit 40 shows Jason Porterfield bought

20   five units.  Mr. Riesel paid him around $100,000 per unit.  Now

21   we are talking about units that sold for $340,000 and

22   Mr. Riesel is paying them $100,000 for a $340,000 unit.  What

23   does that say?  I mean, it's a basic given fact, I can't sell

24   these condos without giving incentives.

25        So when Mr. Riesel got into this deal, he knew the

 1    market was declining.  He had to sell the condos with

 2    incentives, so that factor is awash.  The fact that the market

 3    was declining is built in, if you will, from the very beginning

 4    of the scheme.

 5           We have provided to the Court in the form of a summary

 6    chart attached to my sentencing memorandum a unit by unit

 7    analysis of the loss.  This is the classic way you do this.

 8    You go look in the property records, how much was the unpaid

 9    principal balance?  We are not adding interest or finance

10    charges, just how much was the bank owed when they foreclosed

11    on the unit and how much did it then sell for?  What was the

12    next sale of the unit after foreclosure, and you take the

13    difference, plain and simple.

14           If there has not yet been a sale, the next best thing

15    to look at is the tax appraisal amount and that's the amount we

16    took.

17           The method we used is dead on in the commentary of the

18    guidelines.  We did exactly what the guidelines say you should

19    do in trying to calculate loss.

20           The evidence at trial and parts I cited in my

21    sentencing memorandum clearly show that Mr. Riesel knew from

22    day one what he was doing here.  You know, when you inflate the

23    price of a condominium unit by that much money and you tell

24    people, you don't have to put up a penny of your own money,

25    nothing.  You can own this condo without putting up a penny of

1    your own money, you know they have got nothing invested in

2    that.  They have got no skin in the game.  There is no way a

3    lender would have given the mortgage loan that they got.

4         You know at some point that that's going to collapse.

5    It's almost a given.  So it's a matter of can we pay these

6    incentives long enough to just get out of this thing and move

7    on and then whatever happens later, happens.  That's what

8    happened here.

9         He stopped paying the incentives.  People who had no

10   motivation to keep making their mortgage payments did what

11   anybody would do, stop making the mortgage payments.

12        And I have cited to the Court again in my sentencing

13   memorandum all of the flashing red lights that are going off

14   when this thing is starting to fall apart.  Mike Zaric sends a

15   delinquency report to Mr. Riesel, $200,000 in unpaid home

16   association dues.

17        Atlantic & Pacific Management, the company that's

18   managing rental guarantee program, Mr. Smith sends a frantic

19   e-mail in January of 2009 to Mr. Riesel, I can't hold off the

20   legal threats anymore.  I need hundreds of thousands of dollars

21   in order to pay back some of these outstanding rental

22   guarantees and HOA fees.

23        It's perfectly clear as this thing progresses that it's

24   falling apart and anybody involved in this scheme, and

25   especially somebody who has obtained a mortgage broker's

```
 1    license, really knows that if you inflate the price of a condo,

 2    the loan-to-value ratio is all out of whack, and when that

 3    thing goes bad, it's going to go bad in a big way.

 4           The guidelines tell you, what's foreseeable?  What's a

 5    reasonably foreseeable pecuniary loss here?  And the evidence

 6    in this case shows that this was all foreseeable.  It was

 7    easily foreseeable to Mr. Riesel.

 8           Ms. Lee is prepared to testify today at the hearing how

 9    she created this chart, and we've actually got all the backup

10    materials to it.  We went and printed out all of the screen

11    shots from the Palm Beach County property records showing the

12    principal value and the updates of the unpaid principal

13    balance.  We have all of that here.  I provided it to defense

14    counsel prior to hearing and she is prepared to testify to

15    this, but this is what we did and this is a reasonable, legally

16    acceptable, and factually solid calculation.  It's

17    conservative.

18           We excluded a bunch of units that we couldn't tell what

19    the loss was.  We excluded units that Kensington Trust bought

20    for itself, essentially, and, frankly, we have, and I am

21    prepared to have Ms. Lee explain this, we prepared even a

22    backup calculation, an even more conservative calculation.  We

23    took only the units that were contained in Government

24    Exhibit 40, units that had been sold up through the end of May

25    of '08.  We combined that with units for which we introduced
```

1    loan files at trial, and we still came up with a loss of around

2    $12 million.  So even using a super-conservative method, we

3    still came up with losses of 12 and a half million dollars.

4         The new guideline that's taking effect is not binding

5    on the Court but even if it were, we are still well over the

6    nine and a half million dollar level for that 20-level

7    increase.

8         So, Your Honor, I have proffered what Ms. Lee is going

9    to testify to.  I am prepared to put her on the stand if you'd

10   like to hear her testimony.

11        THE COURT:  Anything else, Mr. Kuehne?

12        MR. KUEHNE:  Yes, Judge, three items.

13        First, Your Honor, and it appears to be conceded by the

14   Government, there were absolutely no loan files for the bulk of

15   these claims the Government is asserting as part of relevant

16   conduct.  Without loan files, without any documentary evidence

17   provided, there is no way to identify those other properties as

18   having been part of conspiratorial illegal conduct, and I would

19   note the case cited, we cite, I believe the Government cites

20   the Trujillo case that talks about charges for relevant

21   conduct, losses for transactions for relevant conduct.

22        In Trujillo, 561 Fed. Appx. 840, 11th Circuit, 2014,

23   the transaction and the loan files were introduced into

24   evidence, all of them, and that's the basis on which the Court

25   utilized that overarching computation.  We don't have any of

1    the operative documents, any, other than the Government having

2    gone to public records and looked at foreclosure sale prices.

3           For that reason, the Court should not use the overly

4    broad brush of 103 units.

5           Second, Your Honor, I want to remind the Court that

6    Siegelman leaves open the issue of what the burden is but

7    particularly guided by Watts, Supreme Court case, where the

8    guideline computation is sufficiently enhanced -- they use the

9    word extremely enhanced -- it's an open question whether clear

10   and convincing evidence is the standard.  There is no clear and

11   convincing evidence to establish these other than the charges

12   that were shown at trial and become part of the conspiracy,

13   wherever that line is, but there is no preponderance of the

14   evidence either.

15          Finally, Your Honor, I remind the Court that in each of

16   the transactions involved that the Government established by

17   evidence, professional appraisals were presented and there was

18   not the slightest evidence, not the slightest allegation, not

19   even a suggestion that Kensington or Eli Riesel had any

20   involvement in false inflated appraisals.  These were fair

21   market value appraisals utilized by the banks in every single

22   instance for which a loan file was presented and to the extent

23   that does auger an argument about what could be the understood

24   reasonably expected loss, those appraisals form the foundation

25   for what Mr. Riesel reasonably understood at the time of the

1    conduct, not something that happened three, four years, two,

2    three and four years later when the banks decided to ultimately

3    obtain a foreclosure sale.

4          Thank you, Judge.

5          THE COURT:  So I just want to be clear.  So

6    Ms. Airan-Pace agreed to the loss amount of $16,496,242.  Are

7    you disputing that loss amount in -- I guess in the overall

8    scheme or are you simply saying Mr. Riesel, that amount

9    shouldn't be attributed to Mr. Riesel for the reasons that you

10   have already articulated?

11         MR. KUEHNE:  More pointedly the latter, Judge, but with

12   regard to the former, I want to note three aspects with

13   Airan-Pace.  One, her charge was a five-year conspiracy.  No

14   amount, no amount of loss computations impacted the guidelines

15   as affected by the maximum sentence allowable by law.

16   Essentially, it's a nonissue for any determination because the

17   most she could have gotten was 60 months.

18         Second, Your Honor, the fact that Airan-Pace, through

19   her plea agreement, agreed to some amount that became mere

20   speculative with no impact on her sentencing is not binding as

21   to Mr. Riesel, nor did Ms. Airan-Pace adduce any evidence as to

22   the loss figures for any of these other transactions.

23         And third, Your Honor, I would note that the evidence

24   reflects that she handled all the closings.  So to the extent

25   that her involvement in all the closings comports with her

1    determination that she was responsible for whatever the banks

2    decided, there is no such evidence in this particular case

3    because we only have loan files for, I believe, 42

4    transactions, not 103.

5            THE COURT:  Okay.  Mr. Capone, the item that was

6    introduced in evidence, I can't remember the number, if it was

7    40 or 41, that you showed me, that chart that was in evidence,

8    what was the loss amount calculated in that exhibit?

9            MR. CAPONE:  Government's Exhibit 40.

10           THE COURT:  I'm sorry, can you put it back on the

11   screen?

12           MR. CAPONE:  Government's Exhibit 40 has a total of

13   63 units on the chart.  In our calculation we excluded three of

14   those units from here because they didn't have a trust

15   disbursement listed.  So what I was explaining to the Court is

16   we took these units, we took all of these units, plus the

17   mortgage loan files that were admitted into evidence, and we

18   did an analysis of the loss using the property records for just

19   those units.

20           So we excluded a whole bunch of other units for which

21   we did not introduce a loan file or weren't included on this

22   chart, and we came up with 12 and a half million dollars in

23   losses.

24           And the purpose of that, again, was just to be

25   conservative.  I anticipated that Mr. Kuehne was going to argue

1    that if I didn't offer a loan file in evidence that it

2    shouldn't count.  This document, Exhibit 40, establishes that

3    each of these units was sold with an incentive package.  It

4    even shows the profit on each of the units.

5         There was some additional loan files that we offered in

6    evidence that were not on Government's Exhibit 40, so our

7    backup number, if you will, our conservative number of 12 and a

8    half million, was based on this exhibit plus a few additional

9    loan files.

10        THE COURT:  Okay.

11        MR. CAPONE:  May I respond to one of Mr. Kuehne's

12   points regarding Ms. Airan-Pace?

13        THE COURT:  Okay.

14        MR. CAPONE:  If you recall, her guidelines with the

15   losses was $16.5 million in losses, wasn't a lot higher than 60

16   months.  If I recall, it was 70-something months.  She was

17   capped at 60 months.  It was a negotiated plea agreement, but

18   her losses did count.

19        I mean, her losses, like all losses in a white collar

20   case, drive the guidelines.  So those losses counted.  They

21   were there.  Her guideline range would have been somewhere

22   around 70 months had she not been capped.  That's my

23   recollection of her guideline range.

24        But I just wanted to point out that those losses did

25   count.  And we calculated those losses the same way we

1  calculated these losses and for every other defendant.  We went

2  into the property records unit by unit.  The reason there is a

3  little variance is because some of these properties have sold

4  and so the number may change or, if it's a tax assessment

5  appraisal, the number may change a little bit.

6      So if you go in month to month, you may find the

7  numbers vary if a unit sold or something like that, but other

8  than that there is not much variance.  But that's how we

9  calculated the losses for all the defendants.

10      THE COURT:  All right.  As to paragraph 52 regarding

11  the loss amount, I first note a number of things.  First, the

12  primary codefendant in this case, Ms. Airan-Pace, stipulated

13  pursuant to her plea and the factual proffer a loss amount in

14  the amount of $16,496,242, which, of course, is greater than

15  the amount agreed to by the Government as to the codefendant,

16  Mr. Tezanos, but based on his involvement in some specific

17  transactions.

18      The Government at trial presented evidence regarding

19  specific transactions, including specific loss amounts

20  totalling 12 and a half million dollars, which I note even with

21  that loss amount, it still falls within 2B1.1(b)(1)(k), with

22  the additional 20 levels.

23      The Court has considered the broad scope of the

24  conspiracy charge in the superseding indictment so I am not

25  even sure if I really have to do a relevant conduct analysis

1    for the acquitted charges because the offenses in the

2    substantive count are clearly contemplated by the broad

3    conspiracy count, but I do find that based on the preponderance

4    of the evidence, that the conduct has been established as it

5    pertains to this defendant.

6            I am going to overrule the objection as to the loss

7    amount.  I am, however -- because it was introduced at

8    evidence, introduced in evidence at trial, I will cap the

9    amount of loss at $12.5 million as to this defendant.  It

10   doesn't affect the guideline calculation pursuant to

11   2B1.1(b)(1)(k).  Even at that amount, it is still a plus 20,

12   and I do find that that loss amount based on the defendant's

13   actions and -- well, based on the conspiracy, even just the

14   conspiracy that this amount was clearly reasonably foreseeable

15   based on the conspiracy.  So I am going to overrule the

16   objection.

17           All right.  What else do we have here?

18           MR. KUEHNE:  Judge, a few other items in our objections

19   to the PSI.  I am noting Your Honor, if we move to paragraph

20   50, we ask the Court to consider a reduction for acceptance of

21   responsibility based on the entirety of the defense that was

22   based on the reliance on advice of counsel that was replete

23   throughout the course of this case, and that was a legal

24   defense presented by Mr. Riesel.  He did not in any way through

25   testimony, through his sentencing letter in any way raise other

```
1    issues in defending this case.

2         The Court should consider that where the defense

3    presented as a legal defense reliance on advice of counsel,

4    that allows the Court to find and allow a reduction for

5    acceptance of responsibility.  He has certainly accepted the

6    conduct.  His entire defense was that the conduct was guided by

7    advice of counsel.

8         The jury convicted, but, nonetheless, he tested the

9    case on the basis of a legal defense for which the Court should

10   give a two level decrease for acceptance of responsibility in

11   the unique circumstances of this case.

12        THE COURT:  Okay.  Your response?

13        MR. CAPONE:  Your Honor, I agree with the probation

14   officer's response that that is not the intent of the

15   acceptance of responsibility.  We are not talking about a

16   constitutional challenge here, challenge to a statute.  He

17   never accepted responsibility until he got convicted and,

18   frankly, he still doesn't acknowledge intent and that is an

19   element of this, intent to fraud, and he denies that to this

20   date.  So he doesn't qualify for acceptance of responsibility.

21        THE COURT:  Okay.  I am going to overrule the

22   objection.  I do not find that the defendant has clearly

23   accepted responsibility as contemplated by 3E1.1.  I don't find

24   that this rule would encompass a situation such as this trial.

25   This wasn't a technical legal issue or a constitutional issue
```

1    for which the defendant challenged.  He is still challenging

2    his intent and his knowing involvement.

3         Therefore, I don't find a reduction for acceptance of

4    responsibility appropriate.

5         Do we have any further objections?

6         MR. KUEHNE:  Yes, Judge.  To make clear, Your Honor, we

7    have brought before the Court in paragraph 54, the Court has

8    already made the adjustment of two levels.  We have asked the

9    Court to actually consider a downward role adjustment and

10   that's our objection to paragraph 54.

11        THE COURT:  Well, based on my earlier ruling, the

12   objection is overruled as to 54, but I will take up the issue

13   regarding a variance or departure after I hear from the

14   Government.

15        MR. KUEHNE:  Your Honor, just so that you are focused,

16   I apologize, I know the Court made a ruling.  We've presented

17   to the Court the specific language on the aggravating versus

18   mitigating role and we do want to emphasize to the Court that

19   the guidelines don't make them mutually exclusive, and as the

20   guidelines have been written, the gain to Mr. Riesel in

21   connection with the loss to the victims is a factor the Court

22   is allowed to consider in evaluating the application of the

23   mitigating role adjustment, and in this particular case, even

24   given the Government's claim of a percentage gain, even though

25   there is no evidence that Mr. Riesel got that money, it

```
 1   still -- any gain to Mr. Riesel still dwarfs the losses for
 2   which the Court should consider the downward adjustment for
 3   mitigating role.  We have argued that.  We have presented that
 4   in our memorandum as well as our response, and that guideline
 5   requires that Court's consideration not simply if an
 6   aggravating role is otherwise found, a mitigating role is not
 7   applicable.
 8           THE COURT:  I understand and I have considered it.
 9           MR. KUEHNE:  Yes, sir.
10           THE COURT:  All right.  Of course, there was the
11   objection to paragraph 59 regarding the total offense level.  I
12   am going to overrule that objection based on my other findings.
13   I think that takes care of all of the objection.  Is that
14   correct?
15           MR. KUEHNE:  Yes, Your Honor, we have articulated the
16   objections.  The Court has made a specific ruling on every
17   objection.
18           THE COURT:  So, Probation, where does that place us now
19   as far as the guideline calculations?
20           THE PROBATION OFFICER:  Your Honor, we are at a total
21   offense level of 29, resulting in a guideline range of 87 to
22   108 months.
23           THE COURT:  All right.  What is the Government's
24   recommendation as to an appropriate sentence?
25           MR. CAPONE:  Your Honor, I request the Court give
```

1   Mr. Riesel a guideline sentence, a sentence within the

2   applicable guideline range.  I would like, however, to reserve

3   my argument.  I know he has got additional presentation, a

4   video and some other argument he would like to make.

5        With the Court's permission, I would like to reserve

6   some of my arguments until after the defense is done.

7        THE COURT:  All right.  Are you ready to proceed with

8   your presentation?

9        MR. KUEHNE:  Yes, Your Honor.  This part of the

10  sentencing moves into the 3553 sentencing factors applicable

11  and considerations of variance.

12       Your Honor, we would like to start off this case, as we

13  notified chambers, we have put together and want to present to

14  the Court a video presentation of many individuals who are

15  offering sentencing comments about Eli Riesel, who he is, and

16  what matters to him and to this Court.  It's 20 minutes.  We

17  are not going to -- we edited it significantly, but it

18  incorporates in a presentation format an overview of what much

19  of the materials are in the sentencing memorandum and the

20  comprehensive set of 100-plus letters that have been presented

21  to the Court.

22       THE COURT:  Okay.

23       (Video played as follows).

24       MS. R. RIESEL:  From when he was a baby, he would play

25  shul.  Eli was the first grandson coming from two Holocaust

```
 1    surviving grandparents so he was a very big deal.  From the day
 2    he was born, it was a very big deal.
 3              MR. RIESEL:  Eli was born in Brooklyn.
 4              MS. R. RIESEL:  He became, as he got older, a very
 5    gifted child.  He was playing violin at three and he was in
 6    concerts at three.  He was an excellent student.  He was
 7    respectful to teachers, helpful to other students in class.
 8              MR. RIESEL:  We have had ten kids.
 9              MS. RIESEL:  He helped out making dinner.  If any baby
10    was crying, he would hold the baby.
11              MALE SPEAKER:  Sit down and sort the socks.  Yes, the
12    laundry.
13              FEMALE SPEAKER:  Whatever needed to be done, counsel
14    the other kids.  The thing he was most excited about always was
15    learning Torah.  Learning Torah for him was the most important
16    thing, even from when he was a baby.
17              From when he was a baby, he would play shul.  He would
18    have his little tallis and he took a little box and he had a
19    little Torah he kept in the box.  And he'd set up all the dolls
20    around and he had a shul from when he was maybe two to three
21    years old.
22              MR. RIESEL:  Our father was a cantor.  He was already a
23    cantor in Europe before he came over to America.  I just
24    couldn't do it, but Eli did.  To this very day, it hasn't left
25    Eli and people notice it.
```

1          MS. R. RIESEL:  After his Bar Mitzvah, I had this great

2     idea.  Eli likes learning, let's motivate him to start reading

3     the Torah every week.  Reading the Torah every week is an hour

4     a day proposition of time to prepare it.  He was up for the

5     challenge.

6          The second challenge of that was taking the walk to the

7     synagogue that hired him to read the Torah for them.

8          MR. RIESEL:  It's very rare.  Usually if you go to a

9     synagogue and you have someone reading Torah, they're in like

10    their 30s, 40s.  He was reading the entire Torah at that age.

11         MS. R. RIESEL:  It was a very big accomplishment on his

12    part and they gave him an award for it at one of the --

13         MR. RIESEL:  -- annual dinners.

14         MS. R. RIESEL:  Yeah, one of the annual dinners.

15         MR. RIESEL:  He was one of the honorees.

16         MS. R. RIESEL:  His intention was always to learn

17    Torah, always to be in the Shiva environment.

18         MR. RIESEL:  And he was valedictorian.

19         MS. R. RIESEL:  He was valedictorian.  Yeah, when he

20    went into real estate, like, it was, like, totally out of his

21    comfort zone.  When he was new, one of the first days he called

22    me up crying, I can't do this.  But he knew he had to work.

23    His wife was expecting.

24         MR. RIESEL:  At one point there was the issue of a

25    divorce and he just said, I am not doing it.  I don't want the

1   kids to grow up in a divorced family.

2           MS. R. RIESEL:  So he worked on it and he worked on it

3   with Nechama and Nechama and also worked on it and together

4   they have really come a long way, like really, really

5   beautiful, really, really beautiful, and the kids also.

6           MR. RIESEL:  He has a good name.  He has a good name

7   and that's why there are people out there who will do whatever

8   they can to help out Eli.  He doesn't ask for it, but they are

9   there for him because he is always there for them.

10          MR. BRECHER:  He is a sweetheart.  He really is.  He is

11  just a very sweet, good person.  You never see him upset.  Even

12  with his kids, you never see him upset.  You know, they're

13  rambunctious kids, but he takes it all in stride.

14          MS. N. RIESEL:  He is a very caring person.  He cares

15  about everybody and nobody is not normal and not good and

16  whatever, everybody is perfect and they just -- some people

17  need a little bit more help.

18          A lot of times he feels that he is the one who is

19  capable of it and he takes it upon himself to help them.  And I

20  felt that marrying him I'd be secure, I'd be happy and all my

21  childhood traumas and issues he would be able to figure out.

22  And he did for the most part.  He was really good about that.

23          He is a wonderful father.  My kids love him I'd like to

24  say more than me.  If Eli is not home, there is a problem.  If

25  I am not home, they are perfectly fine.  They miss me and they

```
 1    want to talk to me but they're fine.  Eli is the super mom.  He
 2    is daddy, mommy and everything in between.  Baker, cooker,
 3    sleeper, bather, you name it, he does it.
 4         MR. EHRICH:  You would be hard-pressed to find someone
 5    who -- no one can say a bad thing about the guy.  Like I don't
 6    think he has ever been in an argument in his life.  For me
 7    personally, he has helped me a tremendous amount getting my
 8    career on track.  I am a professional singer, cantor.  He is --
 9    I get jittery before the high holidays and the big events and
10    he would just work with me.  He is a brilliant cantor.  I mean,
11    I think his grandfather was like a famous Chazzan cantor and he
12    grew up with it.  His ear, his understanding of the music,
13    his -- when he leads a congregation, it's a -- it's not just
14    about his voice or the fact that he owns the music.  It's --
15    it's -- he understands the words he is saying in Hebrew and he
16    just takes us with him.
17         MR. BRECHER:  I moved down here, joined up with the
18    Kollel.  The Kollel is comprised of between 5 and 15 of the
19    young men who have studied as rabbis, understand the Torah, and
20    are willing to then help themselves get in a post education
21    type of situation, get to know it better and then help others
22    by spending time with members of the community who are less
23    learned.
24         Eli started coming more often to the Kollel and
25    studying there and he would bring his kids.  And they were at
```

1   that time very young.  He was involved in the Kollel.  He was

2   involved in studying himself, and very quickly he started

3   helping others who knew less than did he and he would study

4   with them.  And he did it with enthusiasm.  He did it as

5   something which they could think about and that he could impart

6   it with great warmth and actually brilliance as well.

7        He came in as a young fellow and starting to study,

8   study more, study more, and then sharing it all.  And he has

9   become a central figure in the community.  His wife has sort of

10  grown with him as well so his trajectory for growth has

11  infected his whole family and it's great.

12       I was in his home for a Shabbos meal, almost like a

13  Thanksgiving meal.  He brings kids to his home, multiple

14  courses.  His wife was great.  She was motherly, and with us

15  were ten kids from South Beach who were these young kids who

16  were sort of wandering around doing nothing with their lives.

17  And he brought them in and he gave them warmth and a familial

18  feeling, he and his wife, and they were singing and they were

19  participating and he was telling them different things from the

20  Torah.  It was great.

21       DR. SABO:  Everything he was, like, behind people were

22  just like right behind him because he was so talented and he

23  would study with people at night.  It wasn't like, you know,

24  people would have to ask him.  He would come over to you and he

25  would say, hey, do you want to study.  And he just took the

1    community by storm.

2         He would just say, come, come with me, come to my

3    house, come from Shabbat, a lot of single people who at Shabbat

4    they are lonely.  They don't have family to sit with.  His

5    house is open house.  I am telling you, this guy has no money.

6    Okay.  I mean, he is just -- he has a small little house and he

7    just never says no.  You know, he sees someone who doesn't have

8    a place for the Shabbat, he brings them in.  He sings during

9    the meal and, you know he speaks, you know, from the different

10   passages and things like that.  He is a good person.  You know,

11   he really is.

12        Now we study almost two hours every morning.  For me,

13   you know, I don't think I ever thought in a million years I

14   would be doing that.  If you speak to the rabbis that I went to

15   school with, they probably would have told you, there is no way

16   that Sabo would be studying two hours in the morning before

17   work, but it was Eli.  He was just that.  He is just a force.

18   He is a guy with only good intentions.

19        He is also an unbelievable father.  I have seen him in

20   the morning.  The children have few clothing, you know what I

21   mean, and he wakes up in the morning and the first thing he

22   does is he makes sure that his kids' clothes are clean.

23   Obviously, they can't afford to do laundry every day, you know

24   what I mean, with water and detergent and stuff like that.  If

25   they are not clean, he cleans them by hand.  He lays out his

1   kids' clothing in the morning for them to be able to get

2   dressed quickly.  He makes them breakfast.  And then he also

3   even makes them dinner.  He has like a crock pot where he puts

4   food inside to have dinner ready by the nighttime.  And this is

5   all done before 6:00 a.m., you know what I mean?

6           MR. GREENBERG:  I have gone to synagogue with him a

7   couple of times when he drags me there on high holidays.  He

8   believes very strongly in Jewish religion and thinks that it

9   would be a benefit to me.  And no matter how bad my mouth is

10  and how short my attention span is, he would always try to get

11  me to go.

12          Extremely honest and extremely humble.  He had a very,

13  very simple house, you know, very simple car.  His wife also

14  worked.  We would leave his house and think, wow, you know, he

15  doesn't have an easy life, you know.  He didn't have -- he

16  didn't really have -- I mean, there was no fancy furniture.

17  There were no fancy cars.  He never wore a watch, no lavish

18  lifestyle.  If he was making huge amounts of money, he was

19  giving it to somebody who has then spent it because he wasn't.

20          MS. LEVINE:  From the children's perspective, he does

21  both what we call fathering and mothering to them.  He takes on

22  a very strong caregiver role.  He is very rational.  He

23  listens.  He will take responsibility.  He makes sure his kids

24  are accountable for their behavior, for their actions and he

25  addresses it both at home and at school, and he really works as

```
 1    a partner with us.  He has three boys that we worked with.
 2    They have Avrohom, Shmuel and Dovid.  And like all boys, they
 3    have some challenges, so he has had more than one occasion to
 4    join us for meetings and he is a very important player in those
 5    meetings, you know, because mothers have a tendency to be very
 6    emotional.  Eli is always calm, level-headed, reflective,
 7    honest and he is able to really affect positive change.
 8            MR. DOLINSKY:  About 20 months ago I was involved in a
 9    horrific car accident, requiring me to be hospitalized for many
10    months and learning how to walk and talk again, and I think at
11    that moment going through something that horrific and seeing
12    what your needs are in such an acute fashion, I think you start
13    to learn what the sense of community means and what the
14    investment of the sense of community means.  And I could really
15    tell you that I was the beneficiary of a tremendous amount of
16    community effort on my part that was personally spearheaded by
17    Eli.
18            We live in a community where there is tens of thousands
19    of people, people that were praying for me.  I obviously have a
20    very strong faith.  I wouldn't be learning with him if I
21    didn't, but knowing that he was able to personally organize
22    thousands and thousands of people praying for me, individuals
23    bringing food to the hospital for me to eat, speaking to my
24    family, helping them, you know, navigate very difficult
25    realities that I would be facing over the next couple of
```

 1   months, you know, being so compassionate to them and also

 2   helping me, you know, on a personal level.  He was scheduling

 3   field trips up to have people from this learning facility visit

 4   me in the hospital.

 5        To say that it facilitated with my recovery would be a

 6   tremendous understatement.

 7        RABBI GROSS:  There was this man walking across the

 8   street and he trips over his own feet.  He falls to the ground,

 9   elderly man.  He hurts himself, knocks his dentures out of his

10   mouth and they are lying there and Eli turns quickly around and

11   he picks them up, which most people would consider to be a

12   biohazard.  No one would dare touch it.  He picks up the

13   person's dentures.  He takes him to the dentist, to this man's

14   dentist.  The man was not even clear where he was going, what

15   he was doing.  He takes him to his dentist.  He makes sure he

16   sits down with him, makes sure the nurses are taking care of

17   him, makes sure his family is contacted, that they know exactly

18   what happened and where this gentleman is.  That's the kind of

19   person he is.

20        MR. SANDHAUS:  You can read about ethics.  Ethics you

21   can preach about and then there is actually to practice ethics,

22   and I think that's the most difficult thing.  It's very easy to

23   read about it.  It's very easy to preach about it, but to have

24   one that can teach and can preach and actually acts that way,

25   that describes Eli, and that is something which is -- it's so

```
 1   powerful when you see an individual like that and it just makes
 2   me to want to always be better, to always be a better person.
 3   Looking up to somebody like that and seeing how he has impacted
 4   the entire community.
 5           MR. DOLINKSY:  You know, I come across so many people
 6   in my life, and that could be in business, that could be in a
 7   religious setting.  That could be even within my family and
 8   there has been very few people that I regard as highly as Eli
 9   and that really has wiggled his way into my conscious of really
10   affecting the way it is that I make decisions and really
11   providing me and installing a very accurate moral compass
12   inside me, and for that I am forever grateful.
13           MS. SHULEVITZ:  He is a very pious, kind, humble
14   person.  He is the last person if you would have to tell me
15   people in the synagogue or in the community that committed a
16   federal crime, his name would be, like, not even existent.
17           MR. LAPCIUC:  Unlike, God forbid, someone being
18   diagnosed with a terminal disease, I hope and I pray that the
19   American legal system there is the concept of compassion and
20   equity that we can make sure that Eli has that available to him
21   so that he can be really an asset to society, not really a
22   liability.
23           I, Marcus Lapciuc, would be more than happy to commit
24   myself unquestionably towards mentoring Eli and make sure that
25   he is one of those next generation leaders that would continue
```

```
 1    to help in issues like healthcare, disadvantaged children,

 2    foster care, education, educational program for minorities,

 3    Hispanic, African American, immigrants, etcetera.  I am sure

 4    that Eli can be one of those people that can really, you know,

 5    make the world better.  Literally light up the world.  That's

 6    really the potential this young man has.

 7         MR. DOLINSKY:  What's the value of someone like Eli

 8    being sentenced and having to serve jail time as opposed to

 9    extending a certain amount of leniency and giving someone like

10    Eli probation?  There is literally no doubt in my mind that the

11    value that he serves to our community, my community, the Miami

12    Beach community as a whole, and that means not just of people

13    that are of the Jewish faith.  He really services, you know,

14    hundreds, if not thousands of people when you think of not just

15    the men that he learns with, but how those people then are

16    affected with their wives and children and in their business

17    relationships.  He is making the community a better place, and

18    I think that he serves a value to where if you take that away,

19    you would be doing more harm to the community than in any way

20    teaching him a lesson.

21         MR. BRECHER:  I have kids and some of my kids are in

22    their 40s and are grandparents themselves, but if I had another

23    one, he is the one I would like to have.  I would just love to

24    see him continue in that role of being a role model, a helper,

25    a teacher, a guide, a mentor for the community.
```

1          DR. SABO:  If there were, you know, more Elis out

2     there, you know, it would be a great, great world.  He is just

3     good.  He is a good person.  He is a good father.  He's a good

4     husband.  You know, his wife also is very, very special, and

5     his dedication to her and to the kids are par to none.

6          MR. EHRICH:  For a guy in his level and his purity,

7     clean guy, just full-time just doing the Lord's work, he -- I

8     feel comfortable telling him what's going on with my life and

9     there is just no judgment.  But his probably greatest

10     achievement is what he does at home with his family.

11          MS. N. RIESEL:  Since my husband has gone back to the

12     Kollel, we are the happiest we have been.  Our marriage is the

13     happiest it can be.  Our children are the happiest they can be.

14     Our home environment is at the best it can possibly be and our

15     lifestyle is the best.  We are just happier.  We are barely

16     above the poverty line as far as our income goes, yet every

17     month somehow there is money to pay the bills and somehow we

18     survive.

19          MR. LAPCIUC:  This is a young man who will be nothing

20     but an asset and will be really one of those people that will

21     make a difference and leave this world in a much better place

22     than that which we have.

23          RABBI GROSS:  We're talking about somebody who cares

24     and somebody who gives, somebody who is important for the

25     functioning of a healthy and wholesome society.  He is not

 1    getting cheered.  Instead, he is, unfortunately, in the

 2    position that he is in today.  And I would just like to ask

 3    Your Honor, Judge Gayles, consider him as a good person that

 4    was trapped into this darkness and grant him as much mercy as

 5    possible.

 6         MR. RIESEL:  Now is the first time in his life he is

 7    really asking for something.  He is asking for his life.

 8         He knows what this thing entails so, of course, we are

 9    worried for him.

10         MS. R. RIESEL:  I want to say to the judge that he is

11    such an asset to the community that it would be terrible, and

12    for his family, terrible if he wasn't there.

13         MR. BRECHER:  I just hope that the judge can continue

14    to show mercy on the sentencing.

15         DR. SABO:  Like I wrote in my letter, you know, without

16    him a lot of people would be lost.

17         MR. BRECHER:  The outpouring from the community

18    demonstrates that he is not the person that is on trial.  The

19    community needs him and a lot of people rely on him.

20         MR. LAPCIUC:  Eli is one of those people in which we,

21    as a society, have reached a fork in the road.  What do we do

22    about a young man whose entire background connotes anything but

23    the issue that he is being faced with, and I am willing to put

24    my hand in the fire that his entire future connotes anything

25    but the issues that he is currently faced with.  He is one of

 1   those that can be a difference maker.  The best place for him

 2   is to continue doing what he is doing.

 3           (Video stopped.)

 4           MR. KUEHNE:  Thank you, Your Honor.  We have -- as the

 5   Court understands from our sentencing memorandum, we are asking

 6   the Court in evaluating the application of advisory guidelines

 7   and the enormity of information about Eli Riesel, that the

 8   Court consider a variance.

 9           To that end, we would ask to come forward to make a

10   brief presentation, Rabbi Ephraim Shapiro, who will -- who has

11   known Eli for quite some time, is a family rabbi from Eli's

12   family's temple and has continued his involvement with Eli and

13   the leaders.

14           Would you let Judge Gayles know who you are and a brief

15   description of what you currently do and then if you have

16   something to impart to Judge Gayles, please do so.

17           RABBI SHAPIRO:  Your Honor, my name is Ephraim Leo

18   Shapiro.  I have been living in South Florida for about

19   43 years, and for the last 17 years I have been one of the

20   rabbis and one of the spiritual leaders in the North Miami

21   Beach community.

22           As such, I am the family rabbi of Eli and his siblings

23   and parents.  I am also a very close friend of the family, and

24   additionally, I also have the privilege that one of the other

25   things that I do besides leading my community spiritually, is

1    that I am a public speaker who has the privilege of traveling

2    the world.   I mention that because of something that I want to

3    say in a minute or two that I think will give that tremendous

4    relevancy.

5          I just want to -- I made a few brief points that I

6    wanted to quickly share with Your Honor.   I didn't realize I

7    was speaking after the video, and after the video, I don't have

8    that much to say.   Some of those points were brought out so

9    exceptionally well, but hopefully the following will have

10   meaning.

11         A few years ago Rabbi Eli Riesel was honored by the

12   Kollel that was just advertised so extensively in the video and

13   I was the one who spoke about him.   And I got up and I made the

14   following statement clearly and unambiguously, that is a point

15   that is simply not arguable.

16         There is a passage in the Talmud that says -- which is

17   the ultimate book in Judaism, that different people, because of

18   their extenuating circumstances, obligate the rest of the world

19   by example.   So-and-so is the wealthiest man in the world, and,

20   yet, he dedicated his life to helping others so what excuse

21   does anyone else have?   So-and-so is the poorest man in the

22   world and, yet, he dedicated his life to helping others so what

23   excuse does anybody else have?   And that is a very powerful

24   statement.

25         I got up there and I told the crowd at that dinner of

 1    about 500, but much more saw it because it was videoed.  I

 2    said, I am able to say clearly that Rabbi Eli Riesel obligates

 3    all of us.  That's not a negotiable fact.  He currently for the

 4    last five, six years is such an impeccable standup and stellar

 5    role model, I perhaps know that better than many of the people

 6    behind me, because additionally I was a part of Eli's life well

 7    before 2008.  As I said, I have been in the synagogue that I am

 8    well before 1998.

 9           I got up there and said as clearly as my name is

10    Ephraim Shapiro, he obligates every one of us because if he

11    could be the role model and the father and the parent and turn

12    a community around like that, then all of us have to do that

13    and that was a very big statement that I was taking upon

14    myself.

15           I asked myself in preparation to speak in front of Your

16    Honor how did he do it, and I think the answer is from a 30

17    second quip, two years ago one of the legendary Jewish leaders

18    died.  His name was Rabbi Galinsky, and he said a 30 second

19    humorous quip that a city had the most dangerous highway with

20    treacherous roads and it was literally harming people on the

21    highway.  So the city council got together and said, we have a

22    brilliant idea.  People are getting hurt on the highway,

23    dangerous curves, potholes.  I got the solution.  Let's raise a

24    million dollars and at the end of the highway we will build a

25    hospital.  It will take care of all those that are ill.  And of

1  course this legendary Jewish leader stormed, fools what you

2  are.  Don't build a hospital, fix the highway.

3       There are a lot of people in life, I realize, that

4  after they hit a certain low point, perhaps spiritually they

5  are not where they used to be.  For Eli, this is not an

6  epiphany.  This is returning to his roots, like I know better

7  than a lot of people because, let's say, he is about 33 now.

8  So I know him since about 14.  So I am well aware of who he

9  was, who he became, who he is and pretty much can guarantee who

10  he will be.

11       Most people in life -- that's why I mentioned earlier I

12  travel the world, not to boost about it but I do, and most

13  people when they have an issue, they will build a hospital and

14  that doesn't take care of any problem.

15       Eli Riesel became my Rebbe, that means he became my

16  mentor.  You fix the highway and he, perhaps better than anyone

17  I have ever met around the whole globe, has the ability not to

18  just build a hospital and temporarily put a Band-Aid, but to

19  genuinely fix the highway.

20       That's why we saw in the video that for the last number

21  of years, I saw one of these those people.  I am not singling

22  him out because I don't know that I have his permission to do

23  so, but he, I know very well who he is, it didn't start off

24  that way.  It started by Eli saying, do you want to learn about

25  20 minutes?  Do you want to join me?  He takes such an

 1   involvement and love in people.  It was accurate to say that

 2   the few hundred people he has impacted exponentially really

 3   means thousands of families, no exaggeration.

 4        Just a quick thought personally he helped me, but I say

 5   it speaks volumes of who he is.  He used to live in North Miami

 6   Beach in 2008.  There is an expression in Judaism (speaking in

 7   Hebrew), which means when you change your living place, you

 8   change your good fortune.  So part of the reason he moved to

 9   Miami Beach, even though it was our loss, is at that time

10   spiritually he was not where he used to be, difficulty perhaps

11   in the marriage and just in a number of areas.  He, as I said,

12   fixed the highway.

13        He always used to come to my home and play music the

14   might of Purim.  Purim is, as anybody behind me can attest, the

15   most joyous of the Jewish festivals.  He moved to Miami Beach

16   and now my star performer was gone because everybody wanted him

17   there at their party.  So I said to my wife, do you think I

18   could call him?

19        Just to summarize, for the next few years even after he

20   moved to Miami Beach I called him.  He had to give up a lot the

21   night of Purim to come up to me.  They wanted him in this place

22   and that place, this place and that place.  He says, Rabbi

23   Shapiro, for you I will do it.

24        It's not such a small story.  It's actually ginormous

25   because the bottom line is as a person whose perseverance has

1    allowed him to bounce back, I can say unequivocally he is

2    second to none.

3           I just want to conclude, Your Honor, with the following

4    sentence.  When I, myself, went to study in Israel about

5    25 years ago, those were the days they used to pass out the

6    cards that you needed for customs and you had to put down if

7    the purpose of your trip was business or pleasure.  I don't

8    think they do it anymore but then when you went to Israel, you

9    had to.  And I was going to study for a year but everybody put

10   down I am going to Israel, I am going for pleasure.

11          I asked my father who was the leading rabbi in Miami

12   Beach for 30 years, daddy, I am going to study for a year

13   Israel.  He says you put down business, because when you go to

14   learn, learning becomes your business.  There is an expression

15   in Judaism (speaking in Hebrew), which means your business has

16   to be learning and helping people.  So even thought your

17   friends may put down pleasure, it is your business.

18          I have never lost focus of that the last 25 years.  And

19   I can say in conclusion to Your Honor, Eli Riesel gets it.  His

20   whole business now is very different than the business that I

21   heard before.  I can't claim to know all the intricacies of

22   everything I heard.  That's true.  But there are some things

23   that I can say I know better than some of the people behind me,

24   where he was, went, is and will, God willing, become, clearly

25   this transformation has let Eli not have an epiphany, but

1    return to his roots.

2         On the way over his father told me that when they drove

3    from Miami to New York and Eli was a boy of 15, all of his

4    siblings were doing what siblings do in a minivan, wreck havoc.

5    I apologize to the siblings, but he always looked in the

6    rearview mirror and saw Eli was in the back seat.  Long trip

7    from Miami to New York, what, about 20 driving hours over a day

8    or two?  Eli at the age of 15, well before this 2008, was

9    learning from the Talmud.  His father who is here can say that

10   that is spot on the truth, the entire trip.  He did it then and

11   he is clearly doing it now.  So it's not like he is becoming

12   something he never was.  He is simply returning to his roots

13   that he did so impeccably after having had the low point that

14   he did.

15        He knows how to fix the highway better than anyone I

16   have met.  I consider him my mentor certainly in the area that

17   he will help anyone and everyone perhaps better than anyone I

18   have met before he will himself.  We see the father, the role

19   model, the husband that he is.

20        And I guess I could say in conclusion that his learning

21   and helping the South Florida landscape is his business and I

22   hope it can remain his business from here on, and I ask Your

23   Honor to take into account everything that I said from

24   beginning to end.  I only mentioned what I do and how much I

25   travel to say perhaps I am somewhat of an authority on the fact

1    that I know where he was, where he is having returned, and a

2    moment of his not being able to do that would be an irreparable

3    devastation.  So I ask Your Honor to take that all into

4    account.

5           THE COURT:  All right.  Thank you, sir.

6           MR. KUEHNE:  Thank you, Rabbi.

7           MR. DAVIS:  Your Honor, at this time we are going to

8    call Rabbi Gross and while he is prepared to come, I just want

9    to provide a transition from Rabbi Shapiro to Rabbi Gross.

10           As Your Honor heard from Rabbi Shapiro, he can speak to

11   Eli, who Eli was in 2008, in the midst of the alleged

12   conspiracy when he decided to move his family to Miami Beach to

13   join the Kollel, and Rabbi Gross can actually pick up from

14   there and really explain to Your Honor the transformation that

15   Mr. Eli began and that culminated in 2012 when he ultimately

16   left the secular world and returned back to, as Rabbi Shapiro

17   explained, his roots, which is citing the Torah.  And Rabbi

18   Gross will also explain the significance of studying the Torah

19   in Jewish religion.

20           Yes, Rabbi Gross.  If you can just start with

21   explaining who you are, what you do and for those of us who are

22   new to Judaism, if you can explain the significance of what you

23   do and then go into your presentation.

24           RABBI GROSS:  Your Honor, my name is Nahomi Yaacov

25   Gross.  I am the Rosh Kollel or the dean of the Miami Beach

1      Community Kollel, which is basically focused on being an

2      educational resource for mostly adults and older teenagers, but

3      we do run children programs also, and we also do a lot of

4      outreach to people who are -- who have different issues with

5      their lives and try to help them at least sometimes

6      financially, sometimes in a religious sense, sometimes in a

7      counseling sense.  This is what we do.

8            Our main focus is, of course, as I said originally on

9      the study of Torah and I use that word study which is a mistake

10     because if you listen to Rabbi Shapiro just speak, he kept on

11     saying the word learn Torah.  You learn Torah.  For people who

12     do it, they never use the word "study."  They use the word

13     "learn."

14           I once heard from a teacher of mine that there is a

15     reason for that.  There is a reason for that, and I will give

16     you an example of why we say we learn Torah, we don't study

17     Torah, which would probably be more proper in English grammar

18     sense or vocabulary sense.

19           The reason why we learn Torah is, for example, we never

20     say that we study driving a car.  An 18-year-old doesn't study

21     driving a car.  He learns to drive a car.  When you learn to

22     drive a car it has the connotation that you are taking the

23     driving and making it part of yourself to the point where you

24     can almost do it subconsciously, which is not good driving

25     practice, but that's the way it is.  It becomes something of

1    who we are.

2            And when we study Torah, which is the words of the

3    Bible and also the words of the rabbis for the thousands of

4    years afterwards, the point of that is not just to study it.

5    It's to learn it.  It's to become part of who we are, and some

6    people are successful and some people are not.  But that's

7    always the goal.

8            So we try to do that with people.  We try to get them

9    to learn Torah, to change their lives.  It changes them by

10   engaging them into an intellectual process, but it has a

11   residual effect on them in the moral sense and also in the

12   sense of their aesthetics.  What's beautiful in life, what's

13   something to be desirable, and as the Torah is learned, it

14   solely becomes part of ourselves.  That is with the study of

15   Torah and what we do.

16           With the permission of Your Honor, I'd like to speak on

17   behalf of my friend Eli Riesel.  Adjectives are powerful words.

18   God tells Jeremiah the profit that words can uproot, smash,

19   destroy and overthrow.  The prosecutor has written that Eli is

20   unremorseful which are powerfully destructive words, but I

21   understand that this is the job of a prosecutor.

22           Similarly, when a person stands before his maker in

23   judgment, there, too, an accusing angel arrives with powerfully

24   destructive words and attacks the individual mercilessly.

25   Miraculously, another angel appears, an angel of grace,

1    kindness and mercy who gives a deeper understanding of the

2    person's character and motivations.

3         Today I choose to be Eli's angel of grace, kindness and

4    mercy and give a more fulsome representation of who he was, who

5    he is, and who he will be.  Rabbi Yonah of Girona, a city in

6    Catalonia, Spain, who lived some 800 years ago writes that

7    repentance consists of 20 steps.  The first, remorse, but then

8    there are another 19.  Number three is agony for the damage you

9    have done.  Number six is shame.  Number seven and number eight

10   is internal and external humility.  Number 13 to treat minor

11   infractions as serious sins, and number 19 is also what

12   Maimonides describe as the epitome of repentance, which is

13   reaching a level where God can testify that the individual has

14   changed to the point where he will no longer commit his older

15   deeds.

16        I have known Eli well for about six years when he began

17   spending time coming to the Kollel to learn on his own,

18   sacrificing his lunch and other free moments of time and to

19   study and teach his friends and acquaintances.  This was a

20   statement of a person mortified with being part of the then

21   Florida real estate market in which the only way to succeed was

22   through rampant greed.  With this he shut the door on his

23   previous life.  Later he accepted our young leadership award

24   and again made a statement.  The statement was a clear public

25   commitment to his position as a public educator.  With this he

1    shut another door behind.

2          He then began working part-time cutting an already

3    meager salary to strengthen his ties to his new vocation.  This

4    was a statement to his former buddies that while he would

5    remain their dear friends, he was leading his life in a new

6    direction.  With this statement he shut another door on his

7    former life.

8          Finally, he began studying and teaching full-time,

9    accepting gladly the attendant hardships, financial, social,

10   etcetera.  He had made his final statement.  He slammed the

11   final door behind.

12         Your Honor, Mr. Capone argues that he sees no remorse

13   in Eli.  Mr. Capone, look more carefully and you will see

14   someone not standing by remorse, the first step of repentance,

15   but rather by the final step, a destination chosen by Eli, a

16   life of no return to the former self which he stumbled.  This

17   is the Eli that was and the Eli that is.

18         Who is the Eli that will be?  His bright future at this

19   point as well as we can envisage is Eli as an instructor of

20   older children and young adults, especially those that are

21   troubled.  Eli has traveled the long and tortuous path of

22   repentance and has discovered his true abilities in life.

23         There are many theories as to justification of

24   imprisonment.  If we consider them, we can fathom why

25   imprisonment might not be appropriate for Eli's situation.  Two

 1   reasons that are made for imprisonment are rehabilitation and

 2   incapacitation.  Eli, at this point, has done more to

 3   rehabilitate himself as a completely changed man, so different

 4   from the Eli of six years ago, more than any punishment could

 5   ever affect.  A man who feels that his future lies in the

 6   education of future generations.

 7           And in regard to the concept of incapacitation, it's

 8   impatently clear that Eli has closed too many doors to be able

 9   to return to the business world.  As a businessman once said,

10   you can only be a businessman if you love money.  Eli has

11   discovered that he does not love money.

12           As far as deterrence and retribution are concerned,

13   both of these theories are based on what is good for society

14   and the moral atmosphere in which we live.  Again, is good for

15   society, in our situation we must balance the loss to society

16   by his potential imprisonment.

17           MR. DAVIS:  And Rabbi Gross, if I can just ask you to

18   speak on -- if we can just return back to the point where

19   Mr. Riesel leaves the business world and starts studying full-

20   time.  Can you explain to the Judge that transition, him first

21   starting off voluntarily, working there without a salary for a

22   year and then ultimately being brought on and how you all came

23   to that decision?

24           RABBI GROSS:  Well, at that point Eli went from being a

25   part-timer bringing in people on his own, studying by himself

1    on his own.  There was a point where he decided that it didn't

2    make a difference anymore.  He was really literally sacrificing

3    his complete salary and landed one day and told us, well, I am

4    here full-time.  There was absolutely no plan that would make

5    any sense, you know, almost except extreme poverty that he was

6    accepting upon himself at that moment.

7          There were various members of our board of directors

8    when this came to their attention they were very disturbed by

9    this because there is no question about it, Eli was the forest.

10   We really appreciated having him in our midst.  He mirrored

11   everything that we tried to do and he was a -- such a valuable

12   resource, you know, to subject him to be -- to such poverty

13   would have been unheard of.

14         So they did give him a stipend at that point, a very

15   minimal one, about less than half of what we pay our regular

16   rabbis because we do have regulations of who is able to receive

17   certain kinds of stipends, and basically it was a charitable

18   decision based on the board of directors.

19         But Eli literally, like I said before a second ago, he

20   discovered he does not love money.  That is a discovery that he

21   made by, unfortunately, getting caught up in the business world

22   and he discovered that was not his place.

23         MR. DAVIS:  Thank you, Rabbi Gross.

24         THE COURT:  Thank you very much.

25         Mr. Kuehne, how much more time do you have for your

1    presentation?  We will have to break for lunch soon.

2           MR. KUEHNE:  Your Honor, I believe we have a total of

3    what we're planning about 20 minutes to finish everything.

4           THE COURT:  Okay.

5           MR. KUEHNE:  Rabbi Sorotzkin, please introduce yourself

6    to Judge Gayles and inform him of your knowledge of Eli.

7           RABBI SOROTZKIN:  Thank you.  Your Honor, as a way of

8    introduction, my name is Eliyahu Meir Sorotzkin and I am the

9    dean of a boarding Talmudic academy for top-notch, highly

10   motivated students in North Plainfield, New Jersey.  It's

11   deeply ingrained in my soul as it's my lineage both from my

12   mother's side and father's side.  My father, may he rest in

13   peace, was the dean of Telshe Rabbinical College in Wickliffe,

14   Ohio, a branch in Chicago, Illinois and a community in the

15   Judaean Hills outside of Jerusalem.

16          From my mother's side, my grandfather was the dean of

17   Telshe in Lithuania until he was killed with the entire student

18   body by Hitler.

19          My great-grandfather was the founder of the famed

20   Telshe Lithuania over 150 years ago.  I married into a family

21   where Talmudic study is the focus of life.  My father-in-law,

22   may he rest in peace, was the dean of Meir Rabbinical College

23   in Brooklyn.  My wife's grandfather, Rabbi Kalmanowitz, was the

24   founder of Meir in Brooklyn with well over a thousand students.

25          It's ingrained deeply in my soul.  I don't want to toot

```
 1    my own horn, but approximately a year and a half ago I
 2    underwent very serious surgery for about ten hours in the
 3    National Institute of Health in Bethesda, Maryland, to remove a
 4    thymoma.  I had induction chemotherapy at Sloan Kettering
 5    presurgery and following surgery, had 27 radiation treatments.
 6              Throughout that period, the presurgery, the surgery,
 7    the post surgery radiation treatments, I didn't miss, with the
 8    help of God, one of my daily Talmudic lessons.  It's much more
 9    than just the scholastic endeavor.  There is a very deep
10    religious connection.  Talmudic is the essence of a religious
11    Jew's spirituality.  It calibrates our ethical and moral
12    compass.  It's how we connect to God and how we, as religious
13    Jews, believe that God connects to this world.  It's our life
14    blood and it has been the life blood of our sages in
15    generations past.
16              When I was younger, I saw my father-in-law close to 80
17    put in a tremendous effort.  He would fly back if he was out of
18    town to give his Talmudic lesson and I used to wonder, would it
19    be so terrible if he missed a day?  Would the world cave in?
20    But as I got older I saw the apple doesn't fall far from the
21    tree.  It's my life's breath.  Today, I cancelled my Talmudic
22    lesson and I came down, flew down here to Miami out of a deep
23    connection and profound respect for Eli Riesel.
24              His commitment to deep Talmudic study and the resulting
25    ethical and moral development of personal growth is amazing.
```

1    He has become my partner of choice for intense Talmudic study

2    when I am down here in Miami, which has been pretty often

3    lately.  On the day that the conviction was handed down by this

4    court while we were waiting in the courthouse for the jury's

5    verdict, I was in the cafeteria downstairs preparing for

6    classes for the upcoming semester, and I got stuck on a

7    complicated commentary, very complex.  And I asked Eli Riesel

8    to come down and study with me.  It took a Herculean effort.

9    He was waiting for such an important judgment.  His life was

10   hanging in the balance but he immersed himself totally.

11        I sent over in class to my students the novel way that

12   Eli said that day, that day to explain that complex issue while

13   he was waiting for the verdict from the jury.

14        Eli is a changed and growing man.  His commitment, if I

15   may say, is incredible and rare.  I have been born and raised

16   among Talmudic scholars who constantly strived for personal,

17   ethical and moral growth, who were deeply committed people, and

18   Eli's seriousness and commitment is rare and has the power to

19   influence.

20        I thank Your Honor for giving me the few minutes to

21   hear my heartfelt plea.  Please, give Eli the chance to keep

22   growing and to have the profound influence that he has on so

23   many, myself included.

24        Thank you, Your Honor.

25        THE COURT:  Thank you, sir.

1          MR. DAVIS:  Your Honor, as we draw down on our

2     character witnesses that we have brought here, we wanted to

3     close out, Your Honor, with presenting a number of individuals

4     who have offered to commit themselves to monitor Mr. Riesel

5     should Your Honor agree to a Zone B, Zone C sentence, but

6     before we get there I want to make sure that I offer a

7     transition from Rabbi Sorotzkin and kind of conclude with this.

8          The take-away that we'd like for Your Honor to have is

9     that Mr. Riesel is someone who is valued in this community.

10    Senior rabbis who never miss their Talmudic study find

11    Mr. Riesel and find his impact in their life to be so important

12    that they are willing to skip that which they find to be dear.

13         We also wanted to bring them out, Your Honor, to

14    explain to you the importance of Talmudic study.  As Your Honor

15    saw from Mr. Riesel's letter, he explained that he commits

16    himself to 7 to 10 to 12 hours a day to study the Torah alone

17    and with others, and what we wanted Your Honor to understand is

18    that in his faith, that is how he connects with God.  That is,

19    in itself, the essence of the post offense rehabilitation that

20    we see in Mr. Riesel, that he is so dedicated to serving God in

21    the way that the Jewish religion does that that is something

22    that Your Honor should understand in deciding an appropriate

23    and just sentence.

24         With that said, I wanted to call Marcus Lapciuc who is

25    the who -- if Your Honor can give me a moment, I left the note

```
 1   at my desk.

 2          THE COURT:  I will ask, I have seen the video.  I have

 3   heard from three people very important to the defendant.  I've

 4   got a packed courtroom and I can see every time the door is

 5   open there are people outside waiting.

 6          If the issue is to impart to me that there are a number

 7   of people that care for the defendant and will support him

 8   if -- during any period of non-incarceration, I think that

 9   point is made.  I don't know if I need to hear anymore as to

10   that issue.

11          MR. KUEHNE:  Your Honor --

12          THE COURT:  Not to mention the number of letters I

13   received.

14          MR. KUEHNE:  Your Honor, thank you.  We appreciate

15   that.  We wanted to present to the Court, but we have done this

16   in writing, the fabric of the alternatives that we have

17   provided to the Court under the auspices of the Aleph Institute

18   and to that extent Mr. Lapciuc, Marcus Lapciuc is here who has

19   actually worked with Eli in one of those projects that Eli has

20   ongoing and he would offer that information to the Court.  It's

21   documented in the material and then Rabbi Lipskar, who overall

22   coordinates work at the Aleph Institute, an organization which,

23   as the Court is familiar, would inform this Court of the role

24   of alternatives to sentencing.

25          If the Court is sufficiently familiar with the material
```

 1  that we have submitted, we certainly respect the fact that Your

 2  Honor is aware of it, but we want the Court to know that we do

 3  have some of these presenters who can more graphically explain

 4  what's in the written materials.  But we do not need to do that

 5  if the Court is fully cognizant of the alternatives we put

 6  together, the package and the Court knows that all the

 7  individuals here do want the best for Eli.

 8          THE COURT:  I understand that and it's safe to assume

 9  that I have read whatever you have given me, but it is your

10  case to present.

11          Why don't we take a ten-minute break and then we will

12  come back and you will let me know how you want to proceed.

13          COURT SECURITY OFFICER:  All rise.

14          (Brief recess)

15          THE COURT:  All right.  Mr. Kuehne or Mr. Davis.

16          MR. DAVIS:  Yes, Your Honor, we want to start wrapping

17  up our presentation, Your Honor.  I want to start with

18  referring Your Honor to our sentencing memorandum, Docket Entry

19  274.  We include a discussion of United States v. Clay and I

20  just really want to jump to it.

21          In U.S. v. Clay, in Clay, Your Honor, the Eleventh

22  Circuit really gives Your Honor the authority and the power and

23  the permission to give a substantial variance based on

24  Mr. Riesel's post-offense rehabilitation, as you have seen

25  articulated by the several rabbis that have come here and the

 1    letters that Your Honor received.  I just want to direct Your

 2    Honor's attention to one thing that is very interesting about

 3    this case, that when you look at the sentences of the

 4    cooperators who plead, who testified against Mr. Clay, they did

 5    not receive variances as significant as Clay did.

 6          So if you look at the screen here, I have it here for

 7    Your Honor, cooperator S. Lambeth, she started with a 190-month

 8    sentence, after her substantial assistance which placed her

 9    right at 188, which you look at Mr. Clay's sentence, he was

10    facing 188 months.  And as Your Honor can see, he received a

11    68 variance and she only received a 23 percent variance, and

12    the Eleventh Circuit actually affirmed that decision.

13          You look at another cooperator, Mosley.  And here the

14    140 is before his substantial assistance to the Government.

15    Mr. Clay started at a guideline sentence of 188, and after a

16    68 percent variance, Clay and cooperator Mosley who also plead,

17    testified, accepted responsibility, they received the same

18    sentence.

19          And Your Honor, I just want to go back up and talk

20    about the facts of Clay so we know where we are going.  In

21    Clay, the defendant was arrested, caught red-handed.  He was

22    arrested with drugs and ultimately led to a conspiracy trial

23    and a trial for the conspiracy and the possession of elicit

24    substances.  He went to trial.  He argued at a motion to

25    suppress and he received a split verdict.

1          At sentencing, the acquitted conduct -- even though he

2    was acquitted of the conspiracy, the acquitted conduct was

3    added to his score and he received his ultimate base offense

4    level at which point the Court reduced.

5          The Eleventh Circuit actually highlighted all of the

6    evidence that was presented at sentencing, and what's unique

7    about that case is that you have -- you have great focus on

8    what he did while the trial was pending.  So he gets arrested

9    in 2004, and he argues that his rehabilitation began about the

10   point of his arrest and continued on through the trial.  And

11   that is the evidence that was presented.

12         What we wanted Your Honor to see is that in this case

13   we have actually presented more.  We have presented a

14   Mr. Riesel whose conversion did not occur after he was

15   arrested.  His conversion did not occur after he was indicted,

16   and his conversion did not occur after he was convicted.  His

17   conversion started way before anyone ever knocked at his door.

18         You heard the testimony.  This conversion started in

19   October of '08.  It wasn't complete and there was still work to

20   be done, but he put himself on the path.  He moved his family

21   and we really wanted to make sure that we brought up Clay

22   before we go into our next witness, who is going to talk about

23   an alternative sentencing structure.

24         So we have Rabbi Lipskar with the Adel Institute.  He

25   has given this presentation to other judges in the Southern

1    District of Florida and judges in the Southern District have

2    used components of their alternative sentencing scheme in

3    sentencing defendants.

4         And so with that, I will invite Rabbi Lipskar to the

5    podium.

6         RABBI LIPSKAR:  Good afternoon, Your Honor.  Thank you

7    for the opportunity to address the Court for just a few moments

8    I know time is pressed so I will be brief, and much of what we

9    have presented has been presented in writing, which Your Honor

10   has indicated that he has already reviewed.

11        I just want to highlight and bring to the attention,

12   once again, of the Court the tremendous focus and conversation

13   that is taking place on a national scale, has been for some

14   time, but was further indicated by the remarks of the president

15   most recently with how we look at the sentencing guidelines,

16   the length of sentences for nonviolent, first-time offenders,

17   once again gives us much to think about in terms of how these

18   individuals are being sentenced.

19        The Aleph Institute, by way of introduction, is a

20   national organization founded back in 1981 and for close to

21   35 years has worked with the courts, worked within all of the

22   Departments of Corrections and the Bureau of Prisons at all

23   levels of legal and penal system to work with individuals and

24   their families that find themselves in this system.

25        Through that we have worked with tens of thousands of

```
 1    individuals who have gone through the system and have been
 2    beneficiaries at times of the programs that we have been able
 3    to implement.
 4          The objective ultimately with incarceration, although
 5    there are many components of sentencing which we heard Rabbi
 6    Gross actually articulate quite well how those are all met in
 7    this case, is to create an opportunity of rehabilitation for an
 8    individual to better themselves and ultimately come out as a
 9    better person and a productive member of society.
10          I can say with great clarity having seen the
11    presentations today, listen to the esteemed rabbis, my
12    relationship with Eli is fairly new and recent.  The extent of
13    the family relationship is that his dear father who is an
14    educator was my daughter's teacher in a program for children
15    with learning disabilities, and I can say, obviously, the apple
16    doesn't fall far from the tree.
17          The rehabilitation component of what incarceration
18    would achieve I think has far surpassed, and I would be
19    comfortable and I would be confident to utilize an individual
20    like Eli to participate in our programs and to go into the
21    prison environment and to mentor those that are trying to
22    change their lives and may not see the ability or the
23    possibilities of what they can become as a clear example of
24    what's possible.
25          So at the individual level, obviously, we have seen
```

1    much presentation about the family and the importance of that,

2    his communal involvement.  I can say with absolute certainty,

3    given our experience, our work on a daily basis in literally

4    hundreds and hundreds of facilities nationwide and many

5    individuals from all backgrounds, all religions, all walks of

6    life as well as the work that we do on a daily basis with their

7    families, both emotional, financial, and other types of support

8    that we provide that adopting an alternative sentencing option

9    for an individual like Eli, which would still be restrictive,

10   would still send a message of deterrence, is something which we

11   would encourage the Court greatly to consider and to impose.

12          Thank you for your time, Your Honor.

13          THE COURT:  All right.  Thank you very much.

14          MR. KUEHNE:  Thank you, Rabbi.

15          Your Honor, we have remaining Mr. Riesel will address

16   the Court and then we have brief argument on the 3553 factors

17   and the variance.  We can do that now or if the Court would

18   prefer that be done at the very end, we otherwise have no

19   further presentation.

20          THE COURT:  Whichever order you prefer.

21          MR. KUEHNE:  My expectation, Your Honor, is that the

22   Government has a presentation and, if so, we would ask the

23   Court to allow Mr. Riesel to be the final speaker.

24          THE COURT:  Okay.  Do you have a presentation or do you

25   just have some comments?

```
 1                MR. CAPONE:  I am just going to argue, Judge.  I don't
 2      have a presentation.
 3                THE COURT:  I'm sorry, do you want Mr. Riesel to speak
 4      after the Government has?
 5                MR. CAPONE:  I would prefer -- Mr. Kuehne is going to
 6      ask for a variance and I would prefer to be able to rebut that.
 7      As the Government representative with burden of proof
 8      throughout the case, I would like to be able to argue why a
 9      variance would not be applicable.
10                THE COURT:  No, I understand that.  The point that I am
11      getting at here is do you want to make the argument, have the
12      Government respond and then have Mr. Riesel speak, or do you
13      want him to speak now?  I don't have a preference.
14                MR. KUEHNE:  Your Honor, I would prefer that Mr. Riesel
15      be the final speaker if the Court allows that.
16                THE COURT:  Okay.  That's fine.
17                MR. KUEHNE:  Your Honor, we have asked the Court to
18      consider a variance under the unique circumstances in this
19      case.  After having set the advisory guidelines as the Court
20      has, there are, nonetheless, a number of issues related to the
21      3553, the sentencing considerations that really warrant a
22      serious evaluation of what the appropriate sentence is for this
23      crime and this offender.
24                We ask the Court to consider the centrality, the
25      importance of Eli Riesel in the family structure.  Not only has
```

 1   the Court heard abundant evidence of his role and his family,

 2   the bread winner, his dedication to the family but in that

 3   process, Your Honor, the aspect of the transformation, the Eli

 4   Riesel being a different person from the snapshot of the crime,

 5   the snapshot of the involvement in real estate sales and

 6   mortgage fraud, but a snapshot of his life, a life that during

 7   that business world separated from his trajectory but for lots

 8   of reasons of a young man wanting to provide.  And it was not a

 9   satisfying life, not because of a criminal investigation, not

10   because of a criminal indictment.  It wasn't who Eli was, and

11   he began the process voluntarily without any thought other than

12   doing what's right for himself, his family and his community,

13   returned to what he had known, returned to Torah, returned to

14   God, and it made his family better.

15           He became far more central to his family and the role,

16   but his family has gone beyond his wife, his parents, his

17   children.  He has a central role in the community, a role that

18   makes clear that the misdeeds of the past, the crimes of the

19   past are not only beyond Eli Riesel, but he has made, by his

20   own actions, a positive determination to separate from any

21   aspect of that life, in his own way to make that repentance,

22   that rehabilitation, that remorse that sometimes is called for

23   not because he has $12 million to repay to banks but to do it

24   by his own life, his own time and his dedication to that which

25   is important.

```
 1            We have given the Court cases, the Clay case, the
 2    Prospere case where courts even under circumstances where
 3    individuals go to trial, as Eli did, even under circumstances
 4    where individuals have significant guidelines, that the Court
 5    has abundant authority and discretion under the unique
 6    circumstances of this case all fully developed in the
 7    sentencing memoranda but focused on Eli, his life with his
 8    family and what Eli has done to repair the family structure
 9    that really was falling apart during his foray in the business
10    world, and why Eli is important to that and why this Court
11    should consider that, his role in reforming himself, himself
12    and helping others in the process recognize that in the choices
13    we make in life, whether they be in the business world -- and
14    the Court saw from the video, the bulk of the adult students at
15    the Kollel are not full-time committed to studying, to
16    learning.  They are people who are trying to balance their
17    business world with their spiritual world.
18            Eli helps them not just in a spiritual, a Torah
19    perspective, but in a choice perspective.  You have heard his
20    guidance and one of the aspects Eli has worked on through the
21    Kollel, through his community, things he is doing today, you
22    have seen it in the letters, Eli has sought out how he can
23    better the lives of children, not just Jewish children but
24    children in the community to help them value learning, to help
25    them value moral choices, choices that he sadly moved away from
```

1   during his time in the business world, but came to embrace.

2   That's the Eli who stands before you and that's the Eli that

3   warrants a significant variance from the advisory guidelines.

4   We believe a variance that allows the Court to move into a Zone

5   C is appropriate under the circumstances of this case and given

6   the Court's treatment of the various offenders in this case is

7   appropriate punishment for Eli Riesel for his role and an

8   appropriate statement to others that the Eli Riesel who is here

9   before you is an example of what deterrence and compassion can

10   be and we think that's appropriate under the circumstances,

11   Your Honor.

12           We will reserve Mr. Riesel's statement until the

13   conclusion.

14           THE COURT:  All right.  Thank you.

15           Mr. Capone.

16           MR. CAPONE:  The presentence report shows that

17   Mr. Riesel worked for the Berkowitz companies for six years,

18   from 2006 to 2012, before he began teaching in Miami Beach.  He

19   was a real estate developer during that time.  He was an owner,

20   part owner of a company.  He was in the business of buying and

21   selling condominiums on a big scale, not just on the east coast

22   of Florida but on the west coast of Florida.

23           Mr. Riesel had an advantaged upbringing.  In your time

24   as a judge on the state bench and here I am sure you have seen

25   many defendants who had a disadvantaged upbringing and when

1    they come before you having committed a crime, perhaps it was a

2    crime of impulse and perhaps that impulsive crime was based on

3    a disadvantaged upbringing.

4          You have before you a man who came from an advantaged

5    background.  He had a loving family.  He had support.  He had

6    friends.  And so when got involved in the real estate business,

7    he didn't do this because of an impulse.  He didn't do this

8    because of some thing that happened in his background which led

9    him to a life of crime.  He made a deliberate choice to

10   participate with his boss and others in this scheme.

11         This is not an isolated incident.  It's a wide-ranging

12   scheme.  It started at Kensington in the fall of '07 and didn't

13   finish until at least the spring or summer of '09.  And there

14   were other complexes in Tampa that started before this.  We are

15   talking about six years of wide-ranging conduct, not an

16   isolated incident.  We are not talking about a person with a

17   disadvantaged background.  We are talking about somebody with

18   an advantaged background.  This was a deliberate, thoughtful

19   choice that he made.

20         The victims in this case aren't just the big banks.

21   It's easy to point to the big banks and say, it's their fault

22   or they should have known better or whatever the case may be.

23   But most of the people who bought these condos as,

24   quote-unquote, investors, were unsophisticated.  Many of them

25   were Spanish speaking only and were asked to sign stacks of

1    documents, including the sale and purchase agreement signed by

2    Mr. Riesel that they didn't understand, with this notion that

3    somehow they can own condos and not have to put up any of their

4    own money.   Their credit was ruined.   They had financial

5    problems that resulted from this, and there are other victims

6    as well.

7          The people who owned the condo next door to the one

8    Mr. Riesel sold, the guy who bought the condo before Kensington

9    bought it who lived there back in 2004, 2005, maybe bought the

10   condo from Carmelken, seen the value of his condo crash because

11   of the massive fraud that went on there, 70 percent foreclosure

12   rate.   I submitted to the Court with my sentencing memoranda an

13   exposé done by the Palm Beach Post about the Kensington

14   property.   It's a mess.   Less than two years after Mr. Riesel

15   began selling condos there, it became a mess.   Those people are

16   victims as well.

17         Mr. Riesel is very different from the other defendants

18   who have appeared before you and before the other judges who

19   have handled guilty pleas of codefendants and co-conspirators.

20   Those other people admitted their wrongdoing very early.   They

21   came in very early.   They acknowledged what they had done wrong

22   and they tried to make it right by cooperating with the

23   Government's investigation.

24         We offered Mr. Riesel the opportunity six months before

25   he was first charged to come in, acknowledge what he had done

 1    wrong, assist the Government to try to make this right.  We

 2    were rebuffed.

 3            He has every right to go to trial.  He has every right

 4    to turn us down and put us to our proof, but now after he has

 5    been convicted to come back and ask you for the same break that

 6    everyone else gets, who came in early, who acknowledged their

 7    wrongdoing, not qualified, unqualified acknowledgment of their

 8    wrongdoing, he wants you to give him the same break that all

 9    these other people got.

10            I suggest, Your Honor, that does not promote respect

11    for the law.  I request that you impose a sentence within the

12    applicable guideline range.

13            THE COURT:  All right.  Thank you.

14            Mr. Riesel, is there anything you would like to say

15    before I impose a sentence?

16            THE DEFENDANT:  Yes.

17            MR. KUEHNE:  Your Honor, as Mr. Riesel speaks, I did

18    want to point out to the Court that the Government's

19    description of Mr. Riesel's employment with the Berkowitz Group

20    is simply wrong.  There was only a small period of time when

21    Eli Riesel was involved in the development business.  His work

22    after Kensington closed had nothing to do with condo sales.  He

23    did completely other activity for the Berkowitz Group as he

24    worked his way out of the business world.  It was only a small

25    fraction of the six years that Eli Riesel worked with the

1    Berkowitz Group that he was involved in any way in the sales of

2    condominiums.

3            Eli, would you like to speak to Judge Gayles about your

4    sentencing?

5            THE DEFENDANT:  Yes.  Your Honor, in the Judaism, we

6    have a passage, I will say it in Hebrew but I will translate.

7    (Speaking in Hebrew), which means, translated, speak little,

8    but do much.

9            Your Honor, I realize that many people stand before you

10   and they say that they regret and they have remorse for actions

11   that they have done in the past.  I, too, regret and have

12   remorse for actions I have done in the past, but this is not a

13   new idea.  I have regretted this and I have had remorse many

14   years ago, as you heard from many of the speakers.  But I moved

15   away.  I moved away from spirituality.  I moved away from the

16   upbringing that I had.

17           I had a very strong upbringing with teachers, parents,

18   advisors and a whole community to look up to who taught me very

19   clear ethics and morals and that is all true, and I am

20   appreciative and privileged to have had that upbringing.  My

21   remorse didn't start today, my remorse -- before you.  My

22   remorse and regret doesn't begin today.  It doesn't start now.

23   My remorse began back in 2008 towards the end of the year when

24   I started feeling that I moved away from the upbringing that I

25   had, that I made the mistake of distancing myself from the

1  mentors and teachers that I closely relied on with the very

2  close relationships as a teenager and as a young adult.

3          I feel that this move away from my spirituality led me

4  to the process or led me to be part of a process which caused

5  dramatic damage and I have tremendous regret and remorse about

6  that, but as I began this statement, speak little but do much.

7          Your Honor, I didn't only have regret years ago as

8  stated by my mentors and teachers and rabbis and friends, but I

9  acted upon this remorse and regret.  I turned it into action.

10 My life was in many different areas very complicated.  Besides

11 moving away from my family, their spiritual, most of my

12 brother-in-laws have been in the trial and some of them are

13 here at various times.  They all look the way I do today.  I

14 didn't look like that in 2007, 2008.  As you see in the video,

15 you see a different look.  I look different.  I act different.

16 I am different.

17         I regretted that I moved away from there and I feel

18 that this led me to be able to become part of a process which

19 caused dramatic damage.  But the actions that I took upon this

20 remorse was to change myself.  Just to sit there and feel bad

21 doesn't help anybody and I made strong decisions to correct a

22 lot of these complicated parts of my life.

23         Me and my wife worked extremely hard on our marriage

24 and I began starting to reconnect with my mentors and teachers

25 who I today have reconnected with and I am extremely close

1   with.

2           So my remorse and regret I feel has turned into action.

3   I began by studying.  About six or seven years ago, in the end

4   of 2008, beginning of 2009, I began by increasing my study,

5   which you heard, the way that our religion works we feel that

6   the study of Torah is our number one ability to connect with

7   God and I wanted to go to the top.  I knew that this was going

8   to be a difficult process.  I was involved in things that took

9   me away, far away from where I started out, and I wanted to

10  start at the top.  I went to study under rabbis and leaders who

11  you have heard from today who are known as some of the most

12  brilliant and dedicated minds in Talmud, not just your average

13  teacher of a seminar, but these are the top and that's who we

14  have brought before you today.  I have become very close to

15  them.

16          I began by studying three to four hours in synagogue,

17  during lunch breaks, early morning before work and after work

18  as rehabilitation to try to get back to where I was.  I was a

19  little bit out of place because I wasn't really part of an

20  organization.  I was too old.  I was 26 at that time, 27 at

21  that time when I started this process, too old to be a student.

22  Most of the students are in their young twenties or early teens

23  and a little bit too old young to be a rabbi.  I was a little

24  bit out of place.

25          Nevertheless, this is what I needed to go to and I

 1    needed to get back to where I was and I wasn't going to let a

 2    few bad years of mistakes change my life forever.

 3          Those three or four hours became extremely important to

 4    me and I realized what I had lost by making these bad

 5    decisions.  I decided July 1st of 2012 -- I had a conversation

 6    with my boss previous to that -- but July 1st, 2012, was the

 7    day that I started a full-time endeavor which consists of 10 to

 8    12 hours per day of intense studying.  This is not sitting in a

 9    library reading a book.  These are lively discussions on some

10    of the most complicated legal aspects in Jewish law.

11          I can assure Your Honor that this is a great

12    undertaking, an extreme dedication and commitment by me, my

13    family and the community at large.

14          I am pleased to tell Your Honor that I am in the midst

15    of publishing my own book of commentary on one of the Tractates

16    of the Talmud with the advice and with the pushing of some of

17    my mentors who are leading scholars in Talmud.  My book has

18    been complete and it's actually in the process of being edited.

19          I am so careful to respect other people's property and

20    it pains me and brings me to large remorse to have known that I

21    was part of a process which caused tremendous damage.  Speak

22    little but do much.

23          Your Honor, this is not even enough for me.  Just

24    changing myself wasn't enough.  I have taken it as my personal

25    responsibility to use some of the knowledge and experiences

1    that I have had, unfortunately, but to use those to better

2    connect with people who find themselves currently in the

3    business world.  Many rabbis never experienced any part of

4    business, let alone a struggle in business.  I am able to use

5    my dual curriculum.  I study the Talmud vehemently, as I

6    discussed, but I have had tremendous experiences, unfortunately

7    as we have heard throughout this trial, but I use those

8    experiences to act so that other people don't find themselves

9    as young people in their early twenties in similar situations

10   where they can potentially make large mistakes and lose the

11   connection that they have with their own advisors.

12          I am adamant to remain connected with them, even if

13   this means I can only make it for 20 to 30 minutes a week, but

14   as long as we are connected and they are coming into temple, I

15   feel that I can keep them away and keep them with the high

16   standards that I now work with that I walked away from seven

17   years ago.

18          I thereby ask Your Honor to view me as a changed

19   person, someone who not only stands before you and speaks about

20   remorse and regret, but someone who has acted upon that remorse

21   and regret to change myself, my family and the community at

22   large.  I ask you to view me as a rehabilitated person so that

23   I may continue to serve the community in the most effective way

24   possible.

25          Thank you.

1          THE COURT:  Thank you.

2          You know, I start by talking about the offense and I

3    have said this at the sentencing hearing for at least one other

4    codefendants but this type of crime, as Mr. Riesel just said --

5    he used the word damaging.  It's not just damaging.  It's

6    far-reaching.  There are many untold victims of mortgage fraud.

7    There, of course, are the banks.  Those are the ones that we

8    have talked about primarily through this trial and sentencing

9    hearing.  There are the purchasers, some of whom were

10   unsophisticated but -- and they were left, after all was said

11   and done, with properties they could not afford.  They lost

12   their credit among other things.  Those are the identifiable

13   victims.

14         There are the other people with units near or about the

15   units at issue who saw their property values diminish and also

16   faced with the prospect of not being able to sell their

17   properties.  They, too, are victims.

18         There are countless people throughout the community

19   that can no longer obtain mortgages for their properties or

20   obtain mortgages to purchase a property because banks are

21   reticent to do that because of the type of fraud at issue in

22   this case.  So, you know, there are so many people in the

23   community that work hard that play by the rules and they are

24   victims of situations for which they had no involvement and

25   that is the unfortunate aspect of all of this.

1            With any sentencing, and I have done many, the thing to

2    always remember is the defendant before you is an individual

3    and you balance the severity of any offense with the individual

4    and you try to fashion an appropriate sentence.

5            In this case, the reduced guideline range based on my

6    sustaining one or more of the objections is 87 to 108 months.

7    That is for a total offense level of 29 with a criminal history

8    category of one.  In years, that roughly calculates to a little

9    more than seven years to nine years, and in deciding what an

10   appropriate sentence is, again, you balance the offense, the

11   unique factors in the offense with Mr. Riesel as an individual.

12           I have considered the fact that he has no prior

13   criminal history.  I have considered among all the statutory

14   factors as well as the amount of time that has passed since the

15   criminal activity ceased in this case.  I have considered the

16   sentences of the codefendants or co-conspirators because some

17   were in this -- under this case number.  Some were sentenced by

18   Judge Marra and one is to be sentenced by Judge Middlebrooks,

19   and I have also considered the unlikelihood of the defendant

20   re-offending and I can easily make that finding based obviously

21   on the people that are here and what has been said.

22           I am mindful that the defendant seemed to have taken a

23   different path long before the Government approached him about

24   the criminal activity in this case, and I also consider, of

25   course, the defendant's age at the time the event happened.

1          Among the letters that I received was one, obviously,

2     from Mr. Riesel himself which provided I think a useful

3     explanation as well as his words here today, and I have no

4     doubt that as Mr. Riesel said in your letter that you lost

5     sight for a time of the spiritual moral values that guided you

6     throughout your young adulthood and, unfortunately, I think

7     that is precisely what landed you in this situation.

8          Based upon my consideration of the facts in this case,

9     Mr. Riesel's unique situation, considering and applying the

10    statutory factors, I do find that a variance is appropriate.

11         So the Court having considered the statements of all of

12    the parties, the Presentence Report which contains the advisory

13    guidelines and the statutory factors set forth in Title 18,

14    United States Code, Section 3553(a), it is the finding of the

15    Court that the defendant is not presently able to pay a fine or

16    restitution at this time.

17         It is the judgment of the Court that the defendant, Eli

18    Riesel, is committed to the Bureau of Prisons to be imprisoned

19    for 36 months as to Count 1.  It is further ordered that the

20    defendant shall make restitution in the amount of $12,500,000,

21    which shall be joint and several with his codefendants, Rashmi

22    Airan-Pace, Jordana Ende-Tobel and Luis Tezanos, as well as

23    Jose Aller and Ernesto Rodriguez in Case Number 13-80194-CR-

24    Marra, and Jose Cossio in Case Number 14-80137-CR-Marra.

25         During the period of incarceration, payment shall be

1    made as follows.  If the defendant earns wages in a federal

2    prison industries, also known as UNICOR, job, then the

3    defendant must pay 50 percent of his wages earned for the

4    financial obligations imposed by this judgment.

5           If the defendant does not work in a UNICOR job, then

6    the defendant must pay a minimum of $25 per quarter toward the

7    financial obligations imposed in the order.

8           Upon release from incarceration, the defendant shall

9    pay restitution at the rate of ten percent of his monthly gross

10   earnings until such time as the Court may alter the payment

11   schedule in the interest of justice.  The U.S. Bureau of

12   Prisons, the U.S. Probation office and the U.S. Attorney's

13   office shall monitor the payment of restitution and report to

14   the Court any material change in the defendant's ability to

15   pay.

16          These payments do not preclude the Government from

17   using any other anticipated or unexpected financial gains,

18   assets or income of the defendant to satisfy the restitution

19   obligations.

20          The restitution shall be made payable to the Clerk of

21   the Court of the United States Courts and forwarded to the U.S.

22   Clerk's Office here in this courthouse in Room 8N09, and

23   restitution will be forwarded by the Clerk of the Court to the

24   victims.

25          Upon release of imprisonment, the defendant shall be

```
 1   placed on supervised release for a term of three years as to

 2   Count 1.

 3           Within 72 hours of release from the custody of the

 4   Bureau of Prisons, the defendant shall report in person to the

 5   probation office in the district where he is released.  While

 6   on supervised release, the defendant shall not commit any

 7   crimes.  He shall be prohibited from possessing a firearm or

 8   ammunition or other dangerous devices.  He shall not possess a

 9   controlled substance.  He shall cooperate in the collection of

10   DNA and shall comply with the standard conditions of supervised

11   release, including the following special conditions:

12           The defendant shall comply with the financial

13   disclosure requirement, the related concern restriction, and

14   the self-employment restrictions as all noted in Part G of the

15   Presentence Report.

16           The defendant shall also successfully complete 200

17   community service hours at a minimum of ten hours per month

18   until they are completed.  And the defendant shall -- or it is

19   ordered that the defendant shall pay immediately to the United

20   States a special assessment of $100 as to Count 1.

21           I will say that -- well, first let me say, in sum, the

22   total sentence is 36 months of imprisonment, to be followed by

23   three years of supervised release with the special conditions

24   and the standard conditions that I've articulated, including

25   12,500,000 in restitution, a $100 special assessment, and the
```

```
 1   200 community service hours.

 2         I do want to note that I find this to be an appropriate

 3   sentence even considering the objections that I overruled and

 4   also considering the jury's verdict in part -- in part varied

 5   from the guideline range because I think the jury's verdict has

 6   to have meaning.

 7         The defendant was convicted of Count 1, but he was

 8   found not guilty of the substantive counts and there could be

 9   any number of reasons for that, but I do find that this

10   sentence is appropriate under the circumstances.

11         And I will say finally, while I don't believe

12   Mr. Riesel will re-offend, there are a couple of things that

13   stood out to me that I heard during the hearing.  One, I think,

14   was used by Mr. Riesel using experiences, which I think is

15   appropriate.  Going forward you will have the opportunity to

16   use your experiences, Mr. Riesel, in this case as a teaching

17   moment for others.

18         There are so many people, particularly younger people

19   that need to hear about what happened to you and your story and

20   the lessons that you have learned and hopefully you will use

21   this unfortunate situation as an opportunity to impart those

22   lessons.

23         Someone, I don't know if it was in the video or one of

24   the rabbis that spoke earlier, but someone said he has a good

25   name and you still have a good name.  The issue is how you go
```

1   forward from this situation and hopefully both you and your

2   family will come out of this unfortunate situation in a much

3   better situation.

4        Now that sentence has been imposed, does the defendant

5   or counsel object to the Court's finding of fact or the manner

6   in which sentence was pronounced?

7        MR. KUEHNE:  Your Honor, before I do that, I would ask

8   the Court for purposes of record, record development, if the

9   Court did consider the concept of post offense rehabilitation

10  since that is a recognized variance factor.  It sounds as

11  though the Court did, but I don't think the Court articulated

12  that.  It would be helpful for this record if any aspect of the

13  Court's variance included at least the Court's commentary of

14  having considered post offense rehabilitation, since that's the

15  language used in the Court decisions.

16       THE COURT:  I did consider that.

17       MR. KUEHNE:  Thank you, Judge.  There are no reasons

18  that Mr. Riesel has to object to the manner of imposition of

19  sentence.  We do preserve all the other arguments presented and

20  thoughtful decisions made by the Court.

21       THE COURT:  All right.  Those objections will be

22  considered preserved.

23       Mr. Riesel, you do have the right to appeal your

24  sentence.  Any notice of appeal must be filed within 14 days

25  after entry of the judgment.  If you are unable to pay the cost

1    of an appeal, you may apply for leave to appeal in forma

2    pauperis.

3           Are there any recommendations?

4           MR. KUEHNE:  Your Honor, Mr. Riesel asked the Court to

5    consider in its discretion authorizing a voluntary surrender in

6    60 days to allow Mr. Riesel to transition from the Kollel to

7    have his family fully taken care of.  It will also allow the

8    U.S. Bureau of Prisons sufficient time to designate Mr. Riesel

9    to an appropriate facility, thereby saving the Government

10   significant funds from not having to transport Mr. Riesel.

11          He is on bond and has continued to abide by every

12   condition of bond.

13          THE COURT:  Okay.

14          MR. KUEHNE:  We will also ask this Court to consider a

15   facility close to South Florida.  There are some in Miami-Dade

16   County and then Orlando, but we would ask the Court to consider

17   recommending a facility close to South Florida.

18          Judge, as I go through the calendar, it's mid July.

19   The religious holidays, and the Court knows that Mr. Riesel

20   does, and his community do respect the religious holidays.  I

21   would ask if the Court could just give me a moment.  It's

22   around 60 days, but it may be a little bit more than 60 days,

23   to look for those dates and we would ask specifically for an

24   opportunity to voluntary surrender after the religious holiday

25   that would allow Mr. Riesel to fully observe the holidays with

1    his family.

2            THE COURT:  All right.  If you want to take a moment to

3    find out those holidays.

4            Is there any objection to the designation in a South

5    Florida facility?

6            MR. CAPONE:  No, Your Honor.  No objection.  I do need

7    to note some of the Government objections for purposes of the

8    appellate record.

9            The Government objects to the Court's loss finding,

10   role finding, as well as the variance, the basis and the length

11   of the variance.

12           Thank you.

13           THE COURT:  Okay.  Your objections are noted.

14           MR. KUEHNE:  Your Honor, I was just a slight bit off.

15   The Jewish holidays end with October 6th as the last date for

16   observing Sukkot and we would ask the Court to authorize a

17   voluntary surrender on October 7th or 8th.  That would be the

18   day after the formal holidays end.

19           And as the Court may be reminded from having considered

20   one of the travel, the Jewish holidays extend not only to Yom

21   Kippur and Rosh Hashanah, but the following days for Sukkot,

22   also an important part of the high holidays.

23           THE COURT:  All right.  Is there an objection to

24   surrender on October 7th?

25           MR. CAPONE:  I will defer to the Court's discretion.

1          THE COURT:  All right.  That will be fine.

2          Mr. Riesel, you shall surrender for service of your

3    sentence at the institution designated by the Bureau of

4    Prisons.

5          MR. KUEHNE:  Your Honor, there is one item, and I am

6    not certain it needs a recommendation but it would not hurt to

7    recommend that the Bureau of Prisons in determining the

8    appropriateness of a facility consider the availability of a

9    Kosher diet, something that Mr. Riesel utilizes as his

10   religious and life choice for a significant amount of time.

11         THE COURT:  All right.  I will make that recommendation

12   as well.

13         Again, sir, you shall surrender for service of your

14   sentence at the institution designated by the Bureau of Prisons

15   on or before 12:00 p.m. on October 7th, 2015.  If you have not

16   received a designation by October 5th, you shall surrender to

17   the U.S. Marshal Service for the Southern District of Florida

18   in the Atkins Courthouse, which is right across the street from

19   this courthouse, at that same time, 12:00 p.m., on October 7th,

20   2015.

21         Do you understand?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Okay.  Anything else today on behalf of the

24   Government?

25         MR. CAPONE:  No, Your Honor.

```
 1              THE COURT:  Was there any forfeiture -- there was a
 2    forfeiture provision, was there not?
 3              MR. CAPONE:  It was agreed to and the Court entered an
 4    order of forfeiture.
 5              THE COURT:  All right.  That will be incorporated in
 6    the judgment.  Anything else on behalf of the defense?
 7              MR. KUEHNE:  No, Your Honor.  Thank you for allowing us
 8    to make the presentation today.
 9              THE COURT:  All right.  Thank you very much.
10              COURT SECURITY OFFICER:  All rise.
11              (Proceedings concluded at 1:23 p.m.)
12
13                     C E R T I F I C A T E
14
15
16          I hereby certify that the foregoing is an
      accurate transcription of the proceedings in the
17
      above-entitled matter.
18
19
20    September 16, 2015   /s/Patricia Diaz
      DATE                 PATRICIA DIAZ, RPR, FPR, FCRR
21                         Official Court Reporter
                           United States District Court
22                         400 North Miami Avenue, Eleventh Floor
                           Miami, Florida 33128
23                         (305) 523-5178
24
25
```